IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RALPH NADER, PETER MIGUEL CAMEJO, ROBERT H. STIVER, MICHAEL A. PEROUTKA, CHUCK BALDWIN, AND DAVID W. PORTER,<br><br>        Plaintiffs,<br><br>    `  vs.<br><br>DWAYNE D. YOSHINA, Chief Election officer, State of Hawaii,<br><br>        Defendant. | CIVIL NO. 04-00611 JMS/LEK |

MEMORANDUM IN SUPPORT

I.    BACKGROUND

A.    PROCEDURAL FRAMEWORK FOR ACCESS TO THE PRESIDENTIAL BALLOT IN HAWAII

In Hawaii, there are two separate and distinct ways a candidate can qualify

for inclusion on the general election presidential ballot: (1) a qualified political

party can designate a candidate; or (2) an individual can petition to be on the

presidential ballot.  Hawaii Revised Statutes (HRS) § 11-113(c)(1) & (2).

263169_8.DOC

1.    ACCESS TO THE PRESIDENTIAL BALLOT VIA
      QUALIFIED POLITICAL PARTY

First, a group seeking to "qualify" as a political party must meet the

requirements set forth in HRS §§ 11-61 to 11-64.  Pursuant to HRS § 11-62, any

group desiring to qualify as a political party for election ballot purposes must file a

petition with the Chief Election Officer, no later than 4:30 p.m. on the one hundred

seventieth day prior to the next primary.  The petition to qualify as a political party

must contain, *inter alia*, the signatures of currently registered voters which

constitute no less than one-tenth of one percent of the total registered voters of the

State as of the last preceding general election. HRS § 11-62(a)(3).  A political

party maintains its "qualified" status by meeting the requirements set forth in HRS

§§ 11-61 to 11-64.  If a group qualifies as a political party for three consecutive

general elections either by petition or pursuant to the requirements set forth in HRS

§ 11-61(b), that group is deemed a political party for the following ten-year period.

HRS § 11-62(d).

As of the last preceding general election held in 2002, there were 676,242

voters registered in Hawaii.  Declaration of Yoshina at ¶ 4.[1]  Therefore, the

---

[1]    Defendant incorporates by reference the Declaration of Dwayne D. Yoshina,
dated October 12, 2004, attached to Defendant's Memorandum in Opposition to
Plaintiffs' Motions for Temporary Restraining Order/Preliminary Injunction, filed
October 12, 2004.  For ease of reference a copy of the Declaration of Dwayne D.
Yoshina, dated October 12, 2004, is attached as Exhibit 14. Defendant Dwayne D.

signature requirement to qualify as a political party for the 2004 election was 677

and the deadline to file a petition to qualify as a political party was April 1, 2004.

Declaration of Yoshina at ¶ 5 & 6.  Once a group is recognized as a qualified

political party, it can file an application to place a presidential candidate on the

primary and general election ballot.  HRS § 11-113(c)(1).

> 2.    ACCESS TO THE PRESIDENTIAL BALLOT VIA
>        PETITION

Individuals, parties or groups that are not considered "qualified political

parties" can petition the Chief Election Officer to place candidates on the general

election presidential ballot, as set forth in HRS § 11-113(c)(2).  Individuals

desiring to place candidates' names on the general election presidential ballot must

file an application and a petition that meets certain statutory requirements.  HRS §

11-113(c)(2).  The petition must: (1) be on the form prescribed and provided by the

Chief Election Officer; (2) be filed no later than 4:30 p.m. on the sixtieth day prior

to the general election; and (3) contain the signatures of currently registered voters

---

Yoshina, who was sued in his official capacity as the Chief Election Officer, has
subsequently retired.  Upon information and belief it is understood that he no
longer resides on the Island of Oahu and may have moved to the Big Island of
Hawaii.  Currently the Election Commission which appoints the Chief Election
Officer is searching for a replacement. The Election Commission has appointed
Office of Election employee Rex Quidilla as the Interim Chief Election Officer,
while it conducts its search.  It is unclear when the search will be completed, but it
may optimistically be done by the end of this year, as the Election Commission is
meeting on December 4, 2007 to discuss the finalists for the position.

which constitute no less than one percent of the votes cast in the State at the last presidential election. Id.

