S.C. NO. 27233

IN THE SUPREME COURT OF THE STATE OF HAWAII

| | |
|---|---|
| MICHAEL A. PEROUTKA, CHUCK BALDWIN, and DAVID P. PORTER, | CIVIL NOS.  04-1-1904<br>04-1-1905 |
| Appellants-Appellants, | APPEAL FROM THE<br>1) DECISION OF THE COURT, AND<br>ORDERS filed on November 23, 2004 |
| vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | 2) FINAL JUDGMENTS filed on April 5, 2005 |
| Appellee-Appellee. | FIRST CIRCUIT COURT |
| | HONORABLE EDEN ELIZABETH HIFO<br>HONORABLE SABRINA McKENNA<br>Judges |
| RALPH NADER, PETER MIGUEL CAMEJO, and ROBERT H. STIVER, | [Consolidated with S.C. No. 27234] |
| Appellants-Appellants | |
| vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | |
| Appellee-Appellee. | |

APPELLEE'S ANSWERING BRIEF

STATEMENT OF RELATED CASES

CERTIFICATE OF SERVICE

EXHIBIT 12

MARK J. BENNETT          2672
Attorney General
State of Hawaii

AARON H. SCHULANER    6954
HOLLY T. SHIKADA        4017
Deputy Attorneys General
235 S. Beretania Street, Room 304
Honolulu, Hawaii  96813
Telephone:  (808) 586-1255
Fax:          (808) 586-1488

Attorneys for Appellee-Appellee
DWAYNE D. YOSHINA,
CHIEF ELECTION OFFICER, STATE OF
HAWAII

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

I.     INTRODUCTION ...................................................................1

II.    COUNTER-STATEMENT OF THE CASE .......................................2

       A.    THE NADER PRESIDENTIAL PETITION.................................4

       B.    THE PEROUTKA PRESIDENTIAL PETITION .......................7

III.   COUNTER-STATEMENT OF THE STANDARD OF REVIEW .......................11

IV.    ARGUMENT.....................................................................14

       A.    THE STATUTES AND ADMINISTRATIVE RULES CONCERNING
             THE VERIFYING OF SIGNATURES ARE CONSTITUTIONAL ........14

       B.    THE DETERMINATION THAT THE APPELLANTS FAILED TO
             SUBMIT SUFFICIENT VALID SIGNATURES WAS BASED ON
             CREDIBILE EVIDENCE AND WAS NOT ARBITRARY OR
             CAPRICIOUS.............................................................17

       C.    THE CHIEF ELECTION OFFICER WAS THE APPROPRIATE
             PERSON TO CONDUCT THE HEARINGS REGARDING
             WHETHER APPELLANTS FAILED TO OBTAIN THE REQUISITE
             AMOUNT OF SIGNATURES FOR PLACEMENT ON THE
             PRESIDENTIAL BALLOT.................................................18

             1.   THE CHIEF ELECTION OFFICER IS STATUTORILY
                  AUTHORIZED TO CONDUCT HEARINGS REGARDING
                  PRESIDENTIAL PETITIONS ....................................19

             2.   THERE HAS NOT BEEN A SHOWING OF IMPROPRIETY
                  ON THE PART OF THE CHIEF ELECTION OFFICER AND
                  THE JOINDER OF EXECUTIVE AND JUDICAL POWER DOES
                  NOT CREATE THE APPEARANCE OF IMPROPRIETY .........19

             3.   DOCTRINE OF NECESSITY .......................................23

       IV.  CONCLUSION............................................................24

TABLE OF AUTHORITIES

Federal Cases

American Party of Texas v. White,
415 U.S. 767, 94 S.Ct. 1296 (1974)......................................................................15

Anderson v. Celebrezee,
460 U.S. 780, 788, 103 S.Ct 1564, 1569-70 .................................................14, 16

Burdick v. Takushi,
504 U.S. 428, 434, 112 S.Ct. 2059, 2063 (1992)..............................................16

Norman v. Reed,
502 U.S. 279, 289, 112 S.Ct. 698, 705 (1992).................................................17

Wolkenstein v. Reville,
694 F.2d 35, 42 (2nd Cir.(N.Y.), 1982) ............................................................20


State Cases

Bumanglag v. Oahu Sugar Co., Ltd.,
78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995).........................................11, 12

Dole Hawaii Division-Castle & Cooke, Inc. v. Ramil,
71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) ............................................13

Franks v. City & County of Honolulu,
74 Hawai'i 328, 334, 843 P.2d 668, 671 (1993).............................................12

Gray v. Administrative Dir. of the Court,
84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)..............................................12

In re Nomination Petition of Mary Flaherty,
564 Pa. 671, 770 A.2d 327 (Penn. Sct. 2001) ................................................16

In re Nomination Petition of Susan M. Silcox,
543 Pa. 647, 674 A.2d 224 (Penn. Sct. 1996)................................................16

In the Matter of the Application of Hawaiian Electric Company, Inc.,
81 Hawai'i 459, 465, 918 P.2d 561 (1996)......................................................13

In the Matter of the Water Use Permit Applications,
94 Haw. 97, 120-21, 9 P.3d 409, 432-33 (2000) ............................................23

<u>Schwab v. Ariyoshi</u>,
57 Haw. 348, 353, 555 P.2d 1329, 1332 (1976) ..............................................21, 22

<u>Sifagaloa v. Board of Trustees of Employees' Retirement System of State of Hawaii</u>,
74 Haw. 181, 840 P.2d 367 (1992) ..........................................................................19, 20

<u>Tate v. GTE Hawaiian Tel. Co.</u>,
77 Hawai'i 100, 102-103, 881 P.2d 1246, 1248-1249 (1994) ...........................................12

<u>Wheeler v. Board of Trustees</u>,
200 Ga. 323, 37 S.E.2d 322 (1946)..............................................................................22

<u>Wolkenstein v. Reville</u>,
694 F.2d 35, 42 (2nd Cir. (N.Y.)) (1982) ...................................................................22

<u>Yamada v. Natural Disaster Claims Commission</u>,
54 Haw. 621, 628, 513 P.2d 1001, 1006 (1973) ...............................................................22


