IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RALPH NADER, PETER MIGUEL CAMEJO, ROBERT H. STIVER, MICHAEL A. PEROUTKA, CHUCK BALDWIN, and DAVID W. PORTER, <br><br> Plaintiffs, <br><br> vs. <br><br> DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii, <br><br> Defendants. | CIVIL NO. 04-0061 JMS/LEK <br><br> PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS OR IN THE
ALTERNATIVE FOR SUMMARY JUDGMENT AND IN SUPPORT
OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

I.    BACKGROUND OF THE CASE

Plaintiffs filed the instant action on October 8, 2004 in the United States

District Court for the District of Hawaii seeking: (1) entry of judgment

determining that Section 11-113, Hawaii Revised Statutes is unconstitutional on

its face and as applied; (2) entry of judgment determining that Defendant's failure

and refusal to place the names of Plaintiffs Nader, Camejo, Peroutka, and Baldwin

on the ballot for the November 2, 2004 statewide election was arbitrary and

capricious and in violation of Plaintiffs' constitutional rights; and (3) issuance of a

preliminary and permanent injunction enjoining Defendant from failing and/or refusing to place the names of Plaintiffs Nader, Camejo, Peroutkla, and Baldwin on the ballot for the November 2, 2004 statewide election.

Plaintiffs' subsequent motions for preliminary injunction filed on October 11, 2004, and temporary restraining order filed on October 12, 2004, were denied after a hearing on October 13, 2004 on the grounds that the parties were currently involved in ongoing state proceedings. Exhibit 9, attached to Affidavit of Eric A. Seitz, Plaintiffs' Concise Statement of Material Facts in Support of Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment (hereinafter "Exhibit ___, Plaintiffs' Concise Statement of Facts"), Order Denying Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction filed October 13, 2004.

In its order the Court noted that prior to its October 13, 2004 hearing both Plaintiffs had petitions pending with the Office of Elections, State of Hawaii to have the names of their respective candidates placed on the ballots for the election of President and Vice President of the United States. Pursuant to the requirements of Section 11-113(c)(2)(B), Hawaii Revised Statutes (hereinafter "HRS § ___"), applications of independent presidential and vice presidential candidates must be

2

supported by "signatures of currently registered voters which constitute **not less than one percent of the votes cast in the State at the last presidential election**,"[1] which in these cases required Plaintiffs to submit 3,711 signatures on their respective petitions.  On or about September 20, 2004 Defendant had informed the Nader/Camejo Campaign and the Peroutka/Baldwin Campaign respectively that they had failed to satisfy the requirements for having their candidates' names placed on the ballot.  Exhibit 9, Plaintiffs' Concise Statement of Facts, at pp. 2-4.

On September 23, 2004 the Nader/Camejo Campaign requested an administrative hearing to contest and review the disqualifications of their candidates, and the Peroutka/Baldwin Campaign made a similar request on September 24, 2004.  On September 29, 2004 an administrative hearing

---

[1]    Section 11-113(c)(2), Hawaii Revised Statutes provides as follows:

(2)    In the case of candidates of parties or groups not qualified to place candidates on the primary or general election ballots, the person desiring to place the names on the general election ballot shall file with the chief election officer not later than 4:30 p.m. on the sixtieth day prior to the general election:
          (A)    A sworn application, which shall include the information required under paragraph (1)(A) and (B), and (C) where applicable;
          (B)    A petition which shall be upon the form prescribed and provided by the chief election officer containing the signatures of currently registered voters which constitute not less than one per cent of the votes cast in the State at the last presidential election.  The petition shall contain the names of the candidates, a statement that the persons signing intend to support those candidates, the address of each signatory, the date of the signer's signature and other information as determined by the chief elections officer.

commenced to address the Nader/Camejo Campaign's challenge, but prior to its

conclusion the Nader/Camejo Campaign entered into a settlement agreement in

which Defendant agreed to re-evaluate and recount the signatures submitted in the

presence of a representative of a Nader representative. The recount began on

October 7, 2004, and had not yet been completed by the time Plaintiffs' motions

for preliminary injunction and temporary restraining order were heard on October

13, 2004. Exhibit 9, Plaintiffs' Concise Statement of Facts, at pp. 2-4.

An administrative hearing on the Peroutka/Baldwin Campaign's challenge

was conducted on September 30, 2004, and in a letter dated October 5, 2004,

Defendant informed the Peroutka/Baldwin Campaign that it had failed to satisfy

the requirements for having their candidates' names placed on the ballot. At the

time of this Court's hearing on October 13, 2004, however, the Peroutka/Baldwin

Campaign had not appealed Defendant's determination to the State Circuit Court.

Exhibit 9, Plaintiffs' Concise Statement of Facts, at pp. 2-4.

