IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RALPH NADER, PETER MIGUEL CAMEJO, ROBERT H. STIVER, MICHAEL A. PEROUTKA, CHUCK BALDWIN, AND DAVID W. PORTER,<br><br>Plaintiffs,<br><br>vs.<br><br>DWAYNE D. YOSHINA, Chief Election Officer, State of Hawaii,<br><br>Defendant. | CV NO. 04-00611 DAE/LEK<br><br>FILED IN THE<br>UNITED STATES DISTRICT COURT<br>DISTRICT OF HAWAII<br><br>OCT 13 2004<br><br>at 2 o'clock and 20 min. P M<br>WALTER A. Y. H. CHINN, CLERK |

<u>ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION</u>

The court heard Plaintiffs' Motion on October 13, 2004. Eric Seitz, Esq., appeared at the hearing on behalf of Plaintiffs; Aaron Schulaner and Russell Suzuki, Deputy Attorneys General for the State of Hawaii, appeared at the hearing on behalf of Defendant. After reviewing the motion and the supporting and opposing memoranda, the court DENIES Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction.

EXHIBIT 9

RECEIVED OCT 13 2004

## BACKGROUND

A.   The Nader Campaign

On September 3, 2004, Robert Stiver ("Stiver") filed an application and petition on behalf of the Nader for President 2004 Campaign to have presidential candidate Ralph Nader ("Nader") and vice-presidential candidate Peter Miguel Camejo ("Camejo") placed on the general election ballot in Hawaii.

There were approximately 5,600 signatures submitted supporting the applications of Nader and Camejo. However, only 3,672 of those submitted were determined to be valid on first count by the Office of Elections. On second count, only 3,124 signatures were found to be valid. According to Hawaii Revised Statutes ("HRS") § 11-113, the required number of valid signatures to place the candidates on the ballot was 3,711. This figure represents one percent of the votes cast in the last presidential election. On September 20, 2004, the Office of Elections informed Stiver that the Nader campaign had failed to obtain the necessary amount of valid signatures. On September 23, 2004, the Nader Campaign representative, Stiver, requested a hearing on the failure to obtain the requisite amount of valid signatures.

The Nader hearing commenced on September 29, 2004. Prior to the conclusion of the hearing, the Office of Elections and the Nader Campaign entered

into a settlement agreement. On October 1, 2004, the Chief Election Officer approved the Nader Settlement Agreement, which provides that the signatures on the petition submitted by the Nader Campaign will be reviewed again in the presence of a Nader representative. During the review, the Nader representative will be allowed to flag the signatures he believes should have been counted.

Pursuant to the Nader Agreement, the Chief Election Officer will review the challenged signatures and his decision will be final. This signature review process began on October 7, 2004, and was incomplete at the time of the hearing as no official count from the review was available.

B. The Peroutka Campaign

On September 3, 2004, David Porter ("Porter"), the Hawaii Coordinator for the Peroutka for President 2004 Campaign, filed an application and petition with the Chief Election Officer to have presidential candidate Michael A. Peroutka ("Peroutka") and vice-presidential candidate Chuck Baldwin ("Baldwin") placed on the general election ballot in Hawaii.

There were approximately 7,145 signatures submitted supporting the applications of Peroutka and Baldwin. However, only 3,481 of those submitted were determined to be valid. According to Hawaii Revised Statutes ("HRS") § 11-113, the required number of valid signatures to place the candidates on the ballot

3

was 3,711. This figure represents one percent of the votes cast in the last presidential election. On September 20, 2004, the Office of Elections informed Porter that the Peroutka campaign had failed to obtain the necessary amount of valid signatures.

On September 24, 2004, the Peroutka Campaign requested a hearing to review its eligible vote count as well. The hearing took place on September 30, 2004 and the Chief Election Official issued his decision on October 5, 2004. In the Peroutka Decision, the Chief Election Officer concluded that the Peroutka Campaign submitted an insufficient amount of valid signatures and, therefore, Peroutka and Baldwin were not eligible to be placed on the presidential ballot in Hawaii. To date, the Peroutka Campaign has not appealed the Peroutka Decision to the Circuit Court.

C.   The Election Has Already Commenced

On September 28, 2004, election officials began mailing out absentee ballots in order to provide overseas voters sufficient time to receive, vote, and return the ballots by the date of the election. This mailing was done in accordance with the Uniformed and Overseas Citizens Absentee Act ("UOCAVA"). As of the time of the hearing, all ballots, absentee and otherwise, (approximately 1,000,500) for the November 2, 2004 General Election have already been printed.

Furthermore, election officials have already begun to receive, through the mail, voted ballots.

