IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RALPH NADER, PETER MIGUEL CAMEJO, ROBERT H. STIVER, MICHAEL A. PEROUTKA, CHUCK BALDWIN, and DAVID W. PORTER,<br><br>    Plaintiffs,<br><br>  vs.<br><br>KEVIN B. CRONIN, Chief Election Officer, State of Hawaii,<br><br>    Defendant.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>CIVIL NO. 04-00611 JMS/LEK<br><br>ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT; AND (2) DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT |

## ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT; AND (2) DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiffs sought inclusion on the Hawaii general election ballot as independent candidates for president and vice-president in the 2004 election, but were denied ballot access because Dwayne Yoshina, former Chief Election Officer for the State of Hawaii,[1] determined that they had not obtained the required

---

[1] Yoshina retired as the Chief Election Officer on March 1, 2007. Office of Elections employee Rex Quedilla served as the Interim Chief Election Officer until the State of Hawaii Election Commission appointed Kevin B. Cronin as the Chief Election officer effective February

(continued...)

number of petition signatures for inclusion on the ballot.  Plaintiffs challenged the

procedures used in reviewing the petition signatures in both state and federal

court.  Plaintiffs' state court action is currently pending before the Hawaii

Supreme Court.  In their federal action, Plaintiffs also challenge as

unconstitutional Hawaii Revised Statutes ("HRS") § 11-113, which requires that

independent candidates for president obtain a minimum number of signatures to

petition for inclusion on the general election ballot.

      Defendant seeks summary judgment and/or dismissal of Plaintiffs'

claims, while Plaintiffs request summary judgment on Count II.  The court held a

hearing on the motions on January 28, 2008.  Based on the following, the court

GRANTS in part and DENIES in part Defendant's motion and DENIES Plaintiffs'

motion.

## II. <u>BACKGROUND</u>

### A.    **Ballot Requirements for Presidential Candidates in Hawaii**

      A presidential candidate can be listed on the general election ballot in

Hawaii in one of two ways: (1) a qualified political party can designate its

candidate; or (2) an individual can petition to be listed, by submitting a petition

---

[1](...continued)

1, 2008.  Cronin is substituted as the defendant in this action pursuant to Federal Rule of Civil
Procedure 25(d).

signed by at least one percent of the number of votes cast in the previous

presidential election.  Under HRS § 11-113(c):

> All candidates for President and Vice President of the United States shall be qualified for inclusion on the general election ballot under either of the following procedures:
>
> > (1) In the case of candidates of political parties which have been qualified to place candidates on the primary and general election ballots, the appropriate official of those parties shall file a sworn application with the chief election officer not later than 4:30 p.m. on the sixtieth day prior to the general election, which shall include:
> >
> > > (A) The name and address of each of the two candidates;
> > > (B) A statement that each candidate is legally qualified to serve under the provisions of the United States Constitution;
> > > (C) A statement that the candidates are the duly chosen candidates of both the state and the national party, giving the time, place, and manner of the selection.
> >
> > (2) In the case of candidates of parties or groups not qualified to place candidates on the primary or general election ballots, the person desiring to place the names on the general election ballot shall file with the chief election officer not later than 4:30 p.m. on the sixtieth day prior to the general election:
> >
> > > (A) A sworn application which shall include the information required under paragraph (1)(A) and (B), and (C) where applicable;
> > > (B) A petition which shall be upon the form prescribed and provided by the chief election officer containing the signatures of currently registered voters which constitute not less than one per cent of the votes cast in the State at the last presidential election.  The petition shall

> contain the names of the candidates, a statement
> that the persons signing intend to support those
> candidates, the address of each signatory, the date
> of the signer's signature and other information as
> determined by the chief election officer.

### 1.    *Political Party Candidates and New Political Parties*

In order to be listed under the first provision as a party's candidate, a political party must be qualified under the requirements set forth in HRS §§ 11-61 through 11-64.  Any group of persons wishing to qualify as a new political party must file a petition for qualification by 4:30 p.m. on the one hundred seventieth day prior to the next primary, *see* HRS § 11-62(a)(1), which contains "the name, signature, residence address, date of birth, and other information as determined by the chief election officer of currently registered voters comprising *not less than one-tenth of one per cent* of the total registered voters of the State as of the last preceding general election."  HRS § 11-62(a)(3) (emphasis added).  The petition must also "[b]e accompanied by the names and addresses of the officers of the central committee and of the respective county committees of the political party and by the party rules[.]"  HRS § 11-62(a)(4).  Once a group has been qualified as a political party for three consecutive general elections by petition, or pursuant to

HRS § 11-61(b),[2] the group is "deemed a political party for the following ten-year period."  HRS § 11-62(d).

As of the 2002 general election, there were 676,242 registered voters in Hawaii.  Yoshina Decl. ¶ 4.  The signature requirement to qualify as a political party for the 2004 election was therefore 677.  Yoshina Decl. ¶ 5.  The deadline to file a petition to qualify as a political party was April 1, 2004.  Yoshina Decl. ¶ 6.

### 2.   *Independent Candidates*

Non-party candidates must file their petition by 4:30 p.m. on the sixtieth day prior to the general election.  HRS § 11-113(c)(2).  The petition must contain:

---

[2] HRS § 11-61(b) states in part:

(1) A party must have had candidates running for election at the last general election for any of the offices listed in paragraph (2) whose terms had expired.  This does not include those offices which were vacant because the incumbent had died or resigned before the end of the incumbent's term; and

(2) The party received at least ten per cent of all votes cast:

(A) For any of the offices voted upon by all the voters in the State; or

(B) In at least fifty per cent of the congressional districts; or

(3) The party received at least four per cent of all the votes cast for all the offices of state senator statewide; or

(4) The party received at least four per cent of all the votes cast for all the offices of state representative statewide; or

(5) The party received at least two per cent of all the votes cast for all the offices of state senate and all the offices of state representative combined statewide.

> the signatures of currently registered voters which constitute *not less than one per cent* of the votes cast in the State at the last presidential election.  The petition shall contain the names of the candidates, a statement that the persons signing intend to support those candidates, the address of each signatory, the date of the signer's signature and other information as determined by the chief election officer.

HRS § 11-113(c)(2)(b) (emphasis added).

In the 2000 presidential election, 371,003 votes were cast in Hawaii. Yoshina Decl. ¶ 7.  An independent candidate for president in 2004 would therefore need 3,711 petition signatures.  Yoshina Decl. ¶ 8.  The deadline for filing independent candidate petitions was September 3, 2004.  Yoshina Decl. ¶ 9.

### 3.     *Petition Review Procedures*

Petitions submitted to qualify as a new political party under HRS § 11-62 are verified by the Chief Election Officer under procedures set forth in Hawaii Administrative Rules ("HAR") §§ 2-51-53 and 54, while independent candidate petitions are reviewed under HAR §§ 2-51-112 and 113.

Under HAR § 2-51-112, the Chief Election Officer first determines "whether the signatory is an active registered voter by checking the statewide voter registration system," ("SVRS").  Further, under HAR § 2-51-113(b):

> (1)     If the signatory on the petition exists as an active registered voter in the statewide voter registration system, then the signatory shall be counted;

6

(2)    If the signatory on the petition does not exist as an active registered voter in the statewide voter registration system, then the signatory shall not be counted;

(3)    If there are duplicate signatories on a party petition, and the signatory is an active registered voter, then the signatory shall be counted once; and

(4)    If the signatory does not provide all of the required information on the petition or if the information is not legible, then the signatory may not be counted.

The Chief Election Officer "may verify that the voter's signature on the petition corresponds with the voter's signature on the voter's registration form.  If the signature does not correspond, then the voter's signature on the petition shall not be counted."  HAR § 2-51-113(d).

## B.     The 2004 Presidential Election

In 2004, Plaintiffs Ralph Nader ("Nader") and Peter Camejo ("Camejo"), and Michel Peroutka ("Peroutka") and Chuck Baldwin ("Baldwin") sought inclusion on the general election ballot as independent candidates for president and vice-president.  Robert Stiver ("Stiver") represented the Nader/Camejo campaign, while David Porter ("Porter") was the Hawaii coordinator for the Peroutka/Baldwin campaign.

On September 3, 2004, Stiver and Porter filed with the Office of Elections signed petitions on behalf of the Nader/Camejo and Peroutka/Baldwin campaigns for inclusion on the general election ballot.  On September 20, 2004,

7

the Office of Elections informed Porter and Stiver that the petitions did not contain the required number of valid signatures.[3]  After further proofing the calculations, on September 24, 2004, the Office of Elections notified Stiver that "the correct total is 3,124 valid signatures which is 587 signatures less that the 3,711 valid signatures needed to qualify to place the names of Ralph Nader for President and Peter Miguel Camejo for Vice President on the general election ballot."  Def.'s Ex. 3.  On the same day, Porter was notified that the Peroutka/Baldwin campaign's "correct total is 3,471 valid signatures which is 240 signatures less than the 3,711 valid signatures required."  Def.'s Ex. 4.

On September 23, 2004, Stiver requested an administrative hearing to contest and review the Office of Election's decision.  The hearing commenced on September 29, 2004, but prior to concluding, the Nader/Camejo campaign entered into a settlement agreement which provided that the petition signatures would be reviewed again in the presence of a representative of the campaign, the campaign representative would be allowed to flag signatures the campaign believed should have been counted as valid, and then Yoshina would review the challenged

---

[3] Defendant's September 20, 2004 letter to Stiver stated that of the 7,184 signatures submitted, "3,672 were valid and 3,512 were invalid."  Def.'s Ex. 1.  The letter to Porter said that 7,195 signatures had been submitted, and "of these 3,481 were valid and 3,714 were invalid."  Def.'s Ex. 2.

signatures and make a final decision.  *See* Def.'s Ex. 5.  The Nader/Camejo

recount began on October 7, 2004.  On October 18, 2004, the Office of Elections

issued its findings that the Nader/Camejo campaign fell 373 signatures short of the

required 3,711 signatures, and would not be included on the ballot.  Def.'s Ex. 7.

The Peroutka/Baldwin campaign requested an administrative hearing

on September 24, 2004, which was commenced on September 30, 3004.  Yoshina

acted as the hearing officer, and issued a decision on October 5, 2004 concluding

that the Peroutka/Baldwin campaign had not obtained enough valid signatures and

was not eligible to be placed on the ballot.  Def.'s Ex. 6.

Plaintiffs filed a Complaint in this court on October 8, 2004.  Count 1

of the Complaint alleges that the Hawaii laws requiring more petition signatures

for independent candidates than for new political parties violates the First and

Fourteenth Amendments of the Constitution.  Compl. ¶¶ 19-20.  Plaintiffs' Count

II claims that Defendant "arbitrarily and capriciously failed and/or refused to count

and/or consider the names of valid signatories on the petitions presented by

Plaintiffs."  Compl. ¶ 22.  On October 11, 2004, Plaintiffs filed a Motion for

Preliminary Injunction, followed by a Motion for Temporary Restraining Order on

October 12, 2004.  On October 13, 2004, United States District Judge David Alan

Ezra denied Plaintiffs' motions for a temporary restraining order and preliminary injunction.  Doc. No. 9.

On October 18, 2004, Plaintiffs appealed the administrative decisions to the state Circuit Court.  Judge Sabrina McKenna heard both cases on November 1, 2004 and affirmed the administrative decisions that day.  The general election took place on November 2, 2004.  Judge McKenna issued written decisions on November 23, 2004, and on April 13, 2005, Plaintiffs filed a joint notice of appeal to the Hawaii Supreme Court.  By October 11, 2005, all of the briefing was submitted in Plaintiffs' appeal of the state court proceedings.

On October 28, 2005, the parties entered a stipulation to stay proceedings in the instant federal action pending resolution of Plaintiffs' appeal to the Hawaii Supreme Court.  This court lifted the stay on November 1, 2007.

On December 4, 2007, Defendant filed a Motion to Dismiss or in the Alternative For Summary Judgment.  Defendant seeks summary judgment as to Count I and asks the court to abstain from considering Count II, which is related to Plaintiffs' state court appeal, pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).

Plaintiffs filed an opposition and cross-motion for summary judgment on January 10, 2008.  Plaintiffs seek summary judgment as to Count II on the grounds that: (1) the practices and procedures used to determine the validity and

10

sufficiency of petition signatures is unconstitutional and not based on any credible evidence; and (2) because Yoshina served as the administrative hearing officer, Plaintiffs were denied a fair hearing before an impartial and objective hearing officer.

As the court stated at the January 28, 2008 hearing, the court GRANTS Defendant's motion as to Count I and DENIES the motion as to Count II. The court also DENIES Plaintiffs' cross-motion for summary judgment as to Count II.

### III.  <u>STANDARD OF REVIEW</u>

A party is entitled to summary judgment as to any claim where there is no genuine issue as to any material fact contained in the pleadings, depositions, answers to interrogatories, admissions or affidavits. Fed. R. Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001). The moving party bears the initial burden of showing that there is no factual dispute regarding those claims for which summary

judgment is sought.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.  ANALYSIS

The court first addresses Count I of Plaintiffs' Complaint, which alleges that HRS § 11-113 violates (1) the First and Fourteenth Amendments of the Constitution, and (2) the Equal Protection Clause of the Fourteenth Amendment of the Constitution.  The court then addresses Plaintiffs' Count II claims challenging the procedures used to review the petitions.

### A.     First and Fourteenth Amendments

#### 1.     *Legal Framework*

The level of scrutiny applied to the state's ballot-access requirements depends on the extent to which the challenged regulation burdens First and Fourteenth Amendment rights.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The court weighs the character and magnitude of the injury to the rights protected by the First and Fourteenth Amendments against the state's interests in justifying

the requirements imposed by its election laws.  *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

If the state's requirements severely restrict those rights, the requirements may be upheld only if they are narrowly tailored to advance a compelling state interest.  *Burdick*, 504 U.S. at 434.  On the other hand, if the law imposes reasonable, non-discriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the state's important regulatory interests are generally sufficient to justify the restrictions imposed.  *Id.*

### 2.    *HRS § 11-113 Is Not Unconstitutional*

With respect to the character and magnitude of the injury to Plaintiffs' rights, courts have recognized that "restrictions upon the access of independent candidates to the ballot impinge on the fundamental rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively."  *Erum v. Cayetano*, 881 F.2d 689, 692 (9th Cir. 1989); *see also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).  The court weighs these rights against the state's asserted interests in avoiding voter confusion and an overcrowded ballot.

It is well established that states have "a legitimate interest in regulating the number of candidates on the ballot."  *Bullock v. Carter*, 405 U.S.

134, 145 (1972); *see also id.* ("In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections."); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) ("[W]e have approved the States' interests in avoiding voter confusion, ballot overcrowding, or the presence of frivolous candidacies, in seeking to assure that elections are operated equitably and efficiently. . . ." (citations and quotation signals omitted)).

Courts have repeatedly held that signature requirements are reasonable preconditions to having one's name on a ballot.  In *Jenness v. Fortson*, 403 U.S. 431, 442 (1971), the Court upheld Georgia's requirement that independent candidates demonstrate "a significant modicum of support" by filing a petition signed by five percent of the total registered voters in the last election for the office sought by the candidate.  "There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot–the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."  *Id.*  Of the five percent signature requirement, the Court observed, "[t]he 5% figure is, to be sure, apparently

14

somewhat higher than the percentage of support required to be shown in many

States as a condition for ballot position, but this is balanced by the fact that

Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any

registered voter to sign as many nominating petitions as he wishes." *Id.* (footnote

omitted).

In *American Party of Texas v. White*, 415 U.S. 767 (1974), the Court

upheld a Texas provision that required independent candidates to file a petition

signed by three to five percent of registered voters depending on the office sought,

although in no event would candidates for any "district office" be required to file

more that 500 signatures.  The Court held that:

> requiring independent candidates to evidence a "significant
> modicum of support" is not unconstitutional.  Demanding
> signatures equal in number to 3% or 5% of the vote in the last
> election is not invalid on its face, *see Jenness v. Fortson*,
> *supra*, and with a 500-signature limit in any event, the
> argument that the statute is unduly burdensome approaches the
> frivolous.

*Id.* at 789 (footnote omitted).  *See also Lubin v. Panish*, 415 U.S. 709, 718 (1974)

("States may, for example, impose on minor political parties the precondition of

demonstrating the existence of some reasonable quantum of voter support by

requiring such parties to file petitions for a place on the ballot signed by a

percentage of those who voted in a prior election."); *Munro v. Socialist Workers*

*Party*, 479 U.S. 189, 193 (1986) ("States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office."); *Nader v. Connor*, 332 F. Supp. 2d 982, 987 (W.D. Tex. 2004) ("Requiring that an independent presidential candidate demonstrate that voters equal in number to one percent of those who voted for president in the last presidential election favor placing the candidate on the ballot, does not place an unreasonable burden on the candidate and satisfies the state's legitimate interest in assuring itself that the candidate is a serious contender truly independent, and with a satisfactory level of community support." (citation, quotation signals, and brackets omitted)).

Although groups seeking to form a new political party need only obtain signatures of one-tenth of one percent of voters -- 677 signatures in 2004 -- political parties are subject to different requirements not applicable to independent candidates, including filing the petition by April 1, 2004 (as opposed to September 3, 2004 for independent candidate petitions). *See* HRS § 11-62. Further, political party candidates may be subject to primary elections or party conventions, while independent candidates' names are placed directly on the ballot upon submission

of a valid petition.[4]  As a result, courts have repeatedly upheld laws providing

different requirements for independent and political party candidates.  *See, e.g.*,

*Erum*, 881 F.2d at 693-94 (upholding a Hawaii requirement that non-partisan

candidates for county office receive 10% of the votes cast in a primary or at least

as many as the least favored successful partisan candidate, whereas partisan

candidates could be on the general election ballot simply by receiving the greatest

number of votes in their party primary, with no minimum vote requirement);

*Nader*, 332 F. Supp. 2d at 988 ("More restrictive signature and deadline

requirements for an independent candidate may be justified if the ballot-access

requirements, as a whole, are reasonable and similar in degree to those for a minor

political-party candidate."); *Stevenson v. State Bd. of Elections*, 638 F. Supp. 547,

554 (N.D. Ill. 1986) (upholding disparities in ballot access requirements between

parties and independents).

---

[4] Additional factors also limit the burden imposed by the one percent signature requirement.  Unlike some states, Hawaii voters signing independent candidate petitions are not restricted from voting in the primaries.  *See Jenness v. Fortson*, 403 U.S. 431, 438-39 (1971) (noting that "Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions [and allows] a voter who has signed the petition of a nonparty candidate to participate in a party primary").  Voters may also sign as many petitions as they like, *see id.*, and Hawaii does not require independent candidates to have been previously unaffiliated with a political party, *see Storer v. Brown*, 415 U.S. 724, 726 (1974) (upholding statute that imposed such a requirement), or compel independent or minor party candidates to file an affidavit regarding their views.  *See Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 446 (1974) (striking statute requiring minor parties to sign loyalty oath before being placed on the ballot).

In sum, the State's one percent signature requirement for independent candidates is a reasonable restriction, and not sufficiently severe to warrant strict scrutiny.  Because HRS § 11-113(c) imposes reasonable, non-discriminatory restrictions upon the First and Fourteenth Amendment rights of voters and candidates, Hawaii's important regulatory interests in avoiding voter confusion and overcrowded ballots sufficiently justify the restrictions imposed.

**B.     Equal Protection**[5]

With respect to Plaintiffs' equal protection challenge to the election laws, the "Equal Protection Clause ensures that 'all persons similarly situated

_____

[5] Although there is substantial overlap between the analysis of Plaintiffs' First and Fourteenth Amendment claims and their equal protection claims, the court separates the equal protection portion of its discussion for organizational clarity.  As the Ninth Circuit explained in *Erum v. Cayetano*, 881 F.2d 689, 694 n.11 (9th Cir. 1989):

> We note that substantial analytical overlap exists between those challenges brought to ballot access restrictions under the first and fourteenth amendments and those brought under the equal protection clause.  Indeed, the Court has relied on cases in the former category to decide those in the latter, and vice-versa.  *See, e.g.*, *Anderson*, 460 U.S. at 786 n.7, 103 S. Ct. at 1569 n. 7 ("In this case, we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis.  We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment"); *see also* G. Gunther, Constitutional Law at 823 (11th ed. 1985).
> Nevertheless, while we follow the Court's trend of relying on both lines of cases to analyze either kind of challenge, we separate out the equal protection portion of our discussion for the purpose of preserving analytical clarity.

should be treated alike.'" *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944

(9th Cir. 2004) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S.

432, 439 (1985)).  Independent and political-party candidates are not similarly

situated with respect to the State's election laws.  *See Storer v. Brown*, 415 U.S.

724, 745 (1974) ("A new party organization contemplates a statewide, ongoing

organization with distinctive political character.  Its goal is typically to gain

control of the machinery of state government by electing its candidates to public

office."); *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1380 (10th

Cir. 1982) ("A political group becoming a recognized political party and offering

to the electorate a slate of candidates is far different than one individual becoming

an independent candidate to run for a particular office."); *Nader*, 332 F. Supp. 2d

at 989-90 ("Differing requirements may be justified when the candidates are not

similarly situated, thereby rendering statutory restrictions reasonable and

nondiscriminatory even when there is a disparity between the requirements for

independent and minor political-party candidates.  Equal protection requires that

similarly situated individuals should be treated alike. . . .  When the individuals are

not similarly situated, however, they need not be treated alike.  Thus, a disparity

among the level of the restrictions can be upheld as reasonable and

nondiscriminatory."); *Stevenson*, 638 F. Supp. at 554 (observing that party

candidates create an entire party platform, run with a slate of candidates, and have

responsibilities which extend beyond those contemplated by an independent).

In any event, Plaintiffs' right to equal protection is not violated here.

The Ninth Circuit held in *Erum*, 881 F.2d at 695, that "the different requirements

Hawaii imposes for placement on the general ballot between so-called new party

candidates and independent candidates" do not amount to invidious

discrimination.  *Erum* states:

> For example, new parties, before they can be recognized as
> such and have candidates appear under their name on the
> primary ballot, must successfully complete certain tasks.  Haw.
> Rev. Stat. § 11-62.  These differences are, like those upheld in
> *Jenness*, related to distinct processes, neither of which is
> inherently more burdensome than the other.  Thus, they do not
> run afoul of the equal protection clause.

*Id.* (footnote omitted).  *See also Jenness*, 403 U.S. at 440-41 ("This [equal

protection] claim is necessarily bottomed upon the premise that it is inherently

more burdensome for a candidate to gather the signatures of 5% of the total

eligible electorate than it is to win the votes of a majority in a party primary.   That

is a premise that cannot be uncritically accepted. . . .  He may enter the primary of

a political party, or he may circulate nominating petitions either as an independent

candidate or under the sponsorship of a political organization.  We cannot see how

Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by

making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other." (footnotes omitted)).

The requirements imposed upon independent candidates for president in Hawaii do not run afoul of the First and Fourteenth Amendments or equal protection.  The court GRANTS Defendant's motion for summary judgment as to Count I.

## C.     Count II: Validity of State's Petition Review Procedures

As to Count II, Defendant requests that the court abstain from deciding issues currently pending before the Hawaii Supreme Court, while Plaintiffs seek summary judgment on the merits of their claims.[6]

### 1.     Abstention

Defendant asks the court to abstain from considering Plaintiffs' claims currently pending before the Hawaii Supreme Court based on *Younger v.*

---

[6] As addressed at the January 28, 2008 hearing, the issues raised in Count II are not moot. The petition review procedures employed during the 2004 general election have not been modified and remain in effect.  Although the 2004 general election was held without including the Nader/Camejo or Peroutka/Baldwin tickets on the Hawaii ballot, Plaintiffs' challenge falls within the "capable of repetition yet evading review" exception to the mootness doctrine. *See Schaefer v. Townsend*,  215 F.3d 1031, 1033 (9th Cir. 2000) (holding that where the election laws in question remain in effect, a plaintiff has standing to challenge them as a member of the class of people affected by the presently written statute, and the case is not moot); *see also Joyner v. Mofford*, 706 F.2d 1523, 1527 (9th Cir. 1983) ("If [election law] cases were rendered moot by the occurrence of an election, many constitutionally suspect election laws . . . could never reach appellate review.").

*Harris*, 401 U.S. 37 (1971).  "Abstention by a district court is required under *Younger* when three criteria are satisfied: (1) State judicial proceedings are ongoing; (2) The proceedings implicate important state interests; and (3) The state proceedings provide an adequate opportunity to raise federal questions."  *Kay v. City of Rancho Palos Verdes*, 504 F.3d 803, 808 (9th Cir. 2007) (citation and quotation signals omitted).

Defendant fails to establish that *Younger* abstention is applicable under the circumstances.  In *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) ("*NOPSI*"), the court considered what types of state court proceedings were applicable under *Younger*.  *NOPSI* notes that because *Younger* "involved a facial First Amendment-based challenge to the California Criminal Syndicalism Act, we held that absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions."  *Id.* at 364.  *NOPSI* goes on to explain that, although *Younger* has been extended beyond state criminal prosecutions, it does not apply to all state court proceedings:

> Although our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions, *it has never been suggested that Younger requires abstention in deference to a state judicial proceeding*

22

> *reviewing legislative or executive action.* Such a broad
> abstention requirement would make a mockery of the rule that
> only exceptional circumstances justify a federal court's refusal
> to decide a case in deference to the States.

*Id.* at 367-688 (citations omitted; emphasis added). The Ninth Circuit has

interpreted *NOPSI* as "[m]aking clear that the mere existence of parallel

proceedings is not sufficient but that the class of case matters . . . *Younger* does

not apply to a state judicial proceeding that is reviewing legislative or executive

action[.]" *Gilbertson v. Albright*, 381 F.3d 965, 974 (9th Cir. 2004) (en banc); *see*

*id.* at 977 ("[A] state proceeding which is nonjudicial or involves the interpretation

of completed legislative or executive action is not of that character.").

    *Younger* has been extended to two types of civil actions: (1) "quasi-

criminal (or at least 'coercive') state civil proceedings–and even administrative

proceedings–brought by the state as enforcement actions against an individual,"

and (2) "those situations uniquely in furtherance of the fundamental workings of a

state's judicial system." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d

56, 69 (1st Cir. 2005); *see also NOPSI*, 491 U.S. at 367-68 (*Younger* has been

expanded to "civil enforcement proceedings" and "civil proceedings involving

certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.").[7]

Neither of these is implicated here. There is no civil enforcement action brought by the state; instead, Plaintiffs sued Defendant in an effort to overturn state laws and procedures as applied to them during the 2004 elections. Nor are the fundamental workings of the state's judicial system in play. Rather, Plaintiffs' state court action is accurately characterized as judicial review of executive action.

To the extent Count II challenges completed administrative hearings (i.e. executive action), Plaintiffs' suit does not represent "the interference with ongoing judicial proceedings against which *Younger* was directed." *NOPSI*, 491 U.S. at 372. The court DENIES Defendant's motion as to Count II.

### 2.   *Plaintiffs' Cross-Motion For Summary Judgment*

Plaintiffs argue that the procedures used by the Office of Elections in reviewing the petitions and verifying signatures were unconstitutional and that

---

[7] *See also Green v. City of Tucson*, 255 F.3d 1086, 1094 (9th Cir. 2001) (en banc), *overruled on other grounds by Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2004) (en banc), (observing that *Younger* is ordinarily restricted "to circumstances in which the state court proceeding is an enforcement action against the federal court plaintiff, and is not met simply by the prospect that the federal court decision may, through claim or issue preclusion influence the result in state court"); *Fresh Int'l Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353, 1360 n.8 (9th Cir. 1986) ("*Younger* abstention ordinarily would not apply when a federal plaintiff also is the plaintiff in state court.").

they were not provided a fair administrative hearing because Yoshina acted as the

hearing officer.  The court addresses each claim in turn.

### a.    *Petition review and signature verification*

Plaintiffs claim that the Office of Elections erred in its review of the

petitions because: (1) it only attempted to identify a signatory by the name listed

on the petition, rather than cross-referencing by address or date of birth; (2) it

rejected signatures as illegible without making a serious effort to decipher names;

and (3) it rejected signatures if the address listed on the petition did not exactly

match the address in the SVRS.  As a result of these procedures, Plaintiffs claim

that Defendant's determination that they did not obtain enough valid signatures

was arbitrary, capricious, and not based on credible evidence.

Whether the Office of Elections cross-referenced the signatures,

rejected signatures as illegible without making a serious effort to decipher names,

or on the basis that the address listed on the petition did not exactly match the

address in the SVRS are questions of fact that cannot be resolved on the current

record.  The administrative record is not before the court, and the court has no way

of determining whether the Office of Elections, in fact, cross-referenced the

signatures, failed to make a serious effort to decipher names, or rejected signatures

if the address on the petition did not match the SVRS.  Plaintiffs fail to show that

there are no genuine issues of fact and do not to meet their burden on summary judgment.

        *b.*    *Impartial hearing officer*

      Lastly, Plaintiffs claim that because Yoshina first determined that the Peroutka/Baldwin campaign's petition did not contain the required number of signatures, it was improper for him to later serve as the hearing officer at the administrative hearing challenging the decision.  Plaintiffs argue that Yoshina was, in effect, reviewing his own previous decisions.

      Under HRS § 11-113(e), the Chief Election Officer is empowered to convene an administrative hearing, but the statute does not establish who must serve as the hearing officer:

> If the applicant, or any other party, individual, or group with a candidate on the presidential ballot, objects to the finding of eligibility or disqualification the person may, not later than 4:30 p.m. on the fifth day after the finding, file a request in writing with the chief election officer for a hearing on the question.  A hearing shall be called not later than 4:30 p.m. on the tenth day after the receipt of the request and shall be conducted in accord with chapter 91.  A decision shall be issued not later than 4:30 p.m. on the fifth day after the conclusion of the hearing.

      In the context of state administrative proceedings, the Hawaii Supreme Court has held that, "[w]hether a particular decision-making procedure is

constitutionally defective for want of impartiality will depend on many

factors . . . , [including] the character of the decision being made, the nature of the

individual and governmental interests at stake, and the feasibility of alternative

procedures." *Sifagaloa v. Bd. of Trs. of Employees' Ret. Sys.*, 74 Haw. 181, 191,

840 P.2d 367, 372 (1992) (citations and quotation signals omitted).  In fact, "[a]n

appearance of impropriety does not occur simply where there is a joinder of

executive and judicial power."  *Id.*

      *Sifagaloa* held that "[a]dministrators serving as adjudicators are

presumed to be unbiased," and that this presumption "can be rebutted by a

showing of disqualifying interest."  *Id.* at 192, 840 P.2d at 372.  *See also Rollins v.*

*Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001) ("ALJs and other similar

quasi-judicial administrative officers are presumed to be unbiased.  This

presumption can be rebutted by a showing of conflict of interest or some other

specific reason for disqualification . . . . [Plaintiff] was required to show that the

ALJ's behavior, in the context of the whole case, was so extreme as to display

clear inability to render fair judgment." (citations and quotation signals omitted)).

      Based on the record presented to the court, Plaintiffs fail to make the

required showing of a disqualifying interest.  *See Sifagaloa*, 74 Haw. at 192, 840

P.2d at 372 ("[T]he burden of establishing a disqualifying interest rests on the

27

party making the assertion.").  Plaintiffs fail to meet their burden on summary judgment with respect to this claim.

In sum, the court DENIES Plaintiffs' cross-motion for summary judgment as to Count II.

## V.  <u>CONCLUSION</u>

The court GRANTS Defendant's motion for summary judgment as to Count I and DENIES the motion as to Count II.  The court also DENIES Plaintiffs' cross-motion for summary judgment as to Count II.  Plaintiffs' claims in Count II remain for trial on March 4, 2008.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 7, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Nader v. Cronin*, Civ. No. 04-00611 JMS/LEK, Order (1) Granting in Part and Denying in Part Defendant's Motion to Dismiss or in the Alternative for Summary Judgment; and (2) Denying Plaintiffs' Cross-Motion for Summary Judgment