IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RALPH NADER, PETER MIGUEL CAMEJO, ROBERT H. STIVER, MICHAEL A. PEROUTKA, CHUCK BALDWIN, AND DAVID W. PORTER,<br><br>      Plaintiffs,<br><br>  vs.<br><br>KEVIN B. CRONIN, Chief Election officer, State of Hawaii,<br><br>      Defendant. | CIVIL NO. 04-00611 ACK-LEK<br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER<br><br><br><br>TRIAL<br>DATE:  March 4, 2008<br>TIME:   9:00 a.m.<br>JUDGE: Hon. Alan C. Kay |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

I.    PROCEDURAL HISTORY

On October 8, 2004, Plaintiffs filed the present lawsuit taking issue with the

constitutionality of (1) the State's petition requirements that independent

candidates for president must obtain more signatures than what is required to

establish a political party and (2) the verification procedures utilized by the Office

of Elections in reviewing the petitions filed by Plaintiffs.

EXHIBIT A

On October 11, 2004, Plaintiffs filed their Motion for Preliminary Injunction and on October 12, 2004 Plaintiffs filed their Motion for Temporary Restraining Order. Defendant filed its Memorandum in Opposition to the motions on October 12, 2004. On October 13, 2004, the Honorable David Alan Ezra denied Plaintiff's Motions for Temporary Restraining Order/Preliminary Injunction.

On October 18, 2004, Plaintiffs filed appeals in Circuit Court regarding the determinations that both the Nader and Peroutka Campaigns had failed to obtain the requisite amount of valid signatures to be placed on the ballot. Nader, et al. v. Yoshina, Civ. No. 04-1-1905-10 SSM and Peroutka, et al. v. Yoshina, Civ. No. 04-1-1904-10 SSM.

On November 1, 2004, Defendant filed his Answer in the present federal court action.

The Honorable Sabrina S. McKenna heard both Circuit Court cases on November 1, 2004. She orally affirmed the underlying administrative decisions that same day. The General Election occurred on November 2, 2004. The written decisions of the Court for both cases were issued on November 23, 2004. Final judgment in both cases was filed on April 5, 2005.

A joint notice of appeal was filed on April 13, 2005. The Peroutka appeal was assigned Supreme Court No. 27233 and the Nader Appeal was assigned Supreme Court No. 27234. The Supreme Court of Hawaii consolidated the two

2

cases for purposes of briefing and disposition under Supreme Court No. 27233. Appellant's Joint Opening Brief was filed on July 22, 2005. The briefing was completed on October 11, 2005, and the case is still pending before the Court.

On July 13, 2005, Defendant filed a motion to dismiss based on the Younger abstention doctrine, given the pending Hawaii Supreme Court cases. Plaintiffs filed their memorandum in opposition on September 25, 2005. On October 6, 2005, the present case was reassigned to the Honorable J. Michael Seabright. A hearing on Defendant's motion was held on October 13, 2005. The parties orally agreed at that time to stipulate to staying the proceedings until the resolution of appeals before the Hawaii Supreme Court. A formal stipulation was submitted and granted on October 28, 2005 staying the proceedings.

On March 31, 2006, the Court, in order to avoid leaving the motion unresolved for an extended period of time, denied without prejudice Defendant's Motion to Dismiss. Given the significant delay in obtaining a decision from the Hawaii Supreme Court, on November 1, 2007, during a status conference, the Court lifted the stay. On November 13, 2007, the parties met with the Honorable Leslie E. Kobayashi for purposes of setting a new trial date. A bench trial was set for March 4, 2008.

On December 4, 2007, Defendant's filed its Motion to Dismiss or in the Alternative for Summary Judgment. Plaintiffs filed its Memorandum in

3

Opposition and a Cross-Motion for Summary Judgment on January 10, 2008. On January 17, 2008, Defendant filed its Reply and Memorandum in Opposition to Plaintiffs' Cross-Motion for Summary Judgment.

Ultimately, the Honorable J. Michael Seabright issued his Order disposing of the motions on February 7, 2008. The Court granted summary judgment as to Count I of the Complaint, finding that the petition requirements of Hawaii Revised Statutes (HRS) § 11-113 were constitutional. As for Count II of the Complaint the Court denied Plaintiff's motion for summary judgment and denied Defendant's motion abstain from deciding the matter until the Hawaii Supreme Court had ruled on the matter.

On February 12, 2008, the present matter was reassigned to the Honorable Alan C. Kay. The parties' final witness lists and a stipulation regarding the authenticity and admissibility of exhibits were filed that same day. Defendant filed its trial brief on February 19, 2008. The parties filed proposed findings of fact on February 27, 2008.

A trial without jury was heard before the Honorable Alan C. Kay on March 4, 2008. Plaintiffs Ralph Nader, Peter Miguel Camejo, Robert H. Stiver, Michael A. Peroutka, Chuck Baldwin, and David W. Porter were represented by Eric A. Seitz, Esq. Defendant Kevin B. Cronin was represented by Deputy Attorney General Aaron H. Schulaner.

4

The Court, having received evidence and considered the arguments of counsel, hereby renders the following findings of fact, conclusions of law, and order.

II.     FINDINGS OF FACT

If it should later be determined that any of these findings of fact should be properly deemed conclusions of law, they shall be deemed as such.

*GENERAL BACKGROUND REGARDING THE PETITION PROCESS*

1.     During election year 2004, the Office of Elections was headed by Chief Election Officer Dwayne D. Yoshina.  (Testimony of Lori Tomczyk)

2.     The Office of Elections was composed of various sections including a ballot operations section which was headed by Ms. Lori Tomczyk.  (Testimony of Lori Tomczyk)

3.     Responsibility for verifying the petitions of prospective presidential candidates for inclusion on the general election ballot was delegated to Ms. Tomczyk.  (Testimony of Lori Tomczyk)

4.     Chief Election Officer Dwayne D. Yoshina was not involved in the verification process.  (Testimony of Lori Tomczyk)

5.     In order for individuals to qualify for inclusion on the general election presidential ballot as president and vice president, the individuals must either be

5

designated by a qualified political party or the individuals must petition to be on the presidential ballot.  HRS § 11-113(c)(1) & (2).

6.    The Chief Election Officer is statutorily authorized to promulgate administrative rules and regulations to carry out the election laws he is responsible for carrying out.  HRS § 11-4.

7.    The Chief Election Officer promulgated Hawaii Administrative Rules (HAR) §§ 2-51-110 through 2-51-113 to address the requirements of HRS § 11-113.

8.    The law provides that the petition shall contain the signatures of currently registered voters, which constitute not less than one per cent of the votes cast in the State at the last presidential election.  HRS § 11-113.

9.    In the 2000 presidential election, 371,033 votes were cast in Hawaii. As such the signature requirement is 3,711 for the 2004 presidential petition. (Testimony of Lori Tomczyk)

10.    The law also provides that the petition shall be upon a form prescribed and provided by the Chief Election Officer.  HRS § 11-113.

11.    The form is prescribed by the Chief Election Officer through administrative rule HAR § 2-51-110.

12.    The form contains the following columns for the voter to fill out (1) "Print Your Name Here," (2) "Sign the Name Under Which You Are Registered to

Vote," (3) "Print the Residence Address at Which You are Registered to Vote," (4) "Birth Date," and (5) "Date Signed." There is additionally a column for the voter's "Social Security Number," however completing this column is optional. The signatory is required to provide all of the relevant information in order to verify the identity of the signature as a currently registered voter. (Testimony of Lori Tomczyk and Appendix H to HAR § 2-51-110).

13.    The law provides for the manner in which it is determined whether an individual is qualified to sign the petition. HAR § 2-51-112. Specifically, the signatory is checked against the statewide voter registration system (SVRS) to determine if he is an active registered voter. The SVRS allows for voter records to be pulled up by either social security number or name. As such, it is critical that signatories comply with the requirement of printing their name in order to avoid illegibility issues, which will result in the record not be being accessible. (Testimony of Lori Tomczyk)

14.    After the voter's record is either pulled up by name or social security number, the law provides for the manner in which the signatory will be validated: (1) if the signatory on the petition exists as an active registered voter in the SVRS, then the signatory is counted; (2) if the signatory does not exist as an active registered voter in the SVRS, then the signatory is not counted; (3)  if there are duplicate signatures, and the signatory is an active registered voter, then the

7

signatory is counted once; and  (4) "if the signatory does not provide all of the

required information on the petition or if the information is not legible, then the

signatory may not be counted."  HAR § 2-51-113(b)(1)-(4).

### PEROUTKA CAMPAIGN

15.    Aspiring presidential candidate Plaintiffs Michael A. Peroutka and his

vice presidential running mate Chuck Baldwin were not designated by a qualified

political party and thus needed to petition to be placed on the general election

ballot. (Testimony of Lori Tomczyk)

16.    Plaintiff David W. Porter on behalf of Plaintiffs Peroutka and Baldwin

acted as their representative in the State of Hawaii in regards to the petition

process. (Testimony of Lori Tomczyk and Joint Exhibit 13-Application)

17.    On May 4, 2004, Plaintiff David Porter, the Hawaii Coordinator for

the Peroutka for President 2004 Campaign (Peroutka Campaign), filled out a form

entitled "An Application for Petition to Place the Names of Candidates for

President and Vice President on the State of Hawaii General Election Ballot."

(Testimony of Lori Tomczyk and Joint Exhibit 13-Application)

18.    Plaintiff Porter was provided with information regarding what was

necessary for purposes of verifying the petition signatures by Ballot Operations

Section Head Lori Tomczyk. (Testimony of Lori Tomczyk and Joint Exhibit 25-

Factsheet)

8

19.    This information consisted of a ten page factsheet regarding the petition process. (Testimony of Lori Tomczyk and Joint Exhibit 25-Factsheet)

20.    Ms. Tomczyk additionally provided Plaintiff Porter a copy of the Election Laws of Hawaii booklet which contains provisions of the United States Constitution, Hawaii State Constitution, Hawaii Revised Statutes, Hawaii Administrative Rules, and County Charters related to elections.  This included HRS § 11-113 and HAR §§ 2-51-110 through 2-51-113.  (Testimony of Lori Tomczyk)

21.    In reviewing the factsheet and the petition form, Ms. Tomczyk brought to his attention page 5 of the factsheet which provided 7 instructions for correctly completing the petition form. (Testimony of Lori Tomczyk and Joint Exhibit 25-Factsheet)

22.    Ms. Tomczyk emphasized as part of her discussion with Plaintiff Porter, consistent with the factsheet, that the petition can only be verified on the basis of the information contained on it, given that the information is compared with the information contained in the official voter register.  She explained that if signatory provides information that is illegible or inconsistent with the information in the official voter register, this may result in the signature not being counted.  She explained that this could involve the signatory providing an incorrect address, social security number,

9

or date of birth, and that this may result from illegible handwriting or a signatory transposing numbers. (Testimony of Lori Tomczyk and Joint Exhibit 25-Factsheet)

23.    Ms. Tomczyk also emphasized, consistent with the factsheet, that the residence address of the signatory where he/she is registered to vote must be recorded. She explained that if the signatory records an address to which the signatory has moved subsequent to registering and has failed to make the change of registration as required by law, that the signature would not be counted. She also explained that mailing addresses were not acceptable as the residence address was required. (Testimony of Lori Tomczyk and Joint Exhibit 25-Factsheet)

24.    In addition, Ms. Tomczyk emphasized that the signatory's social security number or date of birth would be needed to distinguish among people having identical names and/or addresses. (Testimony of Lori Tomczyk and Joint Exhibit 25-Factsheet)

25.    Plaintiff Porter was issued initial petition sets that day. Each petition set consisted of 4 pages and a total 48 rows for petition signatures. (Testimony of Lori Tomczyk and Joint Exhibit 23-Petition)

26.    The Application for Petition included a "For Office Use Only" section in which the Office of Election staff would notate when petition forms were issued

10

to the Peroutka Campaign and when they were received from the Peroutka Campaign. (Testimony of Lori Tomczyk and Joint Exhibit 13-Application)

27.    The Office of Elections received its first group of petition sets from the Peroutka Campaign on July 15, 2004. (Testimony of Lori Tomczyk and Joint Exhibit 13-Application)

28.    The signatures were reviewed and verified against the Statewide Voter Registration System (SVRS) in accordance with the applicable administrative rules. (Testimony of Lori Tomczyk)

29.    At the conclusion of the review of the petition sets submitted on July 15, 2004, Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, which he signed without any changes. Ms. Tomczyk initials "LPT" are listed in the lower left hand corner of the last page of the letter. (Testimony of Lori Tomczyk and Joint Exhibit 14-Letter)

30.    The letter indicated that a total of 606 signatures were found in the petition sets submitted by Plaintiff Porter. Of the 606 signatures, 299 were found to be listed as "Active" (currently registered) in the SVRS, 35 were found to be listed as "Inactive" in the SVRS, 67 could not be verified because information on the petition was insufficient (i.e., no social security number, date of birth, signature, or could not read the record), 146 did not appear in the SVRS, 59 could not be verified because the address information on the petition did not match the

11

address information in the SVRS, and 0 were found to have appeared twice on the petition. (Testimony of Lori Tomczyk and Joint Exhibit 14-Letter)

31.    The letter, dated July 29, 2004, containing the above referenced information was picked up by Plaintiff Porter, personally, from the Office of Elections on July 30, 2004. (Testimony of Lori Tomczyk and Joint Exhibit 14-Letter)

32.    Petition sets were received by the Office of Elections on July 30, 2004, August 6, 2004, and August 13, 2004. (Testimony of Lori Tomczyk and Joint Exhibit 13-Application)

33.    The signatures were reviewed and verified against the SVRS in accordance with the applicable administrative rules. At the conclusion of the review of the petition sets submitted on July 30, 2004, August 6, 2004, and August 13, 2004, Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, which was ultimately signed on his behalf by Office of Elections' employee Robynn Yokooji, without any changes. Ms. Tomczyk initials "LPT" are listed in the lower left hand corner of the last page of the letter. (Testimony of Lori Tomczyk and Joint Exhibit 15-Letter)

34.    The letter was dated August 24, 2004 and was sent by certified mail return receipt requested. The letter indicated that as of August 13, 2004, a total of 2,077 signatures had been submitted of which 1,039 were found to be valid. The

letter provided a breakdown as the previous letter had of the amount of signatures that had been received, and how many had been found to be valid or invalid and the reasons why. As a reminder, the letter also indicated that the deadline for the filing of the petition was September 3, 2004. (Testimony of Lori Tomczyk and Joint Exhibit 15-Letter)

35.    Plaintiff Porter dropped off additional petition sets on August 30, 2004, August 31, 2004, September 1, 2004, September 2, 2004, and finally on September 3, 2004 when he formally filed the Peroutka Campaign petition. (Testimony of Lori Tomczyk and Joint Exhibit 13-Application)

36.    The additional petition sets were again reviewed following the procedures established by HRS § 11-113 and its implementing administrative rules. (Testimony of Lori Tomczyk)

37.    A review of the Peroutka Campaign petition indicates that the vast majority of the signatories did not provide their social security number and that many of the names submitted were not legible. (Testimony of Lori Tomczyk and Joint Exhibit 23-Petition)

38.    The petition signatures were reviewed and verified against the SVRS in accordance with the applicable administrative rules. (Testimony of Lori Tomczyk)

39.    Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, dated September 20, 2004, indicating that the Peroutka Campaign had not obtained enough valid signatures and as such would not be placed on the general election ballot. Her initials "lpt" are listed in the lower left hand corner of the last page of the letter. The letter was signed on his behalf by Office of Elections' employee Robynn Yokooji, without any changes. (Testimony of Lori Tomczyk and Joint Exhibit 17-Letter)

40.    In subsequently proofing the calculations, Ms. Tomczyk discovered an addition problem which resulted in the numbers initially released needing to be revised. The ultimate result was that the amount of valid signatures was reduced from 3,481 to 3,471. (Testimony of Lori Tomczyk)

41.    Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, dated September 24, 2004, indicating the revised numbers which still was less than the amount necessary for inclusion on the general election ballot. Her initials "lpt" are listed in the lower left hand corner of the letter. The letter was signed by the Chief Election Officer, without any changes. (Testimony of Lori Tomczyk and Joint Exhibit 18-Letter)

42.    On September 24, 2004, the Peroutka Campaign submitted a written request for a hearing. (Testimony of Lori Tomczyk and Joint Exhibit 19-Letter)

43.    A contested case hearing was subsequently held pursuant to HRS §

11-113, on September 30, 2004. (Testimony of Lori Tomczyk and Joint Exhibit

30-Transcript)

44.    During the hearing, Plaintiff Porter testified that he appreciated the

work, effort, and cooperative attitude of the Office of Elections and had no

complaints about how the process was handled at that point and he reemphasized

that those comments were directed especially to Ms. Tomczyk. (Testimony of Lori

Tomczyk and Joint Exhibit 30 at page 10-Transcript)

45.    During the hearing, Plaintiff Porter admitted that certain signatures or

addresses he was challenging were illegible to even him, and that he complimented

the staff of the Office of Elections on how well they had been able to decipher

illegible handwriting to do as well as they did.  (Testimony of Lori Tomczyk and

Joint Exhibit 30 at pages 44 to 45-Transcript)

46.    During the hearing, after Ms. Tomczyk testified about being

concerned that 12 names on the petition looked like they could have been written

by the same person, Plaintiff Porter admitted that he had concerns regarding two

individuals that were sent to him, apparently by the national Peroutka campaign,

who in one group of petitions had obtained 300 signatures, of which only 39 were

found to be valid. (Testimony of Lori Tomczyk and Joint Exhibit 30 at pages 74 to

76-Transcript)

15

47.     The Chief Election Officer issued his Findings of Fact, Conclusions of Law, and Decision on October 5, 2004. (Joint Exhibit 3-Decision)

48.     The Chief Election Officer determined that the Peroutka Campaign had failed to submit the requisite number of valid signatures required by HRS § 11-113, and as such did not qualify for inclusion on the general election ballot. (Joint Exhibit 3-Decision)

## NADER CAMPAIGN

49.     On July 16, 2004, Plaintiff Robert H. Stiver, the Hawaii Coordinator for the Nader Campaign, signed a form entitled "An Application for Petition to Place the Names of Candidates for President and Vice President on the State of Hawaii General Election Ballot." (Testimony of Lori Tomczyk and Joint Exhibit 49-Application)

50.     Plaintiff Stiver was provided with information regarding what was necessary for purposes of verifying the petition signatures by Ballot Operations Section Head Lori Tomczyk. (Testimony of Lori Tomczyk and Joint Exhibit 50-Factsheet)

51.     This information consisted of a ten page factsheet regarding the petition process. (Testimony of Lori Tomczyk and Joint Exhibit 50-Factsheet)

16

52.    Ms. Tomczyk additionally provided Plaintiff Stiver a copy of the Election Laws of Hawaii booklet which contains provisions of the United States Constitution, Hawaii State Constitution, Hawaii Revised Statutes, Hawaii Administrative Rules, and County Charters related to elections.  This included HRS § 11-113 and HAR §§ 2-51-110 through 2-51-113.  (Testimony of Lori Tomczyk)

53.    In reviewing the factsheet and the petition form, Ms. Tomczyk brought to his attention page 5 of the factsheet which provided 7 instructions for correctly completing the petition form. (Testimony of Lori Tomczyk and Joint Exhibit 50-Factsheet)

54.    Ms. Tomczyk emphasized as part of her discussion with Plaintiff Stiver, consistent with the factsheet, that the petition can only be verified on the basis of the information contained on it, given that the information is compared with the information contained in the official voter register.  She explained that if signatory provides information that is illegible or inconsistent with the information in the official voter register, this may result in the signature not being counted.  She explained that this could involve the signatory providing an incorrect address, social security number, or date of birth, and that this may result from illegible handwriting or a

17

signatory transposing numbers. (Testimony of Lori Tomczyk and Joint Exhibit 50-Factsheet)

55.    Ms. Tomczyk also emphasized, consistent with the factsheet, that the residence address of the signatory where he/she is registered to vote must be recorded. She explained that if the signatory records an address to which the signatory has moved subsequent to registering and has failed to make the change of registration as required by law, that the signature would not be counted. Ms. Tomczyk also explained that mailing addresses were not acceptable as the residence address was required. (Testimony of Lori Tomczyk and Joint Exhibit 50-Factsheet)

56.    In addition, Ms. Tomczyk emphasized that the signatory's social security number or date of birth would be needed to distinguish among people having identical names and/or addresses. (Testimony of Lori Tomczyk and Joint Exhibit 50-Factsheet)

57.    Plaintiff Stiver was issued initial petition sets that day. Each petition set consisted of 4 pages and a total 48 rows for petition signatures. (Testimony of Lori Tomczyk and Joint Exhibit 54-Petition)

58.    The Application for Petition included a "For Office Use Only" section in which the Office of Election staff would notate when petition forms were issued

18

to the Nader Campaign and when they were received from the Nader Campaign. (Testimony of Lori Tomczyk and Joint Exhibit 49-Application)

59.    The Office of Elections received its first group of petition sets from the Nader Campaign on July 26, 2004.  (Testimony of Lori Tomczyk and Joint Exhibit 49-Application)

60.    The signatures were reviewed and verified against the SVRS in accordance with the applicable administrative rules. (Testimony of Lori Tomczyk)

61.    At the conclusion of the review of the petition sets submitted on July 26, 2004, Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, which he signed without any changes.  Ms. Tomczyk's initials "LT" are listed in the lower left hand corner of the last page of the letter. (Testimony of Lori Tomczyk and Joint Exhibit 52-Letter)

62.    The letter indicated that a total of 89 signatures were found in the petition sets submitted by Plaintiff Stiver.  Of the 89 signatures, 52 were found to be listed as "Active" (currently registered) in the SVRS, 2 were found to be listed as "Inactive" in the SVRS, 7 could not be verified because information on the petition was insufficient (i.e., no social security number, date of birth, signature, or could not read the record), 25 did not appear in the SVRS, 2 could not be verified because the address information on the petition did not match the address information in the SVRS, and 1 provided a name on the petition which was

19

different from the name indicated on the SVRS. (Testimony of Lori Tomczyk and Joint Exhibit 52-Letter)

63.     The letter, dated August 2, 2004, containing the above referenced information was sent by certified mail return receipt requested. (Testimony of Lori Tomczyk and Joint Exhibit 52-Letter)

64.     Other than providing two petition sets on July 30, 2004, the Nader Campaign did not provide any additional petition sets until August 27, 2004, August 30, 2004, September 2, 2004, and finally on September 3, 2004, which was the deadline for the filing of its petition. (Testimony of Lori Tomczyk and Joint Exhibit 49-Application)

65.     A review of the Nader Campaign petition indicates that the vast majority of the signatories did not provide their social security number and that many of the names submitted were not legible. (Testimony of Lori Tomczyk and Joint Exhibit 54-Petition)

66.     The petition signatures were reviewed and verified against the SVRS in accordance with the applicable administrative rules. (Testimony of Lori Tomczyk)

67.     Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, dated September 20, 2004, indicating that the Nader Campaign had not obtained enough valid signatures and as such would not be

20

placed on the general election ballot. Ms. Tomczyk's initials "lpt" are listed in the lower left hand corner of the last page of the letter. The letter was signed on his behalf by Office of Elections' employee Robynn Yokooji, without any changes. (Testimony of Lori Tomczyk and Joint Exhibit 55-Letter)

68.    In subsequently proofing the calculations, Ms. Tomczyk discovered an addition problem which resulted in the numbers initially released needing to be revised. The ultimate result was that the amount of valid signatures was reduced from 3,672 to 3,124. (Testimony of Lori Tomczyk)

69.    On September 23, 2004, Ms. Tomczyk met with Plaintiff Stiver at the Office of Elections and orally informed him of the error and explained to him that a letter would be sent to him with the corrected amount. (Testimony of Lori Tomczyk)

70.    During their meeting, Plaintiff Stiver presented Ms. Tomczyk with a letter requesting a hearing concerning the determination that the Nader Campaign had not obtained enough valid signatures. (Testimony of Lori Tomczyk and Joint Exhibit 57-Letter)

71.    Ms. Tomczyk prepared a letter for Chief Election Officer Dwayne D. Yoshina's signature, dated September 24, 2004, indicating the revised numbers which were still less than the amount necessary for inclusion on the general election ballot. Ms. Tomczyk's initials "lpt" are listed in the lower left hand corner

21

of the letter. The letter was signed by the Chief Election Officer, without any changes. (Testimony of Lori Tomczyk and Joint Exhibit 43-Letter)

72.    The Nader hearing commenced on September 29, 2004. (Testimony of Lori Tomczyk and Joint Exhibit 63-Transcript)

73.    Prior to the conclusion of the hearing, the Office of Elections and the Nader Campaign entered into a settlement agreement. (Joint Exhibit 35-Settlement Agreement)

74.    On October 1, 2004, the Chief Election Officer approved the Nader Settlement Agreement, which provides that the signatures on the petition submitted by the Nader Campaign would be reviewed again in the presence of a Nader representative. (Joint Exhibit 35-Settlement Agreement)

75.    During the review, the Nader representative would be allowed to flag the signatures he believed should have been counted. (Joint Exhibit 35-Settlement Agreement)

76.    Finally, pursuant to the Nader Settlement Agreement, the Chief Election Officer would subsequently review the challenged signatures and his decision would be final. (Joint Exhibit 35-Settlement Agreement)

77.    On October 18, 2004, the Chief Election Officer issued his findings that the Nader Campaign had failed to obtain the requisite amount of valid

signatures required by Hawaii Revised Statutes § 11-113. (Joint Exhibit 36-Findings)

III.    CONCLUSIONS OF LAW

If it should be later determined that any of these conclusions of law should be properly deemed findings of fact, they shall be deemed as such.

1.    In this case the Court cannot find that the Chief Election Officer arbitrarily or capriciously failed or refused to count or consider the names of valid signatories in violation of Plaintiffs' rights under the United States Constitution.

2.    The Hawaii Supreme Court has repeatedly held that legislative enactments are presumptively constitutional, and a party challenging the statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt, and the constitutional defect must be clear, manifest, and unmistakable. Schwab v. Ariyoshi, 58 Haw. 25, 31, 564 P.2d 135, 139 (1977); Blair v. Cayetano, 73 Haw. 536, 542, 836 P.2d. 1066 (1992).

3.    In this case the Court cannot find that there is a clear, manifest and unmistakable constitutional defect in terms of the procedures used in verifying signatures, or in allowing the Chief Election Officer to act as the hearings officer to hear Plaintiffs' objection to their disqualification.

4.    The Court does not find that it is clear, manifest, and unmistakable that the relevant laws or procedures are unconstitutional.

23

5.     The United States Supreme Court has held, that when a state election law imposes reasonable non-discriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the state's important regulatory interest are generally sufficient to justify the restrictions. Anderson vs. Celebrezze, 470 U.S. 780 (1983).

6.     The Ninth Circuit Court of Appeals has held that Hawaii can constitutionally regulate its elections by limiting access of nonpartisan candidates to the general election ballot, and by imposing different requirements as between nonpartisan and partisan candidates. Erum v. Cayetano, 881 F.2d 689 (9th Cir. 1989).  This is consistent with the United States Supreme Court prior holding which allowed different treatment of partisan versus independent candidates. American Party of Texas vs. White, 415 U.S. 767 (1974).

7.     In this case the law does allow the Chief Elections Officer to issue administrative rules and pursuant to that power the administrative rules were promulgated.  HRS § 11-4.

8.     When petitions are submitted to place individuals on the presidential ballot, the designated representative of the Chief Election Officer verifies the eligibility of the signatures. HAR § 2-51-113.

24

9.    The signatory must be a registered voter in Hawaii and must appear in the statewide voter registration system as an active registered voter. HAR § 2-51-113(b).

10.    The same administrative rule says if the signatory does not provide all of the required information on the petition or if information is not legible, then the signatory may not be counted.  HAR § 2-51-113(b)(4).

11.    The Court finds these administrative rules to be reasonable restrictions.

12.    The Court, having reviewed the evidence, does not find that the actions taken or the decisions below were arbitrary or capricious in any way.

13.    The Plaintiffs have raised the issue of the appropriateness of the Chief Election Officer conducting the underlying administrative hearing.

14.    In terms of due process, the Supreme Court of Hawaii has made it very clear that fundamentals of just procedure also apply to agency hearings.  An independent adjudicator is essential to the attainment of the goal that justice be done, and that it be seen to be done. Sifagaloa vs. Board of Trustee, 74 Haw. 181 (1992).

15.    However, the Supreme Court of Hawaii in the same case clearly held that administrators serving as adjudicators are presumed to be unbiased, and the

25

presumption can be rebutted by a showing of disqualifying interest either pecuniary or institutional.

16.    In this case the Chief Election Officer has no pecuniary interest.

17.    In terms of institutional interest, the Chief Election Officer's only interest is to see that fair elections be conducted.

18.    As such, I do not see the type of institutional interest that would be required to overturn his decision.

## ORDER

IT IS HEREBY ORDERED that the judgment be entered in favor of Defendant and against Plaintiffs on all claims.

DATED:  Honolulu, Hawaii,_____ 2008.


_____
JUDGE OF THE ABOVE-ENTITLED COURT



_____
RALPH NADER, ET AL. V. KEVIN B. CRONIN, CIVIL NO. 04-00611 ACK-LEK; DEFENDANT'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW