IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

RALPH NADER, PETER MIGUEL ) Civ. No. 04-00611 ACK-LEK
CAMEJO, ROBERT H. STIVER, )
MICHAEL A. PEROUTKA, CHUCK )
BALDWIN, AND DAVID W. PORTER, )
    )
        Plaintiffs, )
    )
        v. )
    )
KEVIN B. CRONIN, Chief Election )
Officer, State of Hawaii, )
    )
        Defendant. )
_____ )


**FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION**

This matter was heard by this Court in a two day bench trial beginning March 10, 2008.  Having heard and weighed all the evidence and testimony adduced at the trial, having observed the demeanor of the witnesses and evaluated their candor and credibility, having heard the arguments of counsel and considered the memoranda submitted, and having reviewed the administrative records, the Court makes the following Findings of Fact, Conclusions of Law and Decision.

**FINDINGS OF FACT**

**I.  Procedural History**

1.  On October 8, 2004, Plaintiffs filed a complaint in the United States District Court for the District of Hawaii

1

challenging the constitutionality of: (1) Defendant's petition requirements that independent candidates for president must obtain more signatures then the number required for candidates of recognized political parties; and (2) the verification procedures utilized by the Defendant in reviewing the petition forms filed by Plaintiffs.

2.   On October 11, 2004, Plaintiffs filed a Motion for Preliminary Injunction and on October 12, 2004 filed a Motion for Temporary Restraining Order.

3.   Defendant filed a Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and Motion for Temporary Restraining Order on October 12, 2004.

4.   On October 13, 2004, the Honorable David Alan Ezra denied Plaintiffs' Motion for Temporary Restraining Order and their Motion for Preliminary Injunction.

5.   Plaintiffs subsequently filed appeals of the administrative hearings in Circuit Court regarding the determinations that both presidential campaigns had failed to obtain the requisite number of valid signatures for placement on the 2004 presidential ballot.  See Nader, et al. v. Yoshina, Civ. No. 04-1-1905-10 SSM and Peroutka, et al. v. Yoshina, Civ. No. 04-1-1904-10 SSM.

6.  The Honorable Sabrina S. McKenna heard both Circuit Court cases on November 1, 2004, and affirmed both underlying administrative decisions.

7.  Defendant filed an Answer in the federal court action that same day.

8.  The presidential election occurred on November 2, 2004 with  none of the Plaintiffs represented on the ballot.

9.  The Circuit Court's written decisions were issued on November 23, 2004 and final judgment was entered in both cases on April 5, 2005.

10.  A Joint Notice of Appeal was filed with the Hawaii Supreme Court on April 13, 2005.  The Hawaii Supreme Court consolidated the two cases under Supreme Court No. 27233.  See Peroutka v. Cronin, 179 P.3d 1050 (Haw. 2008).  Plaintiffs filed their Joint Opening Brief on July 22, 2005.  On September 30, 2005 Defendant filed an Answering Brief and Plaintiffs filed a Reply Brief on October 11, 2005.

11.  Defendant filed a Motion to Dismiss in the federal court action based on the Younger abstention doctrine, arguing that the court should abstain from ruling until the Hawaii Supreme Court had made its determinations.[1]

---

[1] In Younger v. Harris, 401 U.S. 37 (1971), the U.S. Supreme Court held that a federal court should abstain from hearing a case that would interfere with a state proceeding.  Specifically, "[a]bstention by a district court is required under Younger when three criteria are satisfied: (1) state judicial proceedings are

12.  Plaintiffs filed a Memorandum in Opposition on September 25, 2005.

13.  On October 6, 2005, the federal case was reassigned to the Honorable J. Michael Seabright.

14.  On October 13, 2005, Judge Seabright held a hearing on Defendant's Motion to Dismiss at which time the parties orally agreed to stay the proceedings until the resolution of appeals before the Hawaii Supreme Court.

15.  A formal stipulation staying the proceedings was submitted and granted on October 28, 2005.

16.  On March 31, 2006, Judge Seabright, in order to avoid leaving the motion unresolved for an indefinite period of time, denied without prejudice Defendant's Motion to Dismiss.

17.  On November 1, 2007, Judge Seabright lifted the stay on the proceedings.

18.  On December 4, 2007, Defendant filed Motion to Dismiss or in the Alternative for Summary Judgment.

19.  On January 10, 2008, Plaintiffs filed a Memorandum in Opposition and a Cross-Motion for Summary Judgment.

20.  On January 17, 2008, Defendant filed a Memorandum in Reply and Opposition to Plaintiffs' Memorandum in Opposition.

---

ongoing; (2) the proceedings implicate important state interests; and (3) the state proceedings provide an adequate opportunity to raise federal questions." Kay v. City of Rancho Palos Verdes, 504 F.3d 803, 808 (9th Cir. 2007) (citations and quotation marks omitted).

21.   On February 7, 2008 Judge Seabright denied Plaintiffs' Cross-Motion for Summary Judgment and granted summary judgment as to Count I of Plaintiff's complaint, finding that the petition requirements of HRS § 11-113 were constitutional.   As for Count II of Plaintiff's complaint, Judge Seabright denied Defendant's request to abstain under <u>Younger</u> and set trial for March 4, 2008. <u>See</u> <u>Nader v. Cronin</u>, Civ. No. 04-00611 JMS/LEK, 2008 WL 336746 (D. Haw. Feb. 7, 2008).

22.   On February 12, 2008, the federal case was reassigned to this Court for all further proceedings. The parties' final witness lists and a stipulation regarding the authenticity and admissibility of exhibits were filed that same day.   On February 19, 2008, Defendant filed its trial brief.

23.   Because of the concerns regarding the fast-approaching 2008 presidential election, the Court held a bench trial on March 10-11, 2008 to address the remaining issues in Plaintiffs' complaint. Plaintiffs were collectively represented by Eric A. Seitz, Esq.   Defendant was represented by Deputy Attorney General Aaron H. Schulaner, Esq.

24.   On March 11, 2008, this Court sua sponte determined that it should abstain from ruling until either the Hawaii Supreme Court made its determination or until June 2, 2008 - the date upon which the parties agreed no alternative to adjudication was possible, as thereafter there would not be

sufficient time for the presidential election to proceed in an orderly manner which would allow any interested parties to petition to be on the ballot.[2]  The Court explained that it held the bench trial as a safety net in the event the Hawaii Supreme Court did not rule by June 2, 2008.  This Court entered a written order on March 18, 2008, documenting its March 11, 2008 determination, and sent a copy of its ruling to Chief Justice of the Hawaii Supreme Court Ronald T.Y. Moon that same day.

25.  On March 27, 2008, the Hawaii Supreme Court ruled in the state case, holding that: (1) pursuant to Hawaii Rules of Appellate Procedure Rule 28(b)(7), Plaintiffs waived their right to challenge the constitutionality of Hawaii's regulatory framework prescribing signatory requirements for a presidential candidate's inclusion on a general election ballot; (2) The Chief Election Officer's interpretation and application of Hawaii's regulatory framework prescribing signatory requirements was not

---

[2] The Court held that the Pullman abstention was warranted. In Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496 (1941) the Supreme Court held that the federal courts should ordinarily abstain where the resolution of a federal constitutional issue may be rendered irrelevant by the determination of a predicate state-law question. The Ninth Circuit adopted a three-part test to determine when the Pullman abstention is warranted: (1) the proper resolution of the state law question at issue must be uncertain; (2) a definitive ruling on the state issue must potentially obviate the need for constitutional adjudication by the federal court; and (3) the complaint must touch upon a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to adjudication is open. See Burdick v. Takushi, 846 F.2d 587 (9th Cir. 1988)

clearly erroneous; and (3) Plaintiffs were provided with a fair administrative hearing.

26.   While the parties have not had an opportunity to brief this issue, a prior ruling by the Hawaii Supreme Court was anticipated in this case and it appears that the principles of res judicata apply.  The doctrine of res judicata ensures the finality of decisions, conserves judicial resources, and protects litigants from multiple lawsuits.  <u>McClain v. Apodaca</u>, 793 F.2d 1031, 1032-33 (9th Cir. 1986).  It is consistent with these principles that a court, apprised by the parties of an earlier decision, examine, sua sponte, the effect of res judicata prior to a second judgment.  <u>Id.</u> at 1033.  To determine whether a state court decision precludes a party from litigating a claim or issue in federal court, the federal court must apply the res judicata rules of the state court in which the prior judgment was rendered.   <u>See Manufactured Home Communities, Inc. v. City of San Jose</u>, 420 F.3d 1022, 1031 (9th Cir. 2005).  Therefore, Hawaii law is applicable to the case at hand.  Hawaii courts look to three critical elements to determine whether the doctrine of res judicata is applicable: (1) "Was the issue decided in the prior adjudication identical with the one presented in the action in question?"; (2) "Was there a final judgment on the merits?"; and (3) "Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?"  <u>See Santos</u>

7

v. State of Haw., 64 Haw. 648, 653, 646 P.2d 962, 966 (Haw.
1982).  "To determine whether a litigant is asserting the same
claim in a second action, the court must look to whether the
'claim' asserted in the second action arises out of the same
transaction, or a series of connected transactions, as the
'claim' asserted in the first action."  Kauhane v. Acutron Co.,
Inc., 71 Haw. 458, 464, 795 P.2d 276, 279 (Haw. 1990).  Any claim
arising from single injury must be raised in a single action
otherwise the claim is barred by res judicata.  Silver v. Queen's
Hospital, 63 Haw. 430, 437, 629 P.2d 1116, 1122 (Haw. 1981). In
this case, Plaintiffs seek review of whether: (1) the policies
and procedures implemented by the Office of Elections were
constitutionally applied to them; (2) the Chief Election
Officer's determinations at the administrative hearings were
arbitrary and capricious; (3) they were provided a fair
administrative hearing.  These issues are not only the same
issues both in form and substance as the issues raised in the
state court action, but also arise out of the same set of facts.
Thus, the first element of res judicata is satisfied.  The second
element requires that the prior state court action resulted in a
final decision on the merits.  Final decisions on the merits
include any claims or defenses that might have properly been
brought in the first action.  See Quality Sheet Metal Co., Ltd.
v. Woods, 2 Haw. App. 160, 164, 627 P.2d 1128, 1129 (Haw. Ct.

8

App. 1981).  Here, all of the substantive claims were also raised
in the state court action.  Thus, the second element of res
judicata is satisfied as well.  Finally, the third element of res
judicata is satisfied because the parties in the state court
action are the exact same parties in this action.  As a result,
the Court finds the principles of res judicata apply to this
matter.  Nevertheless, in an abundance of caution, the Court will
further proceed with its own analysis and will supplement the
Hawaii Supreme Courts decision with its own Findings of Facts,
Conclusions of Law, and Decision.

## II.  General Background Regarding Petition Process

1.   In 2004, the Office of Elections was headed by
Chief Elections officer, Dwayne D. Yoshina ("Yoshina").

2.   Lori Tomczyk ("Tomczyk") was in charge of the
Office of Elections' ballot operations division.

3.   In order for a prospective candidate to qualify for
inclusion in the presidential election, the candidate must either
be designated by a qualified political party or petition to be
placed on the presidential ballot.  See Hawaii Revised Statutes
("HRS") § 11-113(c)(1)&(2).

4.   The Chief Elections Officer is statutorily
authorized to promulgate administrative rules and regulations to
carry out the elections laws.  HRS § 11-4.

5.   The Chief Election Officer promulgated Hawaii Administrative Rules ("HAR") §§ 2-51-110 through 2-51-113 to address the requirements contained in HRS § 11-113.

6.   HRS § 11-113 provides that the petition shall contain the signatures of currently registered voters, which constitute not less than one per cent of the votes cast in the State during the last presidential election.

7.   In the 2000 presidential election, 371,033 votes were cast in Hawaii.  As such, petitioners were required to collect 3,711 signatures for the admission on the 2004 presidential ballot.

8.   Additionally, HRS § 11-113 provides that the petition shall be upon a form prescribed and provided by the Chief Election Officer.

9.   A sample petition form is attached as Appendix H to HAR § 2-51-110.

10.   The form contains the following columns for the signatory to fill out: (1) "Print Your Name Here," (2) "Sign the Name Under Which You Are Registered to Vote," (3) "Print the Residence Address at Which You are Registered to Vote," (4) "Birth Date," and (5) "Date Signed."  There is also a column for the voter's "Social Security Number," however, completing that column is optional.  Id.

11.  After the Office of Elections receives petition sets from prospective candidates, it confirms the signatory by comparing the information contained in the petition against the information in the statewide voter registration system ("SVRS").

12.  The Office of Elections can only access voter records from the SVRS by either social security number or name. Therefore, if a name is illegible and a social security number is not provided, the Office of Elections will not be able to confirm a signatory against the information contained in the SVRS.

13.  If the signatory does not exist as an active registered voter in the SVRS, then the signatory is not counted. If there are duplicate signatures, and the signatory is an active registered voter, then the Office of Elections will count the signatory once.  Finally, if the signatory does not provide all of the required information on the petition, or if the information is not legible, then the signatory may not be counted.  See HAR § 2-51-113(b)(1)-(4).

14.  Responsibility for verifying the petitions of prospective presidential candidates for inclusion on the general election ballot was delegated to Tomczyk.

III.  **Peroutka Campaign**

1.  Presidential candidate, Michael A. Peroutka ("Peroutka") and his running mate Chuck Baldwin ("Baldwin"), were

11

not designated by a qualified political party and thus needed to petition to be placed on the general election ballot.

2.   David W. Porter ("Porter") acted as the Hawaii coordinator for the Peroutka/Baldwin 2004 campaign ("Peroutka Campaign").

3.   On May 4, 2004, Porter filled out a form entitled "An Application for Petition to Place the Names of Candidates for President and Vice President on the State of Hawaii General Election Ballot."

4.   Tomczyk provided Porter with a packet containing a ten page factsheet regarding the petition process (the "Factsheet"), and a booklet containing provisions of the United States Constitution, Hawaii State Constitution, and selected election laws and procedures found in the Hawaii Revised Statutes, Hawaii Administrative Rules, and County Charters (the "Booklet").

5.   In reviewing the Factsheet and the petition form, Tomczyk explained to Porter that the petition can only be verified by comparing the information provided by the signatory with the information in the SVRS.

6.   She also explained to Porter that if the signatory provided an incorrect or illegible address, social security number, or date of birth, it would not be counted because the

12

Office of Elections could not adequately confirm the accuracy of the signatory's information.

7.    Tomczyk told Porter that a signatory's social security number or date of birth would be necessary to distinguish among people having identical names.

8.    She also explained that, pursuant to the Factsheet, the signatory must provide the residence address where he or she is registered to vote and that a mailing address would be insufficient to validate the signatures.

9.    Porter was issued initial petition sets on May 4, 2004.  Each petition set consisted of 4 pages and a total 48 rows for petition signatures.

10.   The Office of Elections received its first group of petition sets from the Peroutka Campaign on July 15, 2004.

11.   Upon completing the review of the first petition set, Tomczyk prepared a letter indicating that, of the 606 total signatures submitted by Porter, 299 were found to be listed as "Active" (currently registered) in the SVRS and consequently considered valid by the Office of Elections.  Of the 307 inactive or invalid signatures, 35 were found to be listed as "Inactive" in the SVRS, 67 could not be verified because some of the information on the petition was insufficient or deficient, 146 did not appear in the SVRS, 59 could not be verified because the address information on the petition did not match the address

13

information in the SVRS, and 0 were found to have appeared twice on the petition. The letter was dated July 29, 2004 and signed by Yoshina without any changes.

12.   Porter submitted additional petition sets on July 30, 2004, August 6, 2004, and August 13, 2004.

13.   After reviewing the next three petition sets, Tomczyk prepared a letter for Yoshina's signature, which was ultimately signed on his behalf by an Office of Elections' employee named Robyn Yokooji ("Yokooji").  The letter indicated that as of August 13, 2004, a total of 2,077 signatures had been submitted to the Office of Elections and that 1,039 were considered valid.  The letter was sent to Porter without any changes by Yoshina on August 24, 2004 via certified mail, return receipt requested.

14.   Porter submitted additional petition sets on August 30, 2004, August 31, 2004, September 1, 2004, September 2, 2004, and finally on September 3, 2004, right before the final deadline for submissions.

15.   On September 20, 2004, Tomczyk prepared another letter, signed by Yokooji, without any changes.  Tomczyk indicated that of the total 7,195 signatures submitted by Porter to the Office of Elections, 3,481 were valid - 230 less than the number of signatures required to be included on the 2004 presidential ballot.

16.   Tomczyk additionally explained that if Porter objected to the findings of eligibility or disqualification of signatures, he could request a hearing.

17.   On September 24, 2004, Tomczyk sent another missive to Porter explaining that the Office of Elections had miscounted the total number of valid signatures, leaving the Peroutka Campaign with 3,471 valid signatures - ten less than the Office of Elections had originally determined.

18.   That same day Porter submitted a written request for a hearing, taking issue with the determinations of the Office of Elections.

19.   On September 30, 2004, the Office of Elections held a hearing with Yoshina acting as the hearing officer.

20.   On October 5, 2004, Yoshina issued his Findings of Fact, Conclusions of Law, and Decision.

21.   Yoshina determined that the Peroutka Campaign submitted 3,477 valid signatures, 234 signatures less than the requisite number of valid signatures required to be placed on the 2004 presidential ballot.

## IV.   Nader Campaign

1.   Presidential candidate, Ralph Nader ("Nader") and his running mate Peter Miguel Camejo ("Camejo"), were not designated by a qualified political party and thus needed to petition to be placed on Hawaii's 2004 general election ballot.

15

2.   Robert H. Stiver acted as the Hawaii coordinator for the Nader/Camejo 2004 campaign ("Nader Campaign").

3.   Similarly, the Nader Campaign attempted to obtain enough signatures for placement on the 2004 presidential ballot. On July 16, 2004, Stiver signed a form entitled "An Application for Petition to Place the Names of Candidates for President and Vice President on the State of Hawaii General Election Ballot."

4.   Tomczyk provided Stiver with a copy of the Factsheet and the Booklet.

5.   As she did with Porter, in reviewing the information, Tomczyk instructed Stiver on how to correctly complete the petition form.

6.   Tomczyk explained to Stiver that if the signatory provided an incorrect or illegible address, social security number, or date of birth, it would not be counted because the Office of Elections could not confirm the accuracy of the signatory's information.

7.   Tomczyk told Stiver that a signatory's social security number or date of birth would be necessary to distinguish among people having identical names.

8.   She also explained that the signatory must provide the residence where he or she is registered to vote and that a mailing address would be insufficient to validate the signature.

16

9.   Stiver was issued initial petition sets on July 16, 2004. Each petition set consisted of 4 pages and a total 48 rows for petition signatures.

10.   The Office of Elections received its first group of petition sets from the Nader Campaign on July 26, 2004.

11.   On August 2, 2004, Tomczyk prepared a letter to Stiver indicating of the 89 total signatures submitted by Stiver, 52 were found to be listed as "Active" in the SVRS, 2 were found to be listed as "Inactive" in the SVRS, 7 could not be verified because information on the petition was insufficient or deficient, or could not read the record), 25 did not appear in the SVRS, 2 could not be verified because the address information on the petition did not match the address information in the SVRS, and 1 provided a name on the petition which was different from the name indicated in the SVRS.  The letter was signed by Yoshina without any changes and sent to Stiver on August 2, 2004 certified mail, return receipt requested.

12.   Stiver submitted additional petition sets on July 30, 2004, August 27, 2004, August 30, 2004, September 2, 2004, and finally on September 3, 2004.

13.   Tomczyk prepared a letter, signed by Yokooji on behalf of Yoshina, dated September 20, 2004.  The letter indicated that the Nader Campaign had not obtained enough valid signatures for inclusion on the 2004 presidential ballot in

Hawaii.  Specifically, of the total 7,184 signatures submitted, the Office of Elections determined that 3,672 were valid - 39 short of the required number of signatures for placement on the 2004 presidential ballot.

14.  In subsequently verifying the calculations, Tomczyk discovered that in fact, Stiver did not submit 3,672 valid signatures, but had only submitted 3,124 - a decrease of 548 signatures.

15.  When tallying the total number of valid signatures, Tomczyk improperly counted petition set 8 (containing 131 signatures) and petition set 12 (containing 417 signatures) twice.

16.  On September 23, 2004, Tomczyk met with Stiver at the Office of Elections.  She orally informed him of the error and explained that a letter would be drafted and sent to him with the corrected information.

17.  During their meeting, Stiver presented Tomczyk with a letter requesting a hearing to determine whether the Nader Campaign had obtained enough valid signatures.

18.  Tomczyk prepared a follow-up letter, dated September 24, 2004, advising Stiver of the mistake and explaining that the revised number of valid signatures was still fewer than the number required for inclusion on the 2004 presidential ballot.  The letter was signed by Yoshina, without any changes.

18

19.   The Nader hearing commenced on September 29, 2004 with Yoshina acting as the hearing officer.

20.   Prior to the conclusion of the hearing, the Office of Elections and the Nader Campaign entered into a settlement agreement (the "Settlement Agreement").

21.   On October 1, 2004, Yoshina approved the Settlement Agreement, which provided that the signatures on the petition submitted by the Nader Campaign would be re-reviewed, but this time, in the presence of a Nader representative.

22.   In addition, the Settlement Agreement provided that if the Nader Campaign disagreed with the determinations of the Office of Elections, it would be given an opportunity to flag the contested signatories for Yoshina's review, which would be final.

23.   Moreover, the Settlement Agreement provided that at the conclusion of the recount, the Nader Campaign could only challenge the constitutionality of the Hawaii statutory and administrative rules and would forego a "signature by signature" court challenge.

24.   During the review, Stiver, in his role as the Nader representative, flagged the signatures he believed were improperly discounted by the Office of Elections.

25.  On October 18, 2004, Yoshina issued his findings that the Nader Campaign had failed to obtain the requisite number of signatures for placement on the 2004 presidential ballot.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the subject matter of this case.  See 28 U.S.C. § 1331.

### I.   The Policies and Procedures Implemented by the Office Elections were Constitutionally Applied

1.  Plaintiffs do not specifically challenge the constitutionality of HRS § 11-113 or HAR §§ 2-51-110 through 2-52-113.[3]  See Hr'g Tr. 2-3, Mar. 10, 2008.[4]  Instead, Plaintiffs

_____

[3]     As noted supra, on February 7, 2008, Judge Seabright ruled that HRS § 11-113 is constitutional.  Specifically, Judge Seabright held that "[b]ecause HRS § 11-113(c) imposes reasonable, non-discriminatory restrictions upon the First and Fourteenth Amendment rights of voters and candidates, Hawaii's important regulatory interests in avoiding voter confusion and overcrowded ballots sufficiently justify the restrictions imposed."  Nader, 2008 WL 336746 at *5-*7.
        The Supreme Court of Hawaii also rejected Plaintiffs' argument that HRS § 11-113(c) was unconstitutional, but did so on other grounds.  Specifically, the court held that Plaintiffs waived their right to challenge the constitutionality § HRS 11-113(c) because they failed to make any arguments supporting that proposition.  See Peroutka, 179 P.3d at 1056.

[4]     The trial transcript states:

        THE COURT:     So you are not challenging the constitutionality of the rules?

        MR. SEITZ:     The rule itself on its face, if implemented    properly    we    believe    is constitutional.

        THE COURT:     Okay. So the answer is yes, you are not challenging the constitutionality of

contend that the Office of Elections had an unconstitutional practice of arbitrarily and capriciously abusing its discretion under HAR § 2-51-113 by discounting: (1) illegible signatories without attempting to identify the signatory by cross-referencing other identifying information in the SVRS; (2) legible signatories that provided non-residential address in lieu of a valid residential address; and (3) legible signatories that did not provide all the information required by the petition form. See generally Id.; Hr'g Tr. 38-45, Mar. 11, 2008.

2.   Here, Plaintiff has the burden of establishing any constitutional violations.  See Cal. Democratic Party v. Lungren, 860 F.Supp. 718, 724 (N.D. Cal. 1994).  Plaintiffs bear a heavy burden of persuasion given that they have advanced a broad attack on the polices and procedures implemented by the Office of Elections in reviewing their petition forms and seek relief that would invalidate those polices in all their applications.   See

the rules?

MR. SEITZ:     Not as written.

THE COURT:     So the issues before the court then are whether the statute and rules were applied arbitrarily and capriciously.

MR. SEITZ:     That's correct.

THE COURT:     As well as Mr. Yoshina's dual role and hearing the -- or being the hearing officer.

MR. SEITZ:     Yes.

21

<u>Crawford v. Marion County Election Board</u>, — S.Ct. —, 2008 WL 1848103 (Apr. 28, 2008).

3.  The Court notes the appropriate constitutional analysis to be followed is found in <u>Anderson vs. Celebrezze</u>, 460 U.S. 780 (1983).

4.  The United States Supreme Court has established a two-part test for determining the constitutionality of election laws and procedures.  <u>See</u> <u>Anderson</u>, 460 U.S. 780.

5.  The first part is the consideration of the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments to the U.S. Constitution.  The second part is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule" and "determine the legitimacy and strength of each of those interests."  <u>Id.</u> at 789.

6.  In applying this analysis, the United States Supreme Court has held that when a state election law imposes reasonable non-discriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the state's important regulatory interest are generally sufficient to justify the restrictions.  <u>Id.</u> at 780.

7.  In looking at part one of the <u>Anderson</u> analysis, concerning the character and magnitude of the asserted injury to constitutional rights, it should be noted that all election laws

to a certain extent impact constitutional rights.  Id. at 788
("Each provision of these schemes, whether it governs the
registration and qualifications of voters, the selection and
eligibility of candidates, or the voting process itself,
inevitably affects--at least to some degree--the individual's
right to vote and his right to associate with others for
political ends.").

8.  As such, the focus of part one of the Anderson
analysis is whether the procedures implemented by the Office of
Elections are reasonable and nondiscriminatory.  Here, there is
no doubt that the procedures implemented by the office of
elections were reasonable and nondiscriminatory.

9.  The Factsheet and petition form merely require all
signatories to provide the date the petition was signed, and the
confirmatory information of their name, date of birth, the
residence address at which they registered to vote and an option
to provide a social security number.  HRS § 11-113 & HAR §
2-51-110(c) (Appendix H-Petition Form).

10.  This is the same information that all voters are
statutorily required to provide when they register to vote.  HRS
§ 11-15 & HAR § 2-51-20 (Appendix A-Voter Registration Form).
The Office of Elections does not require any additional
information from the signatory.

11.  Plaintiffs' argument that the Office of Elections should have attempted to identify the signatory by cross-referencing other identifying information with information in the SVRS is unavailing.

12.  As previously noted, the Office of Elections can only access voter records from the SVRS by either social security number or name.  A review of the petition forms showed that with few exceptions, no signatories provided social security numbers.[5] Moreover, Porter testified at trial that when petitioning, he did not request signatories to provide social security numbers because he had concerns about identity theft.  A legible name was necessary for the Office of Elections to retrieve the confirmatory information in the SVRS.  Thus, without a legibly printed name the Office of Elections could not confirm the signatories in most instances.

13.  Moreover, Porter conceded at the Peroutka administrative hearing that certain signatures or addresses he was challenging were illegible to even him, and that he complimented the staff of the Office of Elections on how well they had been able to decipher illegible handwriting.  See Peroutka Admin. Tr. 44-45.

---

[5] This Court finds, as Judge McKenna found, and the Supreme Court of Hawaii affirmed, that "most signatories did not provide social security numbers."  See Peroutka, 179 P.3d at 1056.

24

14.   From a reading of the relevant procedures, the testimony of Tomczyk, Porter and Stiver's at trial and at the administrative hearings, the Court finds that the Office of Elections was reasonable and non-discriminatory in its treatment of signatories that provided illegible names.[6]

15.   Plaintiffs' second argument, that the Office of Elections should have counted signatories that provided a non-residential address, but that could have been confirmed against information in the SVRS, is also unpersuasive.

16.   The Factsheet states that mailing addresses are not acceptable.  This restriction is congruous with the language in the petition form which requires the signatory to provide "the residence address which you are registered to vote."

17.   Plaintiffs contend that if a signatory provides a mailing address in lieu of a residence address and the signatory can be confirmed by comparing the information to the information in the SVRS, then it is unreasonable for the Office of Elections to discount that signature.

18.   However, a residence address is required in order to determine if a signatory is in fact who he or she claims to be

---

[6] The Supreme Court of Hawaii noted, "HAR § 2-51-113(b)(4) . . . clearly provides that the Chief Election Officer 'may' not count a signature 'if the information is not legible.'  Moreover, the circuit court 'confirmed that many of the names submitted were not legible, as found below-thus, this finding was not clearly erroneous.'"  Peroutka, 179 P.3d at 1056.

and in ascertaining whether the individual is a "currently registered voter" in terms of being qualified to sign the petition.

19.   The residence address is the cornerstone of becoming a registered voter.   See HRS § 11-15.   A person's residence dictates where the person can vote and for what office. As such, the election laws address the issue of residence address in HRS §§ 11-13, 11-14, 11-14.5, 11-15, 11-18, 11-19, 11-20, 11-15, and 11-26.   A mailing address in comparison has no real legal significance when it comes to being a registered voter.

20.   A signatory who provides a non-residential address is not in fact confirming that he or she is still properly registered at the residence indicated in the SVRS.   The signatory is merely confirming that he or she still receives their mail at the same place.   The law is clear that providing one's residence is the linchpin of being properly registered.   Therefore, the Court finds that the Office of Elections's practice and procedure of requiring residential addresses for confirmatory purposes is also reasonable and non-discriminatory.

21.   Plaintiffs' final argument, that the Office of Elections unconstitutionally discounted signatories that did not provide all the information required by the Factsheet, is their least compelling.

22.  As noted, HAR § 2-51-113(b)(4) provides the Office of Election with discretion in discounting signatories that do not provide all the information required on the petition forms.

23.  Plaintiffs suggest that Hawaii law does not require rejection of a signatory who appears on the SVRS but does not provide all of the required information on the petition forms.

24.  Plaintiffs' however, fail to acknowledge that HAR § 2-51-113(b)(4) gives that discretion to the Office of Elections.

25.  Moreover, it is important to note that Hawaii's petition restrictions are less onerous than Texas's, which require notarization of petition signatures.  See American Party of Texas v. White, 415 U.S. 767 (1974).  In White, the Supreme Court held that the Texas ballot qualification system requiring signature notarization was a permissible burden on First and Fourteenth Amendment rights.  Id. at 787.

26.  More recently, the Supreme Court upheld as constitutional an Indiana law requiring government issued photo identification to vote.  See Crawford, 2008 WL 1848103.  In this case, the Factsheet and petition form simply required signatories to properly provide information requested on the petition form. The requirements in this case are far less cumbersome than those in either Crawford or White.

27.   The second part of the <u>Anderson</u> analysis is to
"identify and evaluate the precise interests put forward by the
State as justifications for the burden imposed by its rule" and
"determine the legitimacy and strength of each of those
interests." <u>Anderson</u>, 460 U.S. at 789. The level of scrutiny
that should be applied depends on the nature of the burden that
has been imposed.  Specifically, if the burden is severe then the
requirement needs to be "narrowly drawn to advance a state
interest of compelling importance." <u>Burdick v. Takushi</u>, 504 U.S.
428, 434 (1992) (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 289
(1992)).  However, if the law imposes reasonable
non-discriminatory restrictions, then the state's important
regulatory interests are generally sufficient to justify the
restrictions. <u>Anderson vs. Celebrezze</u>, 470 U.S. 780, 788, 103
S.Ct 1564, 1569 (1983).  To do otherwise, would essentially tie
the hands of the State to be able "to assure that [its] elections
are operated equitably and efficiently." <u>Burdick</u>, 504 U.S. at
433.

28.   For the reasons stated above, the policies and
procedures utilized by the office of Elections were reasonable
and nondiscriminatory.

29.   When a state's policy or procedure is determined
to be reasonable and non-discriminatory, the state's regulatory
interests are generally determined to be sufficient to justify

28

it.  Here, Defendant's regulatory interests include: (1) ensuring that the election processes are efficient; (2) avoiding voter confusion by overcrowding the ballot by those who cannot show more than a modicum of support; (3) detecting fraudulent or questionable signatures; (4) determining if the signatory is actually a "currently registered voter" or if there is a problem with his or her registration; and (5) maintaining the integrity of the voter registration rolls.  The Court finds these interests to have a great deal of merit.

30.  Defendant's third interest, detecting fraudulent or questionable signatures, is especially compelling.[7]  Tomczyk testified at the Peroutka's administrative hearing about being concerned that 12 names on the petition looked like they could have been written by the same person.  See Peroutka Admin. Hr'g at 74-76.  Porter admitted that he had concerns about the authenticity of petition signatures obtained by two individuals that were sent to him by the Peroutka Campaign.  In one group of petitions for example, these individuals had obtained 300 signatures, of which only 39 were found to be valid.  Id.

31.  The Supreme Court has noted the prevalence of fraudulent voting throughout this Nation's history.  Crawford, 2008 WL 1848103 at *8.  Moreover, the court in Crawford explained

---

[7] The Supreme Court of Hawaii came to an almost identical conclusion about the State's interests.  See Peroutka, 179 P.3d at 1055.

that while no evidence of actual voter fraud had been shown in
that case, the threat of voter fraud was real and the state's
interest in preventing it was "a neutral and nondiscriminatory
reason supporting the State's decision to require photo
identification."  Id.

32.  Thus, the Court finds that the polices and
procedures implemented by the Office of Elections were
constitutional and the application of those policies and
procedures did not deprive Plaintiffs of their constitutional
rights.

33.  The Court does, however, have reservations about
some of the procedures used to determine the validity of
signatures.

34.  Specifically, Tomczyk testified that while the
Office of Elections makes an effort to confirm signatories that
provide general delivery addresses, it does not make the same
effort with regard to signatories that provide post office box
addresses.[8] This policy is inconsistent.  The petition form
requires the signatory to "Print the Residence Address at Which
You are Registered to Vote."  If the signatory does not provide

---

[8] "General Delivery" is defined as "a department of a post
office that handles the delivery of mail at a post office window
to persons who call for it."  Webster's Ninth New Collegiate
Dictionary 510 (9th ed. 1986).

30

the required information, the Office of Elections should make no attempt to confirm that signatory.

35.   In the instant case, if the Office of Elections mistakenly matched general delivery addresses against the information in the SVRS, and validated those signatories in contravention of their written procedures, Plaintiffs could only have benefitted because improper signatories were validated. Therefore, in this case, any inconsistencies in the Office of Elections' procedures are irrelevant.

36.   In addition, it is unclear whether the Office of Elections makes an attempt to confirm signatories that provide rural route addresses.[9]  At trial, Tomczyk testified that it seemed as if the Office of Elections does not have a clear confirmation policy for signatories that provide rural routes in the residential address field of the petitions.  The Court finds that even if the Office of Elections did not match rural route addresses, as they should have, the number of miscounted signatories is so insignificant that it does not effect the ultimate outcome in this case.

## II.   Yoshina's Administrative Rulings Were Not Arbitrary and Capricious

---

[9] "Rural Route" is defined as "a mail-delivery route in a rural free delivery area."  Webster's Ninth New Collegiate Dictionary 1032 (9th ed. 1986).

1.   Section 706(2)(A) of the Administrative Procedure Act ("APA") provides that a "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   See 5 U.S.C. § 706(2)(A).   Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n., 92 F.3d 940, 942 (9th Cir. 1996).

2.   A reviewing court must consider whether "the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment.... The court is not empowered to substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled on other grounds by, Califano v. Sanders, 430 U.S. 99, 105 (1977).   "Agency action is valid 'if a reasonable basis exists for the agency's decision.'"   Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008) (quoting Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1076 (9th Cir. 2006).

3.   "A reasonable basis exists where the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'"   Id. (quoting Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric., 415 F.3d 1078, 1093 (9th Cir. 2005).

4.   The Court "should not supply a reasoned basis for the agency's action that the agency itself has not given.  But a decision of less than ideal clarity will be upheld if the agency's path may reasonably be discerned."  <u>Sears Sav. Bank v. Fed. Sav. and Loan Ins. Corp.</u>, 775 F.2d 1028, 1029 (9th Cir. 1985) (internal citations omitted); <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 2886 (1974).

5.   Plaintiffs contend that Yoshina's determination, that both the Nader Campaign and the Peroutka Campaign failed to submit a sufficient number of signatures to qualify for the 2004 ballot,  was arbitrary and capricious because his determinations were based on unconstitutional policies and procedures.  As noted above, the polices and procedures implemented by the Office of Elections has already been determined to be constitutional and thus, Yoshina's determinations were not arbitrary and capricious.[10]

## III.  Plaintiffs' Constitutional Due Process Rights Were Not Violated

1.   Plaintiffs contend that Yoshina's dual role as investigator of the validity of petition signatures and as

---

[10] The Court's determination is congruous with the Supreme Court of Hawaii's ruling that Yoshina's interpretation and application of Hawaii's regulatory framework prescribing signatory requirements was not clearly erroneous.  <u>Peroutka</u>, 179 P.3d at 1055-58.

hearing officer of the subsequent administrative hearings violated Plaintiffs constitutional due process rights.

2.  A "fair trial in a fair tribunal is a basic requirement of due process." See Withrow v. Larkin, 421 U.S. 35, 47 (1975) (quoting In re Murchison, 349 U.S. 133, 136 (1955)). This concept not only applies to courts, but to administrative agencies as well.  Id.

3.  Plaintiff "must overcome a presumption of honesty and integrity in those serving as adjudicators." Withrow, 421 U.S. at 47; see also U.S. v. Garcia-Martinez, 228 F.3d, 956, 961 (9th 2000); Schweiker v. McClure, 456 U.S. 188, 195 (1982) (holding that administrators serving as adjudicators are presumed unbiased); Sifagaloa vs. Board of Trustee, 74 Haw. 181 (1992). The presumption can be rebutted by a showing of a disqualifying interest or a pecuniary interest.  Sifagaloa, 74 Haw. at 192 (1992).

4.  This Court does not detect the type of institutional or pecuniary interest required to overturn Yoshina's determinations at the administrative hearing.  It is uncontested that Yoshina did not have an active role in the initial validation process. Plaintiffs only contend that Yoshina's supervision and review of Tomczyk's initial determinations coupled with his role as subsequent adjudicator, unconstitutionally infringed on Plaintiffs due process rights.

34

However, fairly read, neither the facts, nor the bald assertions made by Plaintiffs about Yoshina's dual role as decisionmaker and investigator prove any interest on Yoshina's part in the outcome of the determinations of either the Peroutka hearing or the Nader hearing.

5.   As a result, the Court finds that Plaintiffs' due process rights were not violated.[11]

### DECISION

1.   Defendant is entitled to judgement on all counts.

2.   As Defendant has prevailed on all grounds, the Court denies Plaintiffs' request for attorney's fees.

3.   Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

---

[11]   Here, the Court's ruling on this issue closely parallels the Supreme Court of Hawaii's ruling in the state court action. See Peroutka, 179 P.3d at 1057-58.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 1, 2008.



_____
Alan C. Kay
Sr. United States District Judge

Nader v. Cronin, Civ. No. 04-00611 ACK/LEK, Findings of Fact, Conclusions of Law and Decision.

36