In the 2000 presidential election, 371,033 votes were cast in Hawaii. Therefore, in 2004, an individual who is not a qualified political party petitioning for a candidate to be included on the general election presidential ballot was required to submit at least 3,711 signatures by September 3, 2004. Declaration of Yoshina at ¶ 8.

3.    VERIFICATION OF SIGNATURES ON PETITIONS, NOTIFICATION OF APPLICANTS AND OBJECTIONS

Once filed, the signatures on the petitions described in the two preceding sections are verified by the Chief Election Officer using the procedures set forth in HRS § 11-113 and the implementing administrative rules, Hawaii Administrative Rules (HAR) §§ 2-51-110 through 2-51-113.

No later than 4:30 p.m. on the tenth business day after filing, the Office of Elections informs the qualified political party or individual applicant of their eligibility or disqualification for placement on the ballot. HRS § 11-113(d). The Chief Election Officer can extend this notification period up to five additional business days if he provides notice of the extension and the reasons for the extension. Id.

In 2004, the deadline to inform applicants of their eligibility for placement on the presidential ballot was September 20, 2004 and the extension deadline was September 27, 2004. Declaration of Yoshina at ¶ 9.

An applicant can object to the eligibility determination of the Chief Election Officer, by filing a written request for a contested case hearing no later than 4:30 p.m. on the fifth day after the finding. HRS § 11-113(e). After receiving such a request, the Chief Election Officer must hold a hearing no later than 4:30 p.m. on the tenth day after the receipt of the request for the hearing. Id. The hearing is conducted in accordance with HRS chapter 91. Id. The Chief Election Officer must issue his decision no later than 4:30 p.m. on the fifth day after the conclusion of the hearing. Id. Pursuant to HRS § 91-14, either party can appeal the Chief Election Officer's decision to Circuit Court within 30 days.

B.    STATEMENT OF FACTS

On September 3, 2004, Mr. David Porter, the Hawaii Coordinator for the Peroutka for President 2004 Campaign, filed an application and petition with the Chief Election Officer to have presidential candidate Michael A. Peroutka and vice-presidential candidate Chuck Baldwin placed on the general election ballot in Hawaii. That same day, Mr. Robert Stiver filed an application and petition on behalf of the Nader for President 2004 Campaign to have presidential candidate

Ralph Nader and vice-presidential candidate Peter Miguel Camejo placed on the general election ballot in Hawaii.

On September 20, 2004, the Office of Elections informed Mr. Porter and Mr. Stiver that their respective campaigns had failed to obtain the necessary amount of valid signatures. See Exhibits 1 & 2. Subsequently, after proofing its calculations, on September 24, 2004, the Office of Elections informed both campaigns of the revised amount of signatures each had obtained. See Exhibits 3 & 4.

On September 23, 2004, the Nader Campaign representative, Robert Stiver, requested a Chapter 91 hearing. The Nader hearing commenced on September 29, 2004. Prior to the conclusion of the hearing, the Office of Elections and the Nader Campaign entered into a settlement agreement (the Nader Settlement Agreement). See Exhibit 5. On October 1, 2004, the Chief Election Officer approved the Nader Settlement Agreement, which provides that the signatures on the petition submitted by the Nader Campaign would be reviewed again in the presence of a Nader representative. During the review, the Nader representative would be allowed to flag the signatures he believed should have been counted. Id. Finally, pursuant to the Nader Settlement Agreement, the Chief Election Officer would subsequently review the challenged signatures and his decision would be final. Id.

On September 24, 2004, the Peroutka Campaign requested a Chapter 91 hearing. The hearing took place on September 30, 2004 and the Chief Election

Officer issued his decision on October 5, 2004 (the Peroutka Decision).  See

Exhibit 6.  In the Peroutka Decision, the Chief Election Officer concluded that the

Peroutka Campaign submitted an insufficient amount of valid signatures and,

therefore, Michael A. Peroutka and Chuck Baldwin were not eligible to be placed

on the presidential ballot.  See Exhibit 6 at ¶ 7.

On September 28, 2004, election officials began mailing out overseas ballots

in order to provide overseas voters sufficient time to receive, vote, and return

ballots by mail to the election officials by the date of the election.  The mail out

was done on this date in order to comply with the Uniformed and Overseas

Citizens Absentee Voting Act (UOCAVA) 42 USC 1973ff et seq.  UOCAVA

requires each State to "permit absent uniformed service voters and overseas voters

to use absentee registration procedures and to vote by absentee ballot in general,

special, primary, and runoff elections for Federal office." 42 USC § 1973ff-1(1).

Declaration of Yoshina at ¶¶ 16 & 17.

On October 8, 2004, Plaintiffs filed the present lawsuit taking issue with the

constitutionality of the State's requirements that (1) independent candidates for

president must obtain more signatures than a candidate from a recognized political

party and (2) the verification procedures of the Office of Elections.

On October 11, 2004, Plaintiffs filed their Motion for Preliminary Injunction

and on October 12, 2004 Plaintiffs filed their Motion for Temporary Restraining

Order.  Defendant filed its Memorandum in Opposition to the motions on October 12, 2004.  On October 13, 2004, the Honorable David Alan Ezra denied Plaintiff's Motions for Temporary Restraining Order/Preliminary Injunction.

On October 18, 2004, the Chief Election Officer issued his findings that the Nader Campaign had failed to obtain the requisite amount of valid signatures required by Hawaii Revised Statutes § 11-113.  See Exhibit 7.  On October 18, 2004, Plaintiffs filed appeals in Circuit Court regarding the determination that both the Nader and Peroutka Campaigns had failed to obtain the requisite amount of valid signatures to be placed on the ballot. Nader, et al. v. Yoshina, Civ. No. 04-1-1905-10 SSM and Peroutka, et al. v. Yoshina, Civ. No. 04-1-1904-10 SSM.  See Exhibits 8 & 9.

The Honorable Sabrina S. McKenna heard both cases on November 1, 2004.  She orally affirmed the underlying administrative decisions that same day.  The General Election occurred on November 2, 2004.  The written decisions of the Court for both cases were issued on November 23, 2004.  See Exhibits A & B to Exhibit 10 (Appellants' Joint Notice of Appeal).  Final judgment in both cases was filed on April 5, 2005.  See Exhibits C & D to Exhibit 10.

A joint notice of appeal was filed on April 13, 2005.  See Exhibit 10.  The Peroutka appeal was assigned Supreme Court No. 27233 and the Nader Appeal was assigned Supreme Court No. 27234.  The Supreme Court of Hawaii

consolidated the two cases for purposes of briefing and disposition under Supreme Court No. 27233. Appellant's Joint Opening Brief was filed on July 22, 2005. See Exhibit 11 (Joint Opening Brief). Appellee's Answering Brief was filed on September 30, 2005. See Exhibit 12 (Answering Brief). Appellant's Reply Brief was filed on October 11, 2005. See Exhibit 13 (Reply Brief).

On July 13, 2005, Defendant filed a motion to dismiss based on the Younger abstention doctrine, given the pending Hawaii Supreme Court cases. Plaintiffs filed their memorandum in opposition on September 25, 2005. On October 6, 2005, the present case was reassigned to the Honorable J. Michael Seabright. A hearing on Defendant's motion was held on October 13, 2005. The parties orally agreed at that time to stipulate to staying the proceedings until the resolution of appeals before the Hawaii Supreme Court. A formal stipulation was submitted and granted on October 28, 2005 staying the proceedings.

On March 31, 2006, the Court, in order to avoid leaving the motion unresolved for an extended period of time, denied without prejudice Defendant's Motion to Dismiss.

Given the significant delay in obtaining a decision from the Hawaii Supreme Court, on November 1, 2007, during a status conference, the Court lifted the stay. On November 13, 2007, the parties met with the Honorable Leslie E. Kobayashi for purposes of setting a new trial date. A bench trial was set for March 4, 2008

263169_8.DOC

9

before the Honorable J. Michael Seabright. The final pretrial conference was set

for January 22, 2008, and the deadline for motions was set for December 4, 2007.

On November 14, 2007, the Hawaii Supreme Court issued a minute order

indicating that it did not believe oral argument was necessary before disposition

and provided the parties ten days to file a motion for the retention of oral

argument, if either party sought oral argument. Neither party requested the

opportunity for oral argument. The Hawaii Supreme Court as of this time has not

issued a decision.

II.     STANDARD OF REVIEW

     A.     DISMISSAL DUE TO A LACK OF SUBJECT MATTER
          JURISDICTION

In the context of a motion to dismiss for lack of subject matter jurisdiction

under Fed. R. Civ. P. 12(b)(1) the plaintiff's allegations are not presumed to be

truthful, and the plaintiff has the burden of proof that jurisdiction exists. The Ninth

Circuit Court of Appeals holds that:

> A motion to dismiss for lack of subject matter jurisdiction may either attack
> the allegations of the complaint or may be made as a "speaking motion"
> attacking the existence of subject matter jurisdiction in fact. Where the
> jurisdictional issue is separable from the merits of the case, the judge may
> consider the evidence presented with respect to the jurisdictional issue and
> rule on that issue, resolving factual disputes if necessary. The standards
> applicable to a Rule 12(b)(1) speaking motion differ greatly from the
> standards for ruling on a motion for summary judgment. Faced with a
> factual attack on subject matter jurisdiction, "the trial court may proceed as
> it never could under Rule 12(b)(6) or Fed.R.Civ.P. 56 . . . [N]o presumptive

truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."

Thornhill Publishing Company, Inc. v. General Telephone & Electronics Corporation, 594 F.2d 730 (9th Cir. 1979) (quoting with approval Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977) (other citations omitted, emphasis added)).

B.    DISMISSAL DUE TO A FAILURE STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Fed. R. Civ. P. 12(b)(6) permits a dismissal on "a dispositive issue of law … without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." Neitzke v. Williams, 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). On a motion to dismiss, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party." Clegg v. Cult Awareness Network, 18 F.3d 752, 753-54 (9th Cir. 1994); however, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." Id. Where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations … a claim must be dismissed." Hishon v. King & Spaulding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Furthermore, the court must dismiss allegations that are "entirely conclusory and

unsupported by any facts alleged in the complaint." Bergquist v. County of

Cochise, 806 F.2d 1364, 1369 (9th Cir. 1986).

C.    SUMMARY JUDGMENT

If matters outside of the pleadings are presented to and not excluded by the

court, then the motion is treated as a motion for summary judgment under Fed.

R. Civ. P. 56.  One of the principal purposes of summary judgment procedure is

to identify and dispose of factually unsupported claims and defenses.  Celotex

Corp. v. Catrett, 477 U.S. 316, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The United States Supreme Court described the policy served by Fed. R. Civ. P.

56 by stating that:

> Rule 56 must be construed with due regard not only for the rights of
> persons asserting claims and defenses that are adequately based in
> fact to have those claims and defenses tried to a jury, but also for the
> rights of persons opposing such claims and defenses to demonstrate
> . . . , prior to trial, that the claims and defenses have no factual
> basis.

Id. at 327.

Summary judgment must be granted against a party who fails to

demonstrate facts to establish an element essential to his or her case where the

party will bear the burden of proof of that essential element at trial.  Id. at 322.

The Ninth Circuit Court of Appeals has provided the following guidance

for the application of Rule 56:

263169_8.DOC                                12

If the party, moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment. Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in rule 56 'specific facts showing that there is a genuine issue for trial.' Hence the nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim.

T.W. Elec. Service v. Pacific Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted, emphasis in the original).

Furthermore, "[t]he mere existence of a scintilla of evidence in support of the . . . [nonmoving party's] . . .position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed 2d 202 (1986). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. T.W. Elec. Services, 809 F.2d at 630-31.

Not every disagreement about a material issue of fact precludes summary judgment. California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) cert. Denied, 484 U.S. 1006 (1988). When the moving party has carried its burden under rule 56 (c), its opponent must do more than simply show that there is some metaphysical doubt as to the

material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 586 (1986).  Legal memoranda and oral argument do not create issues of

fact capable of defeating an otherwise valid motion for summary judgment.

British Airways Bd. V. Boeing Co., 585 F. 2d 946, 952 (9th Cir. 1978).

III.    ARGUMENT

The Plaintiffs have brought this Complaint seeking federal court intervention

asserting that HRS § 11-113's different qualification requirement between political

party candidates and independent candidates is unconstitutional.  As indicated by

Defendant previously in response to Plaintiffs' Motions for Temporary Restraiing

Order /Preliminary Injunction, these different qualifications are well supported by

federal case law.

Plaintiffs, additionally, claim that the manner in which the Office of

Elections verified the signatures on the presidential petitions was unconstitutional.

However, this matter is currently being addressed by the Hawaii Supreme Court.

As such, the Court should respectfully abstain from deciding this claim.

A.      HAWAII'S DIFFERENT REQUIREMENTS FOR POLITICAL
        PARTY PRESIDENTIAL CANDIDATE AND INDEPENDENT
        CANDIDATES ARE BASED ON CONSTITUTIONALLY
        REASONABLE AND SUFFICIENT REGULATORY INTERESTS

The United States Supreme Court in Burdick v. Takushi, 504 U.S. 428, 112

S.Ct. 2059 (1992) has already conducted a review of Hawaii's ballot access laws

and determined that they pass constitutional muster.  In <u>Burdick</u>, the Supreme

Court held that Hawaii's prohibition on write-in voting does not unreasonably

infringe upon any First and Fourteenth Amendment rights because reasonable

alternatives for ballot access were available as is the case here.

When a state election law provision imposes reasonable, nondiscriminatory

restrictions upon the First and Fourteenth Amendment rights of voters, the State's

important regulatory interests are generally sufficient to justify the restrictions.

<u>See</u> <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569-1570

(1983).  In <u>Erum v. Cayetano</u>, 881 F.2d 689 (9th Cir. 1989), it was held that

Hawaii could constitutionally regulate its elections by limiting access of

nonpartisan candidates to the general election ballot and by imposing different

requirements as between nonpartisan and partisan candidates.

In <u>American Party of Texas v. White</u>, 415 U.S. 767, 94 S.Ct. 1296 (1974),

the Texas ballot qualification system was challenged which required larger parties

to demonstrate major support amongst the electorate at the last election in order to

attain ballot status and smaller parties to show support of 1% of the vote for

governor at the previous election.  The Supreme Court determined that the

requirement of the notarized signatures of 1% of the total gubernatorial votes at the

last preceding general election for minority parties and 3% or 5% for independent

candidates were not impermissible burdens on the First and Fourteenth

Amendment rights. Indeed, in <u>American Party</u>, the Court determined that Texas' system of different standards for qualification was not unconstitutional even though persons who had voted in party primaries were ineligible to sign an independent candidate's petition.

Hawaii's regulatory interests are reasonable and sufficiently justify the qualification requirements. The 1% requirement is reasonable under the <u>American Party</u> standard. In balancing that reasonable restriction with the State's interest in avoiding voter confusion and the overcrowding of the ballot, see Declaration of Yoshina at ¶ 24, the State's nondiscriminatory interest is sufficient to justify the restriction. The two paths of getting on the presidential ballot (political party or by petition) are different but both are reasonable and ensure that only candidates who can show more than a modicum of support are able to be on the ballot.

Furthermore, while the number of signatures required for a political party to put forth a candidate and an independent candidate qualifying by petition, are different, the periods for obtaining the signatures are likewise different. Thus, a group of people is able to qualify as a political party by presenting 677 valid signatures by April 1, 2004 while an independent candidate requires 3,711 but has until September 3, 2004 to obtain the requisite signatures. <u>See</u> Declaration of Yoshina, ¶¶ 25-28. Such differentiation, it is submitted, is not discriminatory, only different.

263169_8.DOC

16

In <u>American Party</u>, the Supreme Court held that:

> we think that the State's admittedly vital interests are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support.  So long as the larger parties must demonstrate major support among the electorate at the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner.  Of course, what is demanded may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot.  The Constitution requires that access to the electorate be real, not 'merely theoretical.'

<u>Id.</u> at 782-3, 94 S.Ct. 1306-07, citing <u>Jenness v. Fortson</u>, 403 U.S. 431, 439, 91 S.Ct. 1970, 1974 (1971) (footnote omitted).

The Court further explained in a footnote that:

> Appellants concede, as we think they must, that the objectives ostensibly sought by the State, viz., preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion, are compelling. ...  As we said only recently in <u>Jenness v. Fortson</u>, supra, 403 U.S., at 442, 91 S.Ct. at 1976:  'There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.'

<u>Id.</u>, n. 14 (citations omitted).

In rejecting the Appellants' argument that the State had invidiously

discriminated against the smaller parties by insisting that their nominations be

made through the convention process, rather than by primary election, because the

convention process is more burdensome, the Court held that:

> If claiming an equal protection violation, the appellants burden was
> to demonstrate in the first instance a discrimination against them of
> some substance. 'Statutes create many classifications which do not
> deny equal protection; it is only 'invidious discrimination' which
> offends the Constitution.' Appellants' burden is not satisfied by
> mere assertions that small parties must proceed by convention when
> major parties are permitted to choose their candidates by primary
> election. The procedures are different, but the Equal Protection
> Clause does not necessarily forbid the one in preference to the other.

Id. at 781-82, 94 S.Ct. at 1306 (citation omitted).

Again, further explaining in a footnote, the Court stated that:

> 'The fact that there are obvious differences in kind between the
> needs and potentials of a political party with historically established
> broad support, on the one hand, and a new or small political
> organization on the other. **(A State is not) guilty of invidious**
> **discrimination in recognizing these differences and providing**
> **different routes to the printed ballot. Sometimes the grossest**
> **discrimination can lie in treating things that are different as**
> **though they were exactly alike, a truism well illustrated in**
> **Williams v. Rhodes, supra.'**

Id., n. 13, citing Jenness v. Fortson, 403 U.S. 431, 441-42, 91 S.Ct. 1970, 1976
(1971) (emphasis added).

> B.    THE COURT SHOULD ABSTAIN FROM DETERMINING THOSE
>        CLAIMS CURRENTLY BEFORE THE HAWAII STATE
>        SUPREME COURT

Under the abstention doctrine first articulated in Younger v. Harris, 401 U.S.

37 (1971), in order to respect the "vital" federalism-based principle of "comity,"

federal courts may not issue declaratory or injunctive relief against

unconstitutional (under the U.S. Constitution) state action, if (1) the plaintiffs are,

at the time of the initiation of the federal action, parties to ongoing state

proceedings, Younger, 401 U.S. at 41, 49; Juidice v. Vail, 430 U.S. 327, 335

(1977); Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 11 (1987), (2) involving important

state interests, Juidice, 430 U.S. at 335; Pennzoil, 481 U.S. at 11, and (3) in which

they have an opportunity to present their federal constitutional claims. Younger,

401 U.S. at 49; Juidice, 430 U.S. at 337; see generally Montclair Parkowners Ass'n

v. City of Montclair, 211 F.3d 1144, 1146 (9th Cir. 2000).

In regards to the first Younger criteria of ongoing state proceedings, it is

undisputed that Plaintiffs are currently pursuing their appeals of the Circuit Court's

decisions before the Hawaii Supreme Court.

The second Younger criteria that the state proceedings involve important

state interests, is also clearly satisfied. Elections and the laws relating to elections

are of paramount state interest.

Finally, the third Younger criteria of having an opportunity to present their

federal constitutional claims, is satisfied by the opportunity to litigate the matter

before the Hawaii Supreme Court.

Having satisfied the three criteria, Younger abstention is required unless this

case falls into the very narrow exceptions involving bad faith, harassment, or other

"extraordinary circumstances," where, for example a statute patently violates express constitutional proscriptions in every paragraph. See Younger, 401 U.S. at 47-49, 53-54.

There is no allegation, and certainly no evidence, that there is any bad faith, harassment or other "extraordinary circumstances" warranting an exception to abstention in this case.

IV.    CONCLUSION

Based on the foregoing arguments, Defendant respectfully submits that the present case should be dismissed or in the alternative that summary judgment should be granted in his favor.

DATED:    Honolulu, Hawaii, December 4, 2007.

AARON H. SCHULANER
HOLLY T. SHIKADA
Deputy Attorneys General

Attorneys for Defendant