<u>State Statutes</u>

Chapter 91, Haw. Rev. Stat............................................................................................4

Haw. Rev. Stat. § 11-15 .............................................................................................15

Haw. Rev. Stat. § 11-113 ....................................................................2, 4, 13, 18, 23

Haw. Rev. Stat. § 91-14 ..........................................................................................4, 12

Haw. Rev. Stat. § 174C-7 ..........................................................................................23

<u>State Rules</u>

Haw. Admin. Rules § 2-51-110 .......................................................................2, 14, 15

Haw. Admin. Rules § 2-51-111 ...........................................................................9, 14

Haw. Admin. Rules § 2-51-112 .........................................................................3, 9, 14

Haw. Admin. Rules § 2-51-113 .....................................................................4, 9, 14, 16

S.C. NO. 27233

IN THE SUPREME COURT OF THE STATE OF HAWAII

| | |
|---|---|
| MICHAEL A. PEROUTKA, CHUCK BALDWIN, and DAVID P. PORTER, | CIVIL NOS.  04-1-1904<br>04-1-1905 |
| Appellants-Appellants, | APPEAL FROM THE<br>1) DECISION OF THE COURT, AND<br>ORDERS filed on November 23, 2004 |
| vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | 2) FINAL JUDGMENTS filed on April 5, 2005 |
| Appellee-Appellee. | FIRST CIRCUIT COURT |
| | HONORABLE EDEN ELIZABETH HIFO<br>HONORABLE SABRINA McKENNA<br>Judges |
| RALPH NADER, PETER MIGUEL CAMEJO, and ROBERT H. STIVER, | [Consolidated with S.C. No. 27234] |
| Appellants-Appellants | |
| vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | |
| Appellee-Appellee. | |

APPELLEE'S ANSWERING BRIEF

I.    INTRODUCTION

The lower court found that the relevant laws and procedures used to verify the presidential petitions of Appellants are constitutional and that the actions of the Office of Elections were not arbitrary or capricious.  Additionally, the lower court found that the Appellants failed to rebut the presumption that the Chief Election Officer is impartial, objective, and unbiased, and as such could conduct the administrative hearing to review the determination

that the Appellants had not obtained sufficient signatures for their petitions for inclusion on the

presidential ballot. The evidence supports the lower court's decision.

II.     COUNTER-STATEMENT OF THE CASE

In Hawaii, there are two separate and distinct ways a candidate can qualify for inclusion

on the general election presidential ballot: (1) a qualified political party can designate a

candidate; or (2) an individual can petition to be on the presidential ballot. Hawaii Revised

Statutes ("HRS") § 11-113(c)(1) & (2).

Individuals, parties, or groups that are not considered "qualified political parties" can

petition the Chief Election Officer to place candidates on the general election presidential ballot,

as set forth in HRS § 11-113(c)(2). Individuals desiring to place candidates' names on the

general election presidential ballot must file an application and a petition that meets certain

statutory requirements. HRS § 11-113(c)(2). The petition must: (1) be on the form prescribed

and provided by the Chief Election Officer; (2) be filed no later than 4:30 p.m. on the sixtieth

day prior to the general election; and (3) contain the signatures of currently registered voters

which constitute no less than one percent of the votes cast in the State at the last presidential

election. Id.

The form was prescribed by the Chief Election Officer through administrative rule

Hawaii Administrative Rules ("HAR") § 2-51-110, and contains columns for the voter to fill out

labeled (1) "Print Your Name Here," (2) "Sign the Name Under Which You Are Registered to

Vote," (3) "Print the Residence Address at Which You are Registered to Vote," (4) "Birth Date,"

and (5) "Date Signed." There is an additional column for the voter's "Social Security Number,"

however completion of this column is optional. The signatory is required to provide all of the

relevant information in order to verify the identity of the signatory as a currently registered voter.

For the 2004 presidential election, the filing deadline was September 3, 2004 and the signature requirement was 3,711, based on one percent of the 371,033 votes cast at the last presidential election.

After the filing of a petition, signatures are verified by the Office of Elections. The Chief Election Officer may designate a representative for verification purposes. HAR § 2-51-112. For the 2004 presidential election, Ballot Operations Coordinator Lori Tomczyk was responsible for the handling of the presidential petitions, including the verification process. Record on Appeal **, Certified Record on Appeal, Peroutka v. Yoshina, Civil No. 04-1-1904-10 (Peroutka Administrative Record, hereinafter "PAR") at 1347-1380 (Testimony of Lori Tomczyk, hereinafter "Tomczyk"). The law sets forth the manner in which to determine whether an individual is qualified to sign the petition. HAR § 2-51-112. Specifically, the signatory is checked against the statewide voter registration system ("SVRS") to see if there is a record on file for the signatory. Id. The SVRS allows for voter records to be pulled up by either social security number or name. PAR at 1359 (Tomczyk). As such, it is critical that if the signatory does not provide a social security number, the signatory comply with the requirement of printing his or her name in order to avoid illegibility issues, which will result in the inability to access the signatory's record.

After the signatory's record is either pulled up by name or social security number, the law sets forth the manner in which the signatory will be validated: (1) if the signatory on the petition exists as an active registered voter in the SVRS, then the signatory is counted; (2) if the signatory does not exist as an active registered voter in the SVRS, then the signatory is not counted; (3) if there are duplicate signatures, and the signatory is an active registered voter, then the signatory is counted once; and (4) "if the signatory does not provide all of the required

information on the petition or if the information is not legible, then the signatory may not be counted." HAR § 2-51-113(b)(1)-(4) & PAR at 77-79 (Tomczyk).

No later than 4:30 p.m. on the tenth business day after filing, the Chief Election Officer must inform the qualified political party or individual applicant of their eligibility or disqualification for placement on the ballot. HRS § 11-113(d). The Chief Election Officer can extend this notification period for up to five additional business days if he provides notice of the extension and the reasons for the extension. Id. In 2004, the deadline to inform applicants of their eligibility for placement on the presidential ballot was September 20, 2004.

An applicant can object to the eligibility determination of the Chief Election Officer by filing a written request for a contested case hearing no later than 4:30 p.m. on the fifth day after the finding. HRS § 11-113(e). After receiving such a request, the Chief Election Officer must hold a hearing no later than 4:30 p.m. on the tenth day after the receipt of the request for the hearing. Id. The hearing is conducted in accordance with HRS chapter 91. Id. The Chief Election Officer must issue his decision no later than 4:30 p.m. on the fifth day after the conclusion of the hearing. Id. Pursuant to HRS § 91-14, either party can appeal the Chief Election Officer's decision to Circuit Court within 30 days.

A.     THE NADER PRESIDENTIAL PETITION

On September 3, 2004, Appellant Robert Stiver filed an application and petition on behalf of the Nader for President 2004 Campaign to have Appellants Ralph Nader and Peter Miguel Camejo placed on the general election ballot in Hawaii, as candidates for President and Vice President, respectively (hereinafter, Appellants Stiver, Nader, and Camejo will be collectively referred to as the "Nader Campaign"). Record on Appeal **, Certified Record on

Appeal, <u>Nader v. Yoshina</u>, Civil No. 04-1-1905-10 (Nader Administrative Record, hereinafter "NAR"), at Volumes II & III at 99-788 (Nader Petition)

On September 20, 2004, the Office of Elections informed the Nader Campaign that it had obtained 3,672 valid signatures, which fell short of the required 3,711 signatures. NAR at 789-791 (Exhibit O-9). Subsequently, on September 23, 2004, after Ballot Operations Coordinator Lori Tomczyk proofed her calculations, she orally informed the Nader Campaign that it had instead obtained 3,124 signatures and that a letter would be sent with the updated numbers. NAR at 938-944 (Testimony of Lori Tomczyk, hereinafter "Tomczyk"). The reduction in the total amount of valid signatures was a result of discovering that two batches of signatures were accidentally counted twice. <u>Id.</u>

On September 23, 2004, the Nader Campaign requested a Chapter 91 hearing. NAR at 943 (Tomczyk). The hearing commenced on September 29, 2004. Prior to the conclusion of the hearing, the Office of Elections and the Nader Campaign entered into a settlement agreement. On October 1, 2004, the Chief Election Officer approved the Nader Settlement Agreement, which provided that the signatures on the petition submitted by the Nader Campaign would be reviewed again in the presence of a Nader representative. During the review, the Nader representative would be allowed to flag the signatures deemed invalid, but which he believed should have been counted. Flagging of a signature would constitute a challenge by the Nader Campaign. Pursuant to the Nader Settlement Agreement, the Chief Election Officer would subsequently review the challenged signatures with the Chief Election Officer's decision being final. NAR at 18-19 (Settlement Agreement, dated October 1, 2004).

The Nader Settlement Agreement notes in relevant part:

We do not waive any constitutional challenges. We are not waiving any challenge that goes to whether or not any requirement for being placed upon the ballot is unconstitutional.

We would not do a Court challenge signature by signature. Rather, we would challenge those Hawaii statutory or administrative rules that exceed those that are permissible under the U.S. Constitution or federal statutes, including but not limited to, the Voter Rights Act of 1965, as amended, or under the Hawaii Constitution.

NAR at 19.

The Office of Elections began reviewing signatures on October 7, 2004. NAR at 19a-19d. On October 8, 2004, the Nader Campaign, together with Appellants Peroutka, Baldwin, and Porter filed a lawsuit in U.S. District Court, entitled Ralph Nader, et al. v. Dwayne D. Yoshina, Civil No. 04-00611 DAE-LEK. A motion for a preliminary injunction was filed seeking inclusion of the Appellants on the presidential ballot. On October 13, 2004, the Court denied Plaintiffs' Motions for Temporary Restraining Order/Preliminary Injunction. Record on Appeal, Nader, et al. v. Yoshina, Civil No. 04-1-1905-10 at 53-139 (Exhibit 2 to Appellee's Answer to the Appellants' Statement of the Case on Appeal).

On October 18, 2004, pursuant to the Nader Settlement, the Chief Election Officer issued his findings that the Nader Campaign had failed to obtain the requisite amount of valid signatures required by Hawaii Revised Statutes Section 11-113. NAR at 19a-19d.

On October 18, 2004, the Nader Campaign filed an appeal in Circuit Court regarding the determination that it had failed to obtain the requisite amount of valid signatures to be placed on the ballot. The Honorable Sabrina S. McKenna ("Judge McKenna") heard the case on November 1, 2004. Judge McKenna orally affirmed the underlying administrative decisions that same day. The General Election occurred on November 2, 2004. The lower court issued its written decision on November 23, 2004. Record on Appeal, Nader, et al. v. Yoshina, Civil No.

04-1-1905-10 at 159-167 (Decision of the Court and Order). On December 17, 2004, an appeal was filed and assigned Supreme Court No. 27008. As a result of the lack of a separate judgment at the time, the appeal was dismissed. Final judgment was eventually filed on April 5, 2005. On April 13, 2005, the Nader Campaign filed the present appeal. Id. at 219-242 (Notice of Appeal).

B.     THE PEROUTKA PRESIDENTIAL PETITION

On September 3, 2004, Appellant David Porter, the Hawaii Coordinator for the Peroutka for President 2004 Campaign, filed a petition with the Chief Election Officer to have Appellants Michael A. Peroutka and Chuck Baldwin placed on the general election ballot in Hawaii, as candidates for President and Vice President, respectively (hereinafter, Appellants Porter, Peroutka, and Baldwin will be collectively referred to as the "Peroutka Campaign"). PAR at 269-1253 (Exhibit O-12, Peroutka Petition). On September 20, 2004, the Office of Elections informed the Peroutka Campaign that it had obtained 3,481 valid signatures, which fell short of the requirement of 3,711 valid signatures. PAR at 169-171 (Exhibit O-6).

Subsequently, on September 24, 2004, after proofing its calculations, the Office of Elections informed the Peroutka Campaign of a revised total of 3,471 valid signatures. PAR at 172-173 (Exhibit O-7). The reduction in the total amount of valid signatures was the result of a group of signatures having been counted twice. PAR at 1364-1365 (Testimony of Lori Tomczyk, hereinafter "Tomczyk").

On September 24, 2004, the Peroutka Campaign requested a Chapter 91 hearing. The hearing took place on September 30, 2004. PAR at 1298-1387 (Transcript of Peroutka Hearing). At the hearing, Ballot Operations Coordinator Lori Tomczyk and Appellant Robert Stiver testified. Ms. Tomczyk confirmed that her job duties included the verification of presidential petitions. PAR at 1348 (Tomczyk). Ms. Tomczyk testified that on or about May 4, 2004, she

provided Appellant Stiver a copy of a factsheet regarding the requirements for the petition and

explained it to him when issuing him his petition.  PAR at 1256-1265, 1349-1350 (Tomczyk and

Exhibit O-14).  The factsheet states, in relevant part, the following:

1. The petition can only be verified on the basis of the information contained on it.  The information is compared with the information contained in the official voter register.  If a voter provides information that is illegible or inconsistent with the information in the official voter register, this may result in the signature not being counted.  Examples of this are the voter providing an incorrect address, social security number, or date of birth.  This frequently results from illegible handwriting or a voter transposing numbers.

2. Use black ink for all signatures.

3. The signature of the voter should match the signature on his/her most recent voter registration affidavit.  This same signature will be needed for any necessary signature validity checks.

4. The name of the voter must be printed in the space provided.

5. The residence address of the voter where he/she is registered to voter must be recorded, not any address to which the voter has moved subsequent to registering and has failed to make the change of registration as required by law.  Mailing addresses are not acceptable.

6. The date on which the signature was recorded must be indicated.

7. Both the voter's social security number and date of birth will be needed to distinguish among people having identical names and/or addresses.

PAR at 1260 (page 5 of Exhibit O-14).

Ms. Tomczyk testified that the Peroutka Campaign, in addition to turning in petition sets

on the filing deadline, also turned in petition sets prior to the filing deadline, which were

reviewed.  By letters dated July 29, 2004 and August 24, 2004, the results of the review were

shared with the Peroutka Campaign.  PAR at 1354, 164-165, and 166-167 (Tomczyk, Exhibits

O-3 & O-4).  The letters stated that signatures had been rejected due to the signatory (1) being

inactive, (2) providing insufficient information, (3) not appearing in the SVRS, or (4) providing

address information on the petition which did not match the address information in the SVRS.

PAR at 165-166 (Exhibits O-3 & O-4). Ms. Tomczyk testified that she followed HAR §§ 2-51-112 and 2-51-113 in verifying the Peroutka Campaign petition. PAR at 1374-1375.

At the hearing, Appellant David Porter objected to the fact that the "state elections officer is also the hearings officer." PAR at 1306 (Testimony of David Porter, hereinafter "Porter"). Appellant Porter did not provide any further argument or evidence in support of his objection. The Chief Election Officer noted that he was qualified to conduct the hearing and that he had no other interest in this matter other than to see that the elections are run smoothly and efficiently. Additionally, Appellant David Porter still retained the right of an appeal to circuit court. PAR at 1307 (Testimony of the Chief Election Officer).

Appellant David Porter noted that "I would just like at this time to enter in to the record the statement that I appreciate the work, the effort, and the cooperative attitude of the State Elections Office" and that "I have no complaints about how the process has been handled at this point." PAR at 1307 (Porter). He then emphasized that he had no complaints concerning Ms. Tomczyk's handling of the process. Id.

Later in the hearing, Appellant David Porter stated:

> By the way, my questions and my testimony, if I give testimony today, is not
> intended in any way to reflect on the competence or the ethics or in another way
> of the state Elections Office. I've made numbers addition mistakes and
> mathematical mistakes in my life and I have no problem with the fact that those
> things have occurred.

PAR at 1334 (Porter).

With respect to the legibility of the information provided by the signatories, Appellant Porter stated the following on cross-examination:

Q.    Okay. So if we were to look at all these different signatures that you're
      challenging or the addresses, some like this one, there's certain parts that
      are, even to you today, not legible; right?

A.    No question. Yeah, no question.

Q.    And so –

A.    In fact, I'm – I have to compliment the staff on how well they've been
      able to decipher illegible handwriting to do as well as they've done. I'm
      used to my handwriting, which probably made it a little more easier for
      me.

PAR at 1341 (Porter).

      Towards the end of her testimony, Ms. Tomczyk stated that approximately 12 signatures

looked like they could have been written by the same person. She was planning to pull the

original voter registration affidavits to compare them against the petition signatures; however

this was unnecessary because none of the signatories even came up as registered voters on the

SVRS. PAR at 1371-1372 (Tomczyk).

      In response to this possibility of fraud, Appellant David Porter asked a question of Ms.

Tomczyk, which confirmed that he also had concerns about fraudulent signatures in his petition

sets.

Q.    Do you recall when I brought the last batch of petitions in, I separated one
      set, one group of petitions –

A.    Uh-huh.

Q.    -- and asked if you would run those separately?

A.    Yeah. Unfortunately, with everything that happened, I lost track of it.

Q.    That's not a problem. That's set one. Over 300 signatures, 39 valid.
      And this same question is the reason I asked you to isolate those, because I
      had concerns with two individuals that the State sent – or that National
      sent to help me with registration. And that one petition – one group of
      petitions were over 300 signatures, but only 39 valid, and I suspected the
      same problem with those.

PAR at 1372-1373 (Porter).

The Chief Election Officer issued his decision on October 5, 2004. PAR at 15-22 (Findings of Fact, Conclusions of Law and Decision).

In the Peroutka Decision, the Chief Election Officer concluded that the Peroutka Campaign submitted an insufficient amount of valid signatures and, therefore, Michael A. Peroutka and Chuck Baldwin were not eligible to be placed on the presidential ballot. PAR at 21.

As previously noted, the Peroutka Campaign, together with the Nader Campaign filed a Motion for Preliminary Injunction in U.S. District Court, which was denied on October 13, 2004. On October 18, 2004, the Peroutka Campaign filed an appeal in Circuit Court regarding the determination that it had failed to obtain the requisite amount of valid signatures to be placed on the ballot. Judge McKenna heard the case on November 1, 2004. She orally affirmed the underlying administrative decisions that same day. The General Election occurred on November 2, 2004. The lower Court issued its written decision on November 23, 2004. Record on Appeal, Peroutka, et al. v. Yoshina, Civil No. 04-1-1904-10 at 175-182 (Decision of the Court and Order). On December 17, 2004, an appeal was filed and assigned Supreme Court No. 27007. As a result of the lack of a separate judgment at the time, the appeal was dismissed. Final judgment was eventually filed on April 5, 2005. On April 13, 2005, the Peroutka Campaign filed the present appeal. Id. at 234-257 (Notice of Appeal).

III.    COUNTER-STATEMENT OF THE STANDARD OF REVIEW

Judicial review of an administrative agency decision is governed by Hawaii Revised Statutes ("HRS") § 91-14. Bumanglag v. Oahu Sugar Co., Ltd., 78 Haw. 275, 279, 892 P.2d 468, 472 (1995). HRS § 91-14(g) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1)     In violation of constitutional or statutory provisions; or
(2)     In excess of the statutory authority or jurisdiction of the agency; or
(3)     Made upon unlawful procedure; or
(4)     Affected by other error of law; or
(5)     Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6)     Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Findings of fact are reviewed under the clearly erroneous standard, while conclusions of law are reviewed de novo under the right/wrong standard.

[A]ppeals taken from findings [of fact] set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, this court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]   The clearly erroneous standard requires this court to sustain the Board's findings unless the court is left with a firm and definite conviction that a mistake has been made.

A conclusion of law ... is not binding on an appellate court and is freely reviewable for its correctness.   Thus, this court reviews [conclusions of law] *de novo,* under the right/wrong standard.

Id. (citing to Tate v. GTE Hawaiian Tel. Co., 77 Haw. 100, 102-103, 881 P.2d 1246, 1248-1249 (1994) [internal citations, internal quotation marks, and footnote omitted]).

The interpretation of a statute is a question of law reviewable de novo.  Franks v. City & County of Honolulu, 74 Haw. 328, 334, 843 P.2d 668, 671 (1993).  When construing a statute, the court must ascertain and give effect to the intention of the legislature, and must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. Gray v. Administrative Dir. of the Court, 84 Haw. 138, 148, 931 P.2d 580, 590 (1997).

Judicial review of an administrative agency's decision is limited. The Supreme Court of Hawaii has held that:

> In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears the **heavy burden** of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. [Emphases added].

In the Matter of the Application of Hawaiian Electric Company, Inc., 81 Haw. 459, 465, 918 P.2d 561 (1996) (citations and internal quotation marks omitted).

And while the courts are "free to reverse the agency's decision if affected by an error of law," the Hawaii Supreme Court has said "Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency. Camara, 67 Haw. at 216, 685 P.2d 797." Dole Hawaii Division-Castle & Cooke, Inc. v. Ramil, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990).

And, with respect to the constitutional challenges, this Court has previously stated that "we have long held that: (1) legislative enactments are 'presumptively constitutional;' (2) 'a party challenging [a statutory scheme] has the burden of showing unconstitutionality **beyond a reasonable doubt**;' and (3) the constitutional defect must be 'clear, manifest[,] and unmistakable.'" Pray v. The Judicial Selection Commission, 75 Haw. 333, 340, 361 P.2d 723, 727 (1993) (citations omitted).

IV.    ARGUMENT

    A.    THE STATUTES AND ADMINISTRATIVE RULES CONCERNING THE VERIFYING OF SIGNATURES ARE CONSTITUTIONAL

The law states that the presidential petition must be signed by a specific amount of registered voters. HRS § 11-113(c)(2)(B). As noted in Appellee's Counterstatement of the Case, in terms of verifying the identity of the signatories as registered voters, the law specifies (1) what information the petition form will contain, and (2) what criteria will be used in reviewing the petitions. HRS § 11-113 & HAR §§ 2-51-110 through 2-51-113.

Appellants allege that the trial court erred in determining that the procedures used in verifying signatures are not unconstitutional. Appellants' Opening Brief at page 8 (Statement of Points of Error).

In reviewing the constitutionality of the petition verification procedures, the appropriate constitutional analysis to be followed is found in <u>Anderson vs. Celebrezze</u>, 460 U.S. 780, 103 S.Ct. 1564 (1983).[1] The United States Supreme Court has established a two-part test. The first part is the consideration of the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments. The second part is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule" and "determine the legitimacy and strength of each of those interests." <u>Id.</u> at 789, 103 S.Ct. at 1569.

---

[1] Appellants in their brief cite to <u>Anderson</u> and similar federal cases for the proposition that ballot access restrictions place burdens on "our most precious freedoms," and "the State has a less important interest in regulating Presidential elections than statewide or local elections." Appellants' Opening Brief at pages 10-11. However, within the same sentence instead of concluding with a statement concerning the actual two part analysis stated in <u>Anderson,</u> which addresses such situations, Appellants' instead cite to state cases for the proposition that election laws "should be liberally construed so as not to deprive a candidate of the right to run for office or the voters of their right to elect the candidate of their choice." <u>Id.</u> This is not the two-part analysis mandated by <u>Anderson.</u>

In applying this analysis, the United States Supreme Court has held that when a state election law imposes reasonable non-discriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the state's important regulatory interest are generally sufficient to justify the restrictions. Id. at 780, 103 S.Ct at 1569.

In looking at part one of the Anderson analysis concerning the character and magnitude of the asserted injury to constitutional rights, it should be noted that all election laws to a certain extent impact constitutional rights. Id. at 788, 103 S.Ct. at 1570 ("Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects--at least to some degree--the individual's right to vote and his right to associate with others for political ends.") As such, the focus of part one of the Anderson analysis is whether the procedures are reasonable and nondiscriminatory.

There can be no dispute that the information required by the petition form is reasonable and nondiscriminatory. The petition laws merely require all signatories to provide the date on which they signed the petition, and the confirmatory information of their name, date of birth, and the residence address at which they are registered to vote. HRS § 11-113 & HAR § 2-51-110(c)(Appendix H). This is the same information that all voters are statutorily required to provide when they register to vote. HRS § 11-15. No additional information is being asked for from the prospective signatory.

In terms of the petition requirements, it is significantly less onerous than the requirement of the notarization of petition signatures, which was previously affirmed by the U.S. Supreme Court in American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296 (1974). Specifically, in White, the Texas ballot qualification system was challenged, including the requirement of

notarized signatures. The Supreme Court determined that the requirement of <u>notarized</u> signatures was not an impermissible burden on First and Fourteenth Amendment rights. <u>Id.</u> at 787, 94 S.Ct. at 1309.

In regards to the criteria to be used when reviewing signatures, the Office of Elections requires all of the requested information to be provided and for it to be legible. HAR § 2-51-113(b)(4). If this does not occur, then the signatory is not counted. <u>Id.</u> This criteria is reasonable and nondiscriminatory in that it applies to all signatures and is necessary in order to reasonably ensure that the signatory is in fact the registered voter he or she claims to be.

Appellants' presumption appears to be that everybody who signs a petition is a currently registered voter. Appellants' Opening Brief at pages 12-15. As such, Appellants are essentially arguing that the State should be not be allowed to exercise its clear and unambiguous discretion to not count a signature for which the required information is not provided or illegible. Appellants fail to cite to any law supporting their argument.

In fact, Appellee is unaware of any state that agrees with Appellants' argument. By way of example, the State of Pennsylvania has reported cases, which note the failure to provide required information on the petition will justify not counting the signature. <u>In re Nomination Petition of Susan M. Silcox</u>, 543 Pa. 647, 674 A.2d 224 (Penn. Sct. 1996) (failure of a signatory to write his or her occupation, place of residence, or even date of signature would result in the signature not being counted, even if a third party were to later provide the information on the petition prior to filing); <u>In Re Nomination Petition of Mary Flaherty</u>, 564 Pa. 671, 770 A.2d 327 (Penn. Sct. 2001) (printed names in the place of signatures were not counted, signatures for which the address provided did not match what was on file were not counted).

As noted previously, the second part of the <u>Anderson</u> analysis is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule" and "determine the legitimacy and strength of each of those interests." The level of scrutiny that should be applied depends on the nature of the burden that has been imposed. Specifically, if the burden is severe then the requirement needs to be "narrowly drawn to advance a state interest of compelling importance." <u>Burdick v. Takushi</u>, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063 (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 289, 112 S.Ct. 698, 705 (1992)). However, if the law imposes reasonable non-discriminatory restrictions, then the state's important regulatory interests are generally sufficient to justify the restrictions. <u>Anderson vs. Celebrezze</u>, 470 U.S. 780, 788, 103 S.Ct 1564, 1569 (1983). To do otherwise, would essentially tie the hands of the State to be able "to assure that [its] elections are operated equitably and efficiently." <u>Burdick v. Takushi</u>, 504 U.S. 428,433, 112 S.Ct. 2059, 2063 (1992).

In the present case, the petition verification requirements are reasonable and nondiscriminatory. As such, the State's important regulatory interests are sufficient to justify the petitioner verification requirements. These important regulatory interests include (1) ensuring that the election processes are efficient; (2) avoiding voter confusion by overcrowding the ballot by those who cannot show more than a modicum of support; and (3) detecting fraudulent or questionable signatures. <u>Id</u>.

B.    THE DETERMINATION THAT THE APPELLANTS FAILED TO SUBMIT SUFFICIENT VALID SIGNATURES WAS BASED ON CREDIBILE EVIDENCE AND WAS NOT ARBITRARY OR CAPRICIOUS

Appellants' argument that the Office of Elections' determination was arbitrary, capricious, and/or was not based on credible evidence, is essentially an extension of its argument

that the practices and procedures mandated by statute and administrative rule are unconstitutional.

The record reflects, as the lower court noted, that several names were illegible. In addition, several individuals did not provide all of the required information. PAR at 269-1253 (Exhibit O-12). At the Peroutka Hearing, Appellant David Porter noted his appreciation of the work, the effort, and the cooperative attitude of the Office of Elections and further stated that he had no complaint about how the process had been handled. PAR at 1307 (Porter). Additionally, he stated that he was not taking issue with the competence or ethics of the Office of Elections. PAR at 1334 (Porter). In fact, Appellant Porter complimented the staff on how well they were able to decipher otherwise illegible handwriting. PAR at 1341 (Porter). He also admitted that he had concerns regarding the validity of the signatures due to the use of certain individuals that were sent by the national party. PAR at 1372-1373 (Porter). Under these circumstances, it is clear that Appellants have not met their burden of showing that the review process was either arbitrary or capricious.

C. THE CHIEF ELECTION OFFICER WAS THE APPROPRIATE PERSON TO CONDUCT THE HEARINGS REGARDING WHETHER APPELLANTS FAILED TO OBTAIN THE REQUISITE AMOUNT OF SIGNATURES FOR PLACEMENT ON THE PRESIDENTIAL BALLOT

Appellants question the appropriateness of the Chief Election Officer conducting the hearings in these cases. Appellants, however, fail to address the fact that the legislature specifically provided for the filing of a hearing with the Chief Election Officer. Additionally, Appellants point to no direct evidence of the Chief Election Officer's alleged bias or lack of impartiality. At the Peroutka Hearing, Appellant David Porter did not specifically allege bias or lack of impartiality when he stated that he objected to the Chief Election Officer being the

hearings officer. PAR at 1306-1307 (Porter). All he said was that he objected to the Chief

Election Officer being the hearings officer. With respect to the Nader Campaign, it appears to

forget that it freely entered into a settlement agreement, which provided for the Chief Election

Officer to review the signatures and make a final determination. NAR at 16-19 (Nader

Settlement Agreement). Finally, Appellants fail to address the doctrine of necessity, given that

the Chief Election Officer's jurisdiction is exclusive and there is no provision for a substitute

hearings officer.

1.    THE CHIEF ELECTION OFFICER IS STATUTORILY AUTHORIZED
      TO CONDUCT HEARINGS REGARDING PRESIDENTIAL
      PETITIONS

Hawaii Revised Statutes §11-113(e) establishes the authority for the Chief Election

Officer to conduct hearings on objections to findings of eligibility or disqualification for

presidential ballots:

> If the applicant, or any other party, individual, or group with a candidate on the
> presidential ballot, objects to the finding of eligibility or disqualification the
> person may, not later than 4:30 p.m. on the fifth day after the finding, file a
> request in writing with the chief election officer for a hearing on the question. A
> hearing shall be called not later than 4:30 p.m. on the tenth day after the receipt of
> the request and shall be conducted in accord with chapter 91. A decision shall be
> issued not later than 4:30 p.m. on the fifth day after the conclusion of the hearing.

2.    THERE HAS NOT BEEN A SHOWING OF IMPROPRIETY ON THE
      PART OF THE CHIEF ELECTION OFFICER AND THE JOINDER OF
      EXECUTIVE AND JUDICAL POWER DOES NOT CREATE THE
      APPEARANCE OF IMPROPRIETY

In Sifagaloa v. Board of Trustees of Employees' Retirement System of State of Hawaii,

74 Haw. 181, 840 P.2d 367 (1992), the Court stated that "[a]dministrators serving as adjudicators

are presumed to be unbiased." Sifagaloa, 74 Haw. at 192, 840 P.2d at 372. The presumption can

be rebutted by showing a disqualifying interest, the burden of which rests on the party making

the assertion.

In Sifagoloa, the Court found no impropriety where the Board of Trustees of the Employees' Retirement System of the State of Hawaii (Trustees) serves the dual functions of investing Employees' Retirement System (ERS) funds and adjudicating disability retirement cases. Sifagaloa was a State of Hawaii employee who was injured in a motor vehicle accident within the scope of his employment and subsequently filed for service-connected total disability retirement benefits. The Medical Board of the ERS submitted its decision to the Trustees, including its finding that although Sifagaloa was incapacitated due to psychological factors, there was no causal connection between the motor vehicle accident and his physical incapacitation. The Medical Board, therefore, recommended that the Trustees deny Sifagaloa's claim, which they did. Id. at 186, 840 P.2d at 370.

Sifagaloa's recourse was to appeal the Medical Board's decision to the Trustees. At the hearing, the hearing officer heard testimony from a psychiatrist called as a witness by the Medical Board that Sifagaloa suffered from a psychiatrically recognized disorder that was directly caused by the motor vehicle accident. Id. at 187, 840 P.2d at 370. In spite of this testimony, the hearing officer found that there was no psychiatric evidence of a causal connection and recommended that the Trustees affirm the Medical Board's decision, which they did. The circuit court upheld this decision, also finding no evidence in the record that the Trustees should be disqualified. Id. at 188, 840 P.2d at 370

On appeal to the Supreme Court, Sifagaloa argued that he was denied his constitutional right to due process because the Trustees' dual interests of awarding retirement benefits and preserving the ERS fund created a conflict of interest that gave rise to an appearance of impropriety and thus a question of the Trustees' impartiality. Id. at 188, 840 P.2d at 371. The Court emphasized that "[a]n appearance of impropriety does not occur simply where there is a

joinder of executive and judicial power." Id. at 191, 840 P.2d at 372. Sifagaloa "failed to overcome the presumption of lack of bias by showing a disqualifying interest on the Trustees' part." Id. at 193, 840 P.2d at 373.

In the present case, the Chief Election Officer does not have any direct, personal, or pecuniary interest in denying inclusion on the ballot to the proposed candidates. The Chief Election Officer has nothing to gain from preventing the proposed candidates from being on the ballot. He has no interest other than running a successful operation in his office, including efficient and smooth elections. (See Wolkenstein v. Reville, 694 F.2d 35, 42 (2nd Cir.(N.Y.), 1982), where a public servant was found not to have any "official motive" in the determinations he made because elected officials had to find funds to run his operation, not he, himself.) The Chief Election Officer's impartiality is not reasonably in question, and there is no appearance of impropriety. Appellants have failed to rebut the presumption that the Chief Election Officer serving as the hearings officer was unbiased.

In fact, the evidence is clear that the Appellants trust the Chief Election Officer. The Nader Campaign entered into a settlement agreement with the Office of Elections in which it agreed to the Chief Election Officer having the final say on a recount of the signatures. NAR at 16-19 (Nader Settlement Agreement). As for the Peroutka Campaign, Appellant David Porter testified at the Peroutka Administrative Hearing about how much he respected and appreciated the hard work of the Office of Elections. PAR at 1307 (Porter).

3.     DOCTRINE OF NECESSITY

Finally, there is a long-recognized "doctrine of necessity" or "rule of necessity," which applies to decision makers at all levels. As stated by the Supreme Court of Hawaii, "Under the doctrine of necessity, an administrative officer exercising a quasi-judicial function can act in a

proceeding, when he would otherwise be disqualified, if jurisdiction is exclusive and no provision exists for substitution." (citations omitted) Yamada v. Natural Disaster Claims Commission, 54 Haw. 621, 628, 513 P.2d 1001, 1006 (1973). The Yamada case concerned the proposed disqualification of a member of the Natural Disaster Claims Commission for pecuniary interest, where the Court found the commission member's participation to be proper despite the apparent prohibition by statute.

In another case involving statutory provisions relating to salaries of Supreme Court justices and circuit court judges, the plaintiffs moved to disqualify all members of the Supreme Court from hearing their appeal. In its *per curiam* opinion, the Court stated:

> To give HRS § 601-7(a) [re: disqualification of judges] the effect of disqualifying every member of the judiciary of Hawaii from hearing the present appeal would be to attribute to the legislature the intent to deny any remedy to the present appellants. It has uniformly been held that the rule of necessity prevails over the policy of disqualification for interest, whether or not that policy has been embodied in a statute. (brackets added)

Schwab v. Ariyoshi, 57 Haw. 348, 353, 555 P.2d 1329, 1332 (1976).

The Supreme Court also quoted Wheeler v. Board of Trustees, 200 Ga. 323, 37 S.E.2d 322 (1946):

> The precise question we must now determine is, when all Justices of this court are disqualified, and all superior court judges are likewise disqualified, thereby resulting in a situation where no qualified court can be constituted, what shall be done? The rule is laid down in 30 Am. Jur. 770, § 55; 'By the great weight of authority, the rule of disqualification must yield to the demands of necessity, and a judge or an officer exercising judicial functions may act in a proceeding wherein he is disqualified by interest, relationship, or the like, if his jurisdiction is exclusive, and there is no legal provision for calling in a substitute, so that his refusal to act would destroy the only tribunal in which relief could be had and thus prevent a determination of the proceeding. Under such circumstances, it is the duty of the disqualified judge to hear and decide the controversy, however disagreeable it may be.' (37 S.E. 2d at 325-26)

Schwab, 57 Haw. at 352, 555 P.2d at 1332.

Thus the Court ruled that the rule of necessity takes precedence and its judges must hear the case.

More recently, the Supreme Court addressed the alleged "conflict of interest" created by the legislature when it provided that the chairperson of the Board of Land and Natural Resources would be the chairperson of the Commission on Water Source Management, pursuant to HRS § 174C-7, even though the Board of Land and Natural Resources could be a party to a hearing before the Commission. The Supreme Court noted that the legislature had the right to overrule the common law doctrine of incompatible office. In the Matter of the Water Use Permit Applications, 94 Haw. 97, 120-21, 9 P.3d 409, 432-33 (2000). In addition, the Supreme Court, further noted that even if disqualification could be shown to be normally appropriate, the rule of necessity would still require him not to be disqualified if his jurisdiction was exclusive and there was no provision for substitution. Id. at 123, 9 P.3d at 435.

The doctrine of necessity also applies in the case at bar. Hawaii Revised Statutes §11-113(e) sets up the Chief Election Officer as the administrator to conduct hearings and does not provide for any other individual to do so. Chapter 91 of the Hawaii Revised Statutes, which is controlling for administrative hearings, does not require that a hearings officer come from outside the department. Therefore, there is no one other than the Chief Election Officer who could conduct the hearing, and the Chief Election Officer, out of necessity must preside at the hearing.

IV.     CONCLUSION

For the foregoing reasons, the judgments of the circuit court should be affirmed.

DATED:  Honolulu, Hawaii, September 30, 2005.

                         MARK J. BENNETT
                         Attorney General
                         State of Hawaii


                         AARON H. SCHULANER
                         HOLLY T. SHIKADA
                         Deputy Attorneys General

                         Attorneys for Appellee-Appellee
                         DWAYNE D. YOSHINA,
                         CHIEF ELECTION OFFICER,
                         STATE OF HAWAII

S.C. NO. 27233

IN THE SUPREME COURT OF THE STATE OF HAWAII

| | |
|---|---|
| MICHAEL A. PEROUTKA, CHUCK BALDWIN, and DAVID P. PORTER, | CIVIL NOS.  04-1-1904<br>04-1-1905 |
| Appellants-Appellants, | APPEAL FROM THE<br>1) DECISION OF THE COURT, AND ORDERS filed on November 23, 2004 |
| vs. | 2) FINAL JUDGMENTS filed on April 5, 2005 |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | FIRST CIRCUIT COURT |
| Appellee-Appellee. | HONORABLE EDEN ELIZABETH HIFO<br>HONORABLE SABRINA McKENNA<br>Judges |
| RALPH NADER, PETER MIGUEL CAMEJO, and ROBERT H. STIVER, | [Consolidated with S.C. No. 27234] |
| Appellants-Appellants | |
| vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | |
| Appellee-Appellee. | |

STATEMENT OF RELATED CASES

Appellee-Appellee Dwayne D. Yoshina, Chief Election Officer, State of Hawai'i, is not aware of any related cases pending in the Hawaii courts or agencies, within the meaning of HRAP 28(b)(11). However, Appellee-Appellee does note the existence of  Ralph Nader, et al. v. Dwayne D. Yoshina, Civil No. 04-00611 DAE-LEK in the United States District Court for the District of Hawaii. A motion for a preliminary injunction was filed seeking inclusion of the Appellants on the presidential ballot. On October 13, 2004, the Court denied Plaintiffs' Motions for Temporary Restraining Order/Preliminary Injunction. A motion to dismiss based on the

<u>Younger</u> abstention doctrine is currently pending before the Honorable David Alan Ezra. The

motion is set to be heard on October 11, 2005.

DATED: Honolulu, Hawaii, September 30, 2005.

AARON H. SCHULANER
HOLLY T. SHIKADA
Deputy Attorneys General

Attorneys for Appellee-Appellee
DWAYNE D. YOSHINA,
CHIEF ELECTION OFFICER, STATE OF HAWAII

S.C. NO. 27233

IN THE SUPREME COURT OF THE STATE OF HAWAII

| | |
|---|---|
| MICHAEL A. PEROUTKA, CHUCK BALDWIN, and DAVID P. PORTER, | CIVIL NOS.  04-1-1904<br>04-1-1905 |
|      Appellants-Appellants, | APPEAL FROM THE<br>1) DECISION OF THE COURT, AND ORDERS filed on November 23, 2004 |
|     vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | 2) FINAL JUDGMENTS filed on April 5, 2005 |
|      Appellee-Appellee. | FIRST CIRCUIT COURT |
| | HONORABLE EDEN ELIZABETH HIFO<br>HONORABLE SABRINA McKENNA<br>Judges |
| RALPH NADER, PETER MIGUEL CAMEJO, and ROBERT H. STIVER, | [Consolidated with S.C. No. 27234] |
|      Appellants-Appellants | |
|     vs. | |
| DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, | |
|      Appellee-Appellee. | |

## CERTIFICATE OF SERVICE

I hereby certify that two (2) copies of Appellee's Answering Brief was duly served upon the following by U.S. mail, postage prepaid, addressed as follows:

ERIC A. SEITZ, ESQ.
LAWRENCE I. KAWASAKI, ESQ.
820 MILILANI STREET, SUITE 714
HONOLULU, HAWAII 96813
Attorneys for Appellants

DATED:  Honolulu, Hawaii, September 30, 2005.


AARON H. SCHULANER
HOLLY T. SHIKADA
Deputy Attorneys General

Attorneys for Appellee-Appellee
DWAYNE D. YOSHINA,
CHIEF ELECTION OFFICER, STATE OF HAWAII