Defendant then filed his answer on November 1, 2004, and the case was set

for a non-jury trial on December 13, 2005.

On July 13, 2005, Defendant moved to dismiss the instant action which

Plaintiffs opposed, arguing that the Court instead should stay the instant

proceedings pending the outcome of proceedings in the state courts but retain

jurisdiction to provide a federal forum to address remaining federal claims that may not have been redressed upon the termination of the state proceedings. Plaintiffs noted that the Circuit Court of the First Circuit, State of Hawaii, had affirmed Defendant's refusal to place the names of their candidates on the ballot, and that both decisions were currently on appeal to the Hawaii Supreme Court. Exhibit 10, Plaintiffs' Concise Statement of Facts, Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss filed September 28, 2005 (attachments omitted).

On October 28, 2005 the parties stipulated and agreed to stay the proceedings herein pending resolution of Plaintiffs' appeal to the Hawaii Supreme Court. On March 31, 2006, the Court entered an Order denying Defendant's motion to dismiss without prejudice, and then on September 26, 2007 the court lifted the stay and set the case for trial on March 4, 2008.

Defendant filed the instant motion on December 4, 2007.

A.    PLAINTIFFS' STATE COURT ACTIONS

In their actions in the state court Plaintiffs alleged: (1) that the procedures used in verifying signatures on their nomination petitions were unconstitutional; (2) that the review of Plaintiffs' petitions was arbitrary, capricious and/or not based on any credible evidence; and (3) that Plaintiffs were

5

not provided a fair administrative hearing. Exhibits 8-9, attached to Defendant's

Motion to Dismiss or in the Alternative for Summary Judgment filed herein on

December 4, 2007.

In verifying the signatures on Plaintiffs' petitions it is undisputed that

Defendant merely identified the signatory by his/her name and then obtained the

signatory's voter records to determine whether the signatory is an active and

properly registered voter. If the signatory did not provide all of the required

information on the petition or if the information was not immediately legible to the

examiner the Office of Elections simply refused to count the signature "without

making a serious effort to decipher the names and/or to use other identifying

information." ¶14, Plaintiffs' Concise Statement of Facts (referring to Exhibit 6,

Affidavit of Robert H. Stiver, at ¶¶9, 13, 14, and Exhibit 7, Affidavit of David W.

Porter, at ¶9). Although the Office of Elections requires that signatories provide

their name, address, and birthdate (¶13, Plaintiffs' Concise Statement of Facts),

examiners did not attempt to validate signatories by cross-referencing that

information on the statewide voter registration system and also rejected signatures

where a signatory's address on the petition did not exactly match the address of

the signatory on the statewide voter registration system, including those that could

be verified by the use of post office box addresses and/or other identifying

6

information. ¶14, Plaintiffs' Concise Statement of Facts (referring to Exhibit 6, Affidavit of Robert H. Stiver, at ¶¶9, 15, and Exhibit 7, Affidavit of David W. Porter, at ¶¶ 9, 17).

It also is undisputed that after Defendant Yoshina initially determined that the Peroutka/Baldwin Campaign had not submitted a sufficient number of signatures on their petition, Defendant Yoshina convened an administrative hearing to address the Peroutka/Baldwin Campaign's challenge and sat as the hearing officer, in effect, reviewing his own previous decisions. ¶15, Plaintiffs' Concise Statement of Facts (referring to Exhibit 6, Affidavit of Robert H. Stiver, at ¶¶5, 6, 7, 8, 9, and Exhibit 4, Plaintiffs' Concise Statement of Facts, Affidavit of David W. Porter, at ¶¶5, 6, 7, 8, 9, 12).

## II.    ISSUES PRESENTED

### A.    PLAINTIFFS' EQUAL PROTECTION CLAIMS

Candidates for President and Vice President of the United States can have their names placed on the general election ballot in Hawaii in two ways. In the case of candidates of qualified political parties, an official of those parties can submit an application identifying each of the two candidates chosen by the party.[2]

---

[2]    ¶2, Plaintiffs' Concise Statement of Facts, referring to HRS §11-113(c)(1) which provides the following:

Any group of persons may qualify as a political party by submitting a petition

containing the signatures of registered voters comprising "**not less than one-tenth**

**of one percent of the total registered voters of the State as of the last**

**preceding general election**," "by the end of the one hundred seventieth day prior

to the next primary."[3]. Defendant submits that in the last preceding general

---

    (c)    All candidates for President and Vice President of the United States shall be qualified for inclusion on the general election ballot under either of the following procedures:
        (1)    In the case of candidates of political parties which have been qualified to place candidates on the primary and general election ballots, the appropriate official of those parties shall file a sworn application with the chief election officer not later than 4:30 p.m. on the sixtieth day prior to the general election, which shall include:
            (A)    The name and address of each of the two candidates;
            (B)    A statement that each candidate is legally qualified to serve under the provisions of the United States Constitution;
            (C)    A statement that the candidates are the duly chosen candidates of both the state and the national party, giving the time, place, and manner of the selection.

    [3]    ¶3, Plaintiffs' Concise Statement of Facts, referring to HRS §11-62(a) which provides the following:

    (a)    Any group of persons hereafter desiring to qualify as a political party for election ballot purposes in the State shall file with the chief election officer a petition as provided in this section. The petition for qualification as a political party shall;
        (1)    Be filed not later than 4:30 p.m. on the one hundred seventh day prior to the next primary;
        (2)    Declare as concisely as may be the intention of the signers thereof to qualify as a statewide political party in the State and state the name of the new party;
        (3)    Contain the name, signature, residence address, date of birth, and other information as determined by the chief election officer of currently registered voters comprising not less than one-tenth of one percent of the total registered voters of the State as of the last preceding general election;
        (4)    Be accompanied by the names and addresses of the officers of the central committee and of the respective county committees of the political party and by the party rules; and
        (5)    Be upon a form prescribed and provided by the chief election officer.

election, i.e., the 2002 general election, 676,242 votes were cast, and, accordingly, candidates seeking to place their names on the 2004 general election ballot by forming a political party were required to submit 677 signatures on a petition by April 1, 2004.[4]

Candidates who are not affiliated with a qualified political party are required to submit a petition containing the signatures of registered voters comprising "not less than one percent of the votes cast in the State at the last presidential election," "by the end of the sixtieth day prior to the general election." HRS §11-113(c)(2).[5] Defendant submits that in the last preceding presidential election, i.e., the 2000 presidential election, 371,033 votes were cast in Hawaii, and, accordingly, candidates seeking to place their names on the general election ballot without affiliation with a qualified political party were required to submit at least 3,711 signatures on a petition by September 3, 2004.[6]

At issue here is the disparity between the signature requirement for candidates not affiliated with a political party, i.e., of "not less than **one percent of the votes cast in the State at the last presidential election**" or 3,711 signatures,

---

[4]    ¶4, Plaintiffs' Concise Statement of Facts.

[5]    ¶5, Plaintiffs' Concise Statement of Facts; see also, note 1, supra.

[6]    ¶4, Plaintiffs' Concise Statement of Facts.

HRS §11-113(c)(2)(B), and the signature requirement for candidates who choose to qualify themselves as a new party, i.e., of "not less than **one-tenth of one percent of the total registered voters of the State as of the last preceding general election**," or 677 signatures, HRS §11-62(a)(3). Candidates not affiliated with a political party are required to obtain approximately a ten times greater percentage, or 3,034 more signatures, than candidates choosing to qualify themselves through the formation of new party are required to obtain.

B.    PLAINTIFFS' STATE COURT CLAIMS

In their actions in the state court Plaintiffs allege: (1) that the procedures used by Defendant in verifying signatures on Plaintiffs' nomination petitions were unconstitutional; (2) that Defendant's review of Plaintiffs' petitions was arbitrary, capricious and/or not based on any credible evidence; and (3) that Plaintiffs were not provided a fair administrative hearing.

III.    STANDARDS OF REVIEW

"A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration 'the extent to which those interests make it

10

necessary to burden the plaintiff's rights.' [...] Under this standard, the

rigorousness of our inquiry into the propriety of a state election law depends upon

the extent to which a challenged regulation burdens First and Fourteenth

Amendment rights.  Thus, as we have recognized when those rights are subjected

to severe restrictions, the regulation must be narrowly drawn to advance a state

interest of compelling importance.  But when a state election law provision

imposes only reasonable, nondiscriminatory restrictions upon the First and

Fourteenth Amendment rights or voters, the State's important regulatory interests

are generally sufficient to justify the restrictions." Burdick v. Takushi, 504 U.S.

428, 434, 112 S.Ct. 2059, __, 119 L.Ed.2d 245, 253 (1992)(hereinafter

"Burdick"); Lightfoot v. Eu, 964 F.2d 865, at 868, note 2 (9th Cir. 1992).

In applying the foregoing analysis the court must consider the "totality" of a

state's election laws and determine whether the state's laws, taken as a whole,

impose an unconstitutional burden on voting and associational rights. Williams v.

Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, __, 21 L.Ed.2d 24, 31 (1968)(holding that in

determining whether or not a state election law violates the Equal Protection

Clause the court must consider the facts and circumstances behind the law, the

interests which the State claims to be protecting, and the interests of those who are

disadvantaged).  The concept of "totality" is intended to identify those situations

where "facially valid election laws may operate in tandem to produce impermissible barriers to constitutional rights." Storer v. Brown, 415 U.S. 724, 737, 94 S.Ct. 1274, __, 39 L.Ed.2d 714, 727 (1974).

In reviewing orders of a State Court concerning the validity of challenges to a nomination petition, the standard of review is whether the findings of fact are supported by substantial evidence, whether there was an abuse of discretion, or whether errors of law were committed. In re Nomination Petition of Flaherty, 770 A.2d 327 (Pa. 2001).

## IV.    ARGUMENT

Although Article II, §1 of the Constitution gives the States the power to regulate elections of the President, this power is subject to the limitation that such power may not be exercised in a way that violates other specific provisions of the Constitution. Williams v. Rhodes, 393 U.S. 23, 30, 31, 89 S.Ct. 5,__ , 21 L.Ed.2d 24, 30 (1968)(holding that States must provide feasible means for independent candidates to appear on the general election ballot). "Candidate eligibility requirements implicate basic constitutional rights of voters as well as those of candidates." Erum v. Cayetano, 881 F.2d 689, 691 (9th Cir. 1989). Ballot access restrictions "place burdens on two different, although overlapping, kinds of rights - the right of individuals to associate for the advancement of political beliefs, and

12

the right of qualified voters, regardless of their political persuasion, to cast their

votes effectively. Both of these rights, of course, rank among our most precious

freedoms." Anderson v. Celebrezze, 460 U.S. 780, 787, 103 S.Ct. 1564, ___, 75

L.Ed.2d 547, 556 (1983). "No right is more precious in a free country than that of

having a voice in the election of those who make the laws under which, as good

citizens, we must live." Williams v. Rhodes, 393 U.S. 23, 31, 89 S.Ct. 5, ___,21

L.Ed.2d 24, 31 (1968)(holding that the freedom of association is protected by the

First Amendment, and this freedom is protected from infringement by the States

by the Fourteenth Amendment).

> [In] the context of a Presidential election, state imposed
> restrictions implicate a uniquely important national interest. For the
> President and Vice President of the United States are the only elected
> officials who represent all of the voters in the Nation. Moreover, the
> impact of the votes cast in each State is affected by the votes cast for
> the various candidates in other States. Thus in a Presidential election
> a State's enforcement of more stringent ballot access requirements,
> including filing deadlines, has impact beyond its borders. Similarly,
> the State has a less important interest in regulating Presidential
> elections than statewide or local elections, because the outcome of the
> former will be largely determined by voters beyond the State's
> boundaries."

Anderson v. Celebrezze, supra 460 U.S. at 794-5, 103 S.Ct. at ___, 75 L.Ed.2d at

561.

13

## A.    PLAINTIFFS' EQUAL PROTECTION CLAIMS

Plaintiffs submit that the petition signature requirement for candidates

not affiliated with a political party, i.e., HRS §11-113(c)(2)(B), imposes a

substantially greater burden on their access to the ballot than that imposed on

candidates affiliated with a new political party, i.e., HRS §11-62(a)(3) which is not

justified by any compelling state interest.

> As between new (third) party candidacies and independent
> candidacies, independent candidacies must be accorded even more
> protection than third party candidacies. This flows from the states'
> heightened interest in regulating the formation of new parties having
> the potential not possessed by independent candidacies for long-term
> party control of state government, *see Storer v. Brown*, 415 U.S. 724,
> 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974),[7] in combination
> with the peculiar potential that independent candidates have for
> responding to issues that only emerge during or after the party
> /
> /
> /

---

[7]    "[T]he political party and the independent candidate approaches to political
activity are entirely different and neither is a satisfactory substitute for the other. A new party
organization contemplates a statewide, ongoing organization with distinctive political character.
Its goal is typically to gain control of the machinery of state government by electing its
candidates to public office. From the standpoint of a potential supporter, affiliation with a new
party would mean giving up his ties with another party or sacrificing his own independent status,
even though his possible interest in the new party centers around a particular candidate for a
particular office. For the candidate himself, it would mean undertaking the serious responsibility
of qualified party status under California law, such as the conduct of a primary, holding party
conventions, and the promulgation of party platforms. But more fundamentally, the candidate,
who is by definition an independent and desires to remain one, must now consider himself a
party man, surrendering his independent status. Must he necessarily choose the political party
route if he wants to appear on the ballot in the general election? We think not." Storer v. Brown,
415 U.S. 724, 745, 94 S.Ct. 1274, 39 L.Ed.2d 714, 732 (1974).

primary process. *Anderson*, 460 U.S. at 790-92, 103 S.Ct. at 1570-71.[8]

Cromer v. State of South Carolina, 917 F.2d 819, at 823 (4th Cir. 1990); see also,

Delaney v. Bartlett, 370 F.Supp.2d 373, 378 (M.D.N.C. 2004)(holding that

unaffiliated candidates' ballot access requirements should be "reasonable" and

"similar in degree" to party candidates requirements [citing Wood v. Meadows,

207 F.3d 708, 712 (4th Cir. 2000)] ).

The instant signature requirement in HRS §11-113(c)(2)(B) is

defended herein on the basis that the "**one percent of the votes cast in the State**

**at the last presidential election**" requirement for candidates not affiliated with a

qualified political party is reasonable under the standard established in American

Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2D 744 (1974).

Defendant's motion at pp. 15-16.

In American Party the "one percent requirement" applied to new or

small political parties, not to independent candidates. The Court held that the

requirement for a new or small political party to get their candidates' names on the

---

[8]     "In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage and may affect voters' assessments of national problems. Such developments will certainly affect the strategies of candidates who have already entered the race; they may also create opportunities for new candidates." Anderson v. Celebresse, 460 U.S. 780, 790, 103 S.Ct. 1564, 75 L.Ed.2d 547, 558 (1983).

ballot, i,.e., to submit evidence showing support of "at least 1% of the total votes cast for governor at the last preceding general election," in the absence of a similar requirement of major political parties, was not unconstitutional where major political parties were otherwise required to show that its candidates had received more than 200,000 votes in the last general election. In American Party the ballot qualification requirement **for independent candidates**, which the Court deemed to be reasonable was "3 to 5 percent of the vote in the last election **with a limit of no more than 500 signatures**." Id., 415 U.S. at 789, 94 S.Ct. at __, 39 L.Ed.2d at 764. Because there is no outside limit on the number of signatures required of independent candidates in HRS §11-113, Defendant's reliance on American Party is entirely misplaced.

Reliance on American Party would also be misdirected because the issue here is not the percentage requirement imposed on independent candidates but the disparity between the signature requirement for candidates not affiliated with a political party, and candidates of a new party. Compare, Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971)(upholding a five percent signature requirement for independent candidates where it applied equally to both independent candidates and candidates seeking to qualify through the equivalent to a "new" party, and where there was no limitation on the right of a

16

voter to write in the name of the candidate of his/her choice on the ballot and to have that write-in vote counted); Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d. 230 (1979)(holding that Illinois' five percent signature requirement for new parties and independent candidates to get on the ballot in elections for offices of political subdivisions amounting to between 35,947 and 63,373 signatures in the City of Chicago, violates the Equal Protection Clause where only 25,000 signatures were required of new political parties and independent candidates in statewide elections).

HRS §11-113(c)(2) not only imposes a substantially greater burden on candidates not affiliated with a political party than that imposed on candidates affiliated with a new political party, it does so in a jurisdiction where voters are not allowed to otherwise write in the name of the candidate of their choice on the ballot and have that write-in vote counted. Burdick, supra (holding that Hawaii's ban on write-in votes is permissible where there is constitutionally sufficient ballot access to candidates); compare, Jenness, supra.

Accordingly the Court must consider the facts and circumstances behind the law in its current form, the interests which the State claims to be protecting, and the interests of those who are disadvantaged to determine whether "there is constitutionally sufficient ballot access to candidates." Burdick, supra.

17

At the time <u>Burdick</u> was decided  HRS §11-62 provided that a new

party petition required signatures of "<u>one percent of the State's registered voters</u>"

in order to qualify to place candidates on the ballot in the 1986 election. <u>Id.</u>, at

504 U.S. __, 112 S.Ct. 2059, 119 L.Ed.2d 254; ¶7, Plaintiffs' Concise Statement

of Facts.  Petitions from independent candidates for president and vice president

who were not affiliated with a recognized political party required signatures of

"<u>one percent of the votes cast in the State at the last presidential election.</u>"  ¶8,

Plaintiffs' Concise Statement of Facts.

The signature requirement of HRS §11-62 to qualify as a new party

remained unchanged until 1999 when the State Legislature passed Act 205 which

reduced the signature requirement to "**<u>not less than one-tenth of one percent of</u>**

**<u>the total registered voters of the State as of the last preceding general</u>**

**<u>election</u>**.." ¶9, Plaintiffs' Concise Statement of Facts.  Standing Committee

Reports of both houses clearly indicate that the purpose of this amendment was to

make it easier for a political party to qualify and operate in Hawaii so as to provide

the voting public greater choice in political parties.  ¶10, Plaintiffs' Concise

Statement of Facts.  However, there was no commensurate reduction in the

signature requirement in HRS §11-113 for petitions from independent candidates,

thereby creating the disparity at issue here.  ¶9, Plaintiffs' Concise Statement of

Facts.

Currently HRS §11-113 imposes a substantially greater burden on independent candidates, like Plaintiffs, who chose to pursue their candidacies as independents (i.e., signatures of "not less than **one percent of the votes cast in the State at the last presidential election**" or 3,711 signatures) than that imposed by HRS §11-62 on candidates who choose to pursue their candidacies by forming a new political party ( i.e., signatures of "not less than **one-tenth of one percent of the total registered voters of the State as of the last preceding general election**," or 677 signatures). Candidates not affiliated with a political party are required to obtain approximately ten times greater the percentage, or 3,034 more signatures, than candidates choosing to pursue their candidacies by forming a new party. Consequently, unaffiliated candidates are severely disadvantaged in getting their names on the general election ballot compared to candidates who choose to pursue their candidacies by forming a new political party.

Such disparity in the signature requirements can be upheld as a legitimate restriction on ballot access only if it is narrowly drawn to advance a compelling state interest. Greaves v. State Board of Elections of North Carolina, 508 F.Supp. 78 (D.C.N.C. 1980)(holding that a strict scrutiny standard applies where a state law discriminates against those who chose to pursue their

19

candidacies for president and vice president as independents rather than by

forming a new political party).  In this case, however, the Defendant fails to show

any "compelling interest" justifying the substantially greater burden imposed on

unaffiliated candidates like Plaintiffs than that imposed on candidates who choose

to pursue their candidacies by forming a new party.

        The only justification raised by Defendant is the State's general

regulatory interest in avoiding voter confusion and overcrowding of the ballot by

requiring candidates appearing on the general election ballot to demonstrate a

significant, measurable quantum of community support.  See, Exhibit 14, attached

to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment,

Declaration of Dwayne D. Yoshina dated October 12, 2004, at ¶24.

        While the "one percent" signature requirement of HRS §11-113(c)(2)

for unaffiliated candidates like Plaintiffs, viewed in isolation, might be justified by

the State's general regulatory interest, such interest is in no way served or

advanced by the decided advantage given to those who choose to pursue their

candidacies by forming a new political party through HRS §11-62.  Storer, 415

U.S. at 737, 94 S.Ct. at __, 39 L.Ed.2d at 727 (1974)(holding that "facially valid

provisions of election laws may operate in tandem to produce impermissible

barriers to constitutional rights.").

20

Here it appears more probable than not that in passing Act 205 and reducing the signature requirements for new parties in HRS §11-62, the Legislature merely overlooked the disparate impact the amendment would have on unaffiliated candidates for the offices of president and vice president of the United States under HRS §11-113; however, "[h]istorical accident, without more, cannot constitute a compelling state interest." Elections Bd., 440 U.S. at 187, 99 S.Ct. at __, 59 L.Ed.2d. at 243.

Accordingly, the Court should determine that HRS §11-113(c)(2) imposes an unreasonable and discriminatory burden on Plaintiffs in violation of the Fourteenth Amendment. Williams v. Rhodes, 393 U.S. at 29, 89 S.Ct. 5, __, 21 L.Ed.2d at 31 ("We therefore hold that no State can pass a law regulating elections that violates the Fourteenth Amendment's command that 'No State shall deny to any person the equal protection of the laws.").

B.    PLAINTIFFS STATE COURT CLAIMS

Plaintiffs submit that the Court should proceed to adjudicate Plaintiffs' claims currently pending in the State courts on the grounds that those claims have been pending since October, 2004, the 2008 presidential campaign season is already well underway, and in the absence of expeditious adjudication in the federal court Plaintiffs' claims are likely to be unresolved for yet another

21

election. <u>Zwickler v. Koota</u>, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967);

<u>Dombrowski v. Pfister</u>, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

Because ballot access restrictions place burdens on "our most precious freedoms,"

and "the State has a less important interest in regulating Presidential elections than

statewide or local elections," <u>Anderson</u>, <u>supra</u>, the  court should evaluate the

actions of the Office of Elections' under the principle that the election code should

be liberally construed so as not to deprive a candidate of the right to run for office

or the voters of their right to elect the candidate of their choice. E.g., <u>In re Nader</u>,

858 A.2d 1167, 1177 (Pa. 2004)("nomination petitions are presumed to be valid

and an objector has the burden of proving that a nomination petition is invalid");

<u>State v. Zimmerman</u>, 130 N.W.2d 753, 757 (Wis. 1964)("Respondent would have

no right to reject the filing of these nomination papers because of paste-ons in the

absence of possession of some fact tending to rebut such presumption of

regularity").

      1.    The practices and procedures utilized and relied upon by
            Defendant to count and determine the validity and sufficiency
            <u>of the signatures on Plaintiffs' petitions are unconstitutional</u>

In the instant cases it is undisputed that the Office of Elections

merely identified the signatory by <u>his/her name</u> and then obtained the signatory's

voter records to determine whether the signatory is an active and properly

registered voter. If the signatory does not provide all of the required information on the petition or if the information is not immediately legible to the examiner the Office of Elections simply refuses to count the signature. ¶14, Plaintiffs' Concise Statement of Facts.

The Office of Elections rejected a large number of signatures as illegible "without making a serious effort to decipher the names and/or to use other identifying information." The evidence, which was never disputed in state court, shows that the procedures and practices employed by the Office of Elections were designed to eliminate names, rather than to validate them. Although a certain number of signatories were deemed valid after their initial review, the Office of Elections, sua sponte, conducted a second review and invalidated an additional number of signatures that previously had been deemed valid.[9] Compare, Nomination Petition of Delle Donne, 779 A.2d 1 (Pa.Cmwlth. 2001)(a signature must be so illegible as to preclude verification); In re Nomination Petition of Cooper, 643 A.2d 717, 725 (Pa.Cmwlth. 1994)("Serious doubts regarding the genuineness of signatures challenged as fraudulent were resolved in favor of Cooper since the court was not absolutely convinced that these signatures were not

---

[9]     Exhibit 6, Plaintiffs' Concise Statement of Facts, Affidavit of Robert H. Stiver, at ¶¶5, 6; Exhibit 7, Plaintiffs' Concise Statement of Facts, Affidavit of David W. Porter, at ¶¶5, 6.

genuine.").

Although the Office of Elections requires that signatories

provide their addresses and dates of birth,[10] the examiners did not attempt to

validate signatories by cross-referencing information on the statewide voter

registration system.  Compare, In re Nomination Petition of Cooper, 643 A.2d 717,

725, n. 19 (Pa.Cmwlth. 1994)(identification of these signatures was attempted by

comparison to the unofficial street list of the Philadelphia County Board of

Elections).

The Office of Elections rejected signatures where a signatory's

address on the petition did not exactly match the address of the signatory on the

statewide voter registration system, including those that could be verified by the

use of post office box addresses and/or other identifying information, although the

law does not require the Office of Elections to invalidate a signatory having a

different address on the statewide voter registration system.[11]  These

disqualifications are particularly onerous because a signatory is not even required

to live in any particular district in order to qualify to vote for the President and

---

[10]      ¶13, Plaintiffs' Concise Statement of Facts.

[11]      Exhibit 6, Plaintiffs' Concise Statement of Facts, Affidavit of Robert H. Stiver, at
¶¶9, 15; Exhibit 7, Plaintiffs' Concise Statement of Facts, Affidavit of David W. Porter, at ¶¶9,
17.

Vice President of the United States. Cf., In re Driscoll, 847 A.2d 44 (Pa.

2004)(holding that a candidate's incorrect listing of his address on his nomination

petition is not a material defect because he is not required to live in the

congressional district to run as representative of that district).

                        Accordingly, this Court should determine that the practices and

procedures utilized by the Office of Elections to count and determine the validity

and sufficiency of the signatures on Plaintiffs' petitions were unconstitutional.

          2.     Defendants' determinations that Plaintiffs failed to submit
               sufficient valid signatures to qualify to have their candidates'
               names placed on the presidential ballot were arbitrary,
               capricious and/or not based on any credible evidence

                        Because the practices and procedures utilized by the Office of

Elections to count and determine the validity and sufficiency of the signatures on

Appellants' petitions were unconstitutional (see above) this Court should hold that

the Defendant's determinations that Plaintiffs failed to submit sufficient valid

signatures were arbitrary, capricious and/or not based on any credible evidence. In

the instant cases the Office of Elections never "indulged a liberal intendment in

favor of many on the principle of idem sonans." State v. Lesueur, 38 S.W. 325

(Mo. 1896). In fact, the Office of Elections rejected a large number of signatures

as illegible "without making a serious effort to decipher the names and/or to use

25

other identifying information." Compare, <u>In re Nomination Petition of Cooper,</u>

643 A.2d 717, 725, n. 19 (Pa.Cmwlth. 1994)(identification of these signatures was

attempted by comparison to the unofficial street list of the Philadelphia County

Board of Elections).

Accordingly, Defendant's determination that Plaintiffs failed to

submit sufficient valid signatures to qualify to have their candidates' names placed

on the presidential ballot was arbitrary, capricious and/or was not based on any

credible evidence.

3.    Plaintiffs were not provided with a fair administrative hearing
      <u>before an impartial and objective hearing officer</u>

In <u>Sifagaloa v. Bd. of Trustees, Employee's Retirement System,</u>

74 Haw. 181, 189 (1992), the Hawaii Supreme Court, in relevant part, reaffirmed

the following principles under which due process claims are to be analyzed:

> There are certain fundamentals of just procedure which are the
> same for every type of tribunal and every type of proceeding.
> Concededly, a fair trial in a fair tribunal is a basic requirement of due
> process. This applies to administrative agencies which adjudicate as
> well as to courts. Of course, a biased decision maker is
> constitutionally unacceptable. But no one would argue seriously that
> the disqualification of decision-makers on grounds of actual bias
> prevents unfairness in all cases. So our system of justice has always
> endeavored to prevent even the probability of unfairness.
>
> The Supreme Court teaches us too that justice can perform its
> high function to the best way only if it satisfies the appearance of

26

justice. For in a popular government, justice must not only be done
but must manifestly be seen to be done. And, there can be little
question that the use of a truly independent adjudicator is essential to
attainment of this goal. Indeed, if there exists any reasonable doubt
about the adjudicator's impartiality at the outset of the case, provision
of the most elaborate procedural safeguards will not avail to create an
appearance of justice.

Since the fundamentals of just procedure impose a requirement
of impartiality on administrative agencies which adjudicate as well as
on courts, we see no reason why an administrative adjudicator should
be allowed to sit with impunity in a case where the circumstances
fairly give rise to an appearance of impropriety and reasonably cast
suspicion on his impartiality. [...]

74 Haw. 189-190 (citations and quotations deleted).

Where a hearing officer, a government official, reviewing a

challenge to an administrative action is familiar with substantially all the pertinent

facts before the hearing commences and acted in an adversary role prior to the

hearing, the petitioner is deprived of a fair hearing before a neutral hearing officer.

Palaez v. Waterfront Commission of New York Harbor, 454 N.Y.S.2d 132, 135

(2d Dep't 1982)("One of the rights secured to an accused person by the law of the

land is, that his accuser shall not be at the same time his judge; that is a principle

of law that is fundamental; it is the first requisite to a fair and impartial trial; it is a

privilege that the law of the land guarantees to every man when his life or liberty,

good name, fame or property is involved."); Cf. Holmes by Holmes v. Sobol, 690

27

F.Supp. 154, 161 (W.D.N.Y. 1988)(holding that a government official who is directly involved in establishing and executing policies governing a program cannot be presumed to be an impartial and independent fair hearing officer for the purposes of reviewing program actions); In re Murchinson, 349 U.S. 133, 136, 75 S.Ct. 623, __, 99 L.Ed. 942, 946 (1955)("[...] no man can be a judge of his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This court has said, however, that every procedure which would offer a possible temptation to the average man as judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.").

        In the instant case it is undisputed that Defendant Yoshina first determined that the Peroutka/Baldwin Campaign did not submit sufficient signatures on their petition to qualify to have their candidates' names placed on the general election ballot for president and vice president. Defendant Yoshina then convened an administrative hearing to address the Peroutka/Baldwin Campaign's challenge at which he himself sat as the hearing officer, and, in effect, reviewed his own previous decisions.[12]

---

[12]    ¶15, Plaintiffs' Concise Statement of Facts.

As a result, the hearing was a farce. Defendant Yoshina, by virtue of his role as Chief Election Officer, responsible for establishing and executing the policies governing the Office of Elections, can hardly be presumed to be the impartial and independent fair hearing office to which the Peroutka/Baldwin campaign was entitled. Holmes by Holmes v. Sobol, 690 F.Supp. 154 (W.D.N.Y. 1988). By seating himself as the hearing officer on the Peroutka/Baldwin Candidate's challenge to the rejection of their petitions, Defendant Yoshina acted as accuser and judge in violation of Plaintiffs' right to due process. Palaez v. Waterfront Commission of New York Harbor, 454 N.Y.S.2d 132 (2d Dep't 1982); In re Murchinson, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Similarly, the Nader/Camejo candidates could not have received a fair and impartial hearing and therefore were compelled to settle for still another flawed recount.

V.    CONCLUSION

For all of the reasons set forth above, the Court should: (1) deny Defendant's motion; (2) declare that HRS §11-113(c)(2) is unconstitutional on its face and as applied to Plaintiffs; (3) declare that the procedures used in verifying signatures on Plaintiffs' nomination petitions were arbitrary, capricious and/or were not based on any credible evidence; (4) declare that Plaintiffs were not

provided a fair administrative hearing, and; (5) restrain, prohibit, and enjoin

Defendant from enforcing and/or applying HRS §11-113(c)(2) in any future

presidential election.

DATED:  Honolulu, Hawai'i, _____ ⌐JAN 1 0 2008 _____.

_____
ERIC A. SEITZ
LAWRENCE I. KAWASAKI

Attorneys for Plaintiffs
RALPH NADER, PETER MIGUEL
CAMEJO, ROBERT H. STIVER,
MICHAEL A. PEROUTKA,
CHUCK BALDWIN, AND DAVID W.
PORTER