## STANDARD OF REVIEW

The standard for granting a temporary restraining order ("TRO") is identical to that for a preliminary injunction. Hawai`i County Green Party v. Clinton, 980 F. Supp. 1160, 1164 (D. Haw. 1997). To obtain either, a party must demonstrate: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief.[1] Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1528 (9th Cir. 1993). These two formulations represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 456 (9th Cir. 1994). These formulations are not separate tests, but the extremes of a single continuum.

---

[1] Traditionally, there were four factors to be considered in deciding whether an injunction or restraining order should issue: 1) the likelihood of the plaintiff's success on the merits; 2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; 3) the relative balance of the harm to the plaintiff and the harm to the defendant; and 4) the public interest. Alaska v. Native Vill. of Venitie, 856 F.2d 1384, 1388 (9th Cir. 1988). These factors have been collapsed into the current test. See id.

Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1201 (9th Cir. 1980).

"If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." Alaska v. Native Vill. of Venitie, 856 F.2d 1384, 1389 (9th Cir. 1988) (quoting Aguirre v. Chula Vista Sanitary Serv., 542 F.2d 779 (9th Cir. 1976)). If the plaintiff shows no chance of success on the merits, the injunction should not issue. Moreover, under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). Finally, a plaintiff must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to injunctive relief. Associated Gen. Contractors of Cal., Inc. v. Coalition For Econ. Equity, 950 F.2d 1401, 1410 (9th Cir. 1991), cert. denied, 503 U.S. 985 (1992).

To the extent the Nader and Peroutka campaigns seek instant inclusion on the ballot, they are seeking something more than preservation of the status quo. The Ninth Circuit has called such relief "mandatory preliminary relief," noting that "mandatory preliminary relief" is disfavored and should not be issued unless the facts and law clearly favor the moving party. Stanley v. Univ. of

S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994); Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1979); accord Martin v. Int'l Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984) (construing as claims for mandatory preliminary relief attempts by women runners to add 5,000-meter and 10,000-meter races to the 1984 Olympic Games in Los Angeles and cautioning that, when a party "seeks mandatory preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction").

## DISCUSSION

In Hawaii, there are two separate and distinct ways a candidate can qualify for inclusion on the general election presidential ballot: (1) a qualified political party can designate a candidate; or (2) an individual can petition to be on the presidential ballot. HRS § 11-113(c)(1) &(2). With respect to the second method, the petition must contain the signatures of currently registered voters which constitute no less than one-tenth of one percent of the total registered voters of the State as of the last preceding general election. HRS § 11-62(a)(3).

Plaintiffs claim that the opportunity of Nader, Camejo, Peroutka, and Baldwin to appear on the November 2, 2004 Hawaii ballot have been rejected and thwarted due to statutes, rules, practices, and procedures of the State of Hawaii and its elections officials that discriminate impermissibly against independent

candidates and unfairly deny and deprive Hawaii voters of the opportunity to vote for them. Plaintiffs, therefore, request injunctive and declaratory relief in this matter, effectively mandating that Nader, Camejo, Peroutka, and Baldwin be included on the November 2, 2004 Hawaii ballot.

A.  Preliminary Injunction

To obtain a TRO or a preliminary injunction, a party must demonstrate: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief. Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1528 (9th Cir. 1993).

When a state election law provision imposes reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions. See Anderson v. Celebrezze, 460 U.S. 780, 788 (1983). In Erum v. Cayetano, 881 F.2d 689 (9th Cir. 1989), the Ninth Circuit held that Hawaii could constitutionally regulate its elections by limiting access of nonpartisan candidates to the general election ballot and by imposing different requirements as between nonpartisan and partisan candidates.

8

In <u>American Party of Texas v. White</u>, 415 U.S. 767 (1974), the Supreme Court held that requiring different methods for inclusion on the ballot and different amounts of signatures for independent candidates versus such methods and amounts for party candidates were not impermissible burdens on First and Fourteenth Amendment rights. <u>Id.</u> In <u>American Party of Texas</u>, the Supreme Court determined that the requirement of the notarized signatures of 1% of the total gubernatorial votes at the last preceding general election for minority parties and 3% or 5% for independent candidates were not impermissible burdens on the First and Fourteenth Amendment. <u>Id.</u>

This case is very similar to <u>American Party</u>. In balancing the reasonable restriction of requisite signatures with the State's interest in avoiding voter confusion and the overcrowding of the ballot with candidates who have no real chance of success, the State's non-discriminatory interest is sufficient to justify the restriction. Moreover, the restrictions in <u>American Party</u> were even more stringent than the restrictions now being applied in Hawaii as presented before this court. The restrictions reviewed in <u>American Party</u> required notarized signatures and also mandated that persons who voted in the party primaries were ineligible to sign an independent candidate's petition. These restrictions, which the Supreme Court upheld as permissible burdens are far more restrictive than those currently

employed in Hawaii.  See also Burdick v. Takahashi, 504 U.S. 428, (holding that Hawaii's ballot access laws pass constitutional muster, at least as analyzed with respect to write-on candidates); Jenness v Fortson, 403 U.S. 431, (holding that a state is not guilty of invidious discrimination violations in recognizing obvious differences between independent candidates and political parties and, therefore, providing different routes to the printed ballot.)  Therefore, the two paths available for getting on the presidential ballot in Hawaii (by political party or by petition) are different, but both are reasonable and ensure that only candidates who can show more than a modicum of support are able to be on the ballot.

Similarly, even if this court assumes, under the "serious questions/balance of hardships" test for injunctive relief, that the campaigns of the respective candidates raised serious questions as to the merits of their claim, the balance of hardships does not tip in their favor.  On September 28, 2004, election officials began mailing out overseas ballots in order to provide overseas voters sufficient time to receive, vote, and return the ballots by the date of the election. This mailing was done in accordance with the Uniformed and Overseas Citizens Absentee Act ("UOCAVA").  As of this time, all ballots, absentee and non-absentee, (approximately 1,000,500) for the November 2, 2004 General Election

have already been printed. Furthermore, election officials have already begun to receive, through the mail, voted ballots.

Any mandated changes at this point would cost the state approximately $490, 245.00 in reprinting fees. This figure does not include incidental costs such as the costs related to mailing out the new absentee ballots. Moreover, election officials have already begun to receive, through the mail, voted ballots from the batch of absentee ballots already sent out. The potential hardship on Defendant is difficult to overcome, and indeed, would tip the scale in Defendant's favor in the present case.

While the court recognizes that 3,711 signatures is not an insubstantial number, it is not so onerous as to make it an unconstitutional impediment requiring this court to issue injunctive or declaratory relief. Moreover, Plaintiffs appear to have only fallen short of the requisite number of signatures to be placed on the ballot by a few hundred. This further indicates that the required number of signatures is indeed within reach of obtaining.

B.  <u>Subject Matter Jurisdiction</u>

Under the abstention doctrine articulated in <u>Younger v. Harris</u> ("Younger"), 401 U.S. 37 (1971), in order to respect the "vital" federalism-based principle of "comity," federal courts may not issue declaratory or injunctive relief

against unconstitutional (under the U.S. Constitution) state action, if (1) the plaintiffs are, at the time of the initiation of the federal action, parties to ongoing state proceedings, (2) involving important state interests, and (3) in which they have an opportunity to present their federal constitutional claims. Id. at 49. Plaintiffs correctly point out that Younger was decided, and originally applied in the context of a Constitutional violation in a criminal proceeding. However, it is well established that Younger applies equally in the context of civil proceedings, including state administrative proceedings as is the case here. See Ohio Civil Rights Comm'n v. Dayton Christian Schools, 477 U.S. 619, 627 & n.2 (1986); Middlesex County Ethics Comm. V. Garden State Bar Ass'n, 457 U.S. 423, 432-34 (1982)).

In this case, after one full day of hearing, but prior to the completion of the hearing, the Plaintiffs Nader, Camejo, and Stiver entered into a settlement agreement requiring the Office of Elections to recount the signatures. This recount is still ongoing and will not be completed until sometime this week. With respect to Plaintiffs Peroutka, Baldwin, and Porter, the appeal period on the decision relating to their request for administrative hearing does not expire until November 4, 2004. To date, they have not filed any appeal to the Circuit Court.

Based on these facts, it appears clear that: (1) there are ongoing state proceedings; (2) the state proceedings involve important state interests (state election regulation and process); and (3) any appeal to the state Circuit Court would permit the Plaintiffs a full opportunity to vindicate any constitutional right they believe has been violated or may be violated in the course of the state court proceedings. Moreover, this case does not fall into any of the very narrow exceptions involving bad faith, harassment, or other "extraordinary circumstances." See Younger, 401 U.S. at 47-49, 53-54. Therefore, there remain serious questions as to whether this case should even be in federal court, based on the principles articulated in Younger.

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, Oct. 13, 2004.

---

DAVID ALAN EZRA
CHIEF UNITED STATES DISTRICT JUDGE

Ralph Nader, et al. v. Dwayne D. Yoshina, CV No. 04-00611 DAE/LEK